PJS:TSJ:jm

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| WILLIAN TAVERAS GOMEZ, | : | NO.  3:CV-08-0619 |
| BARBARA GOMEZ, WILFREDO | : | |
| RAFAEL TAVERAS, WILIANA | : | |
| TAVERAS, by their next friend | : | (Judge Caputo) |
| WILIAN TAVERAS GOMEZ, | : | |
| Plaintiffs | : | |
| | : | |
| v. | : | |
| | : | |
| WILLIAM J. FEISSNER, et al., | : | |
| Defendants | : | Filed Electroncially |

**<u>DEFENDANTS CHISTINO'S AND EPPLEY'S
BRIEF IN SUPPORT OF
MOTION TO DISMISS AND FOR SUMMARY JUDGMENT</u>**

PETER J. SMITH
UNITED STATES ATTORNEY

TIMOTHY S. JUDGE
Assistant U.S. Attorney
Atty. I.D. #PA 203821
P.O. Box 309
Scranton, PA 18501
Phone 348-2800
Fax: 348-2830
E-Mail: timothy.judge@usdoj.gov

# TABLE OF CONTENTS

I.    Factual Background. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    A.    The Investigation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    B.    The Application for a Search Warrant for
        11 West Monroe Avenue. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    C.    State Law Enforcement Request for Assistance
        from ICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    D.    Briefing by the Pennsylvania Attorney General's Office. . . . . . . . . . 6

    E.    Entry of 11 West Monroe. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    F.    Entry into 9 West Monroe. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    G.    Custody of Persons and Search of the Premises.. . . . . . . . . . . . . . . 12

II.   Procedural Background. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

III.  Questions Presented. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

IV.   Legal Standards. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

    A.    Dismissal. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

    B.    Summary Judgment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

V.    Argument. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

    A.    The Court should dismiss Plaintiffs' first four causes of
        action as to Special Agents Christino and Eppley or grant
        judgment in their favor because 42 U.S.C. §1983 does not
        apply to federal officers acting under color of federal law
        and because Plaintiffs fail to allege or establish a conspiracy. . . . . . 23

B. The Court should dismiss Plaintiffs' fifth cause of action
as to Special Agent Christino and Eppley or grant judgment
in their favor because 42 U.S.C. §1981 does not apply to
federal officers acting under color of federal law and
because Plaintiffs fail to allege or establish a conspiracy. . . . . . . . . 28

C. The Court dismiss Plaintiffs' sixth and seventh cause of
action as to Special Agents Christino and Eppley or grant
judgment in their favor because Plaintiffs have failed to
allege a conspiracy under 42 U.S.C. §§1985(3) and 1986. . . . . . . . . 30

D. The Court should grant summary judgment on all seven
of Plaintiffs' causes of action in favor of Special Agent
Christino and Eppley because they are entitled to
qualified immunity. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

VI. Conclusion.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

# TABLE OF AUTHORITIES

## FEDERAL CASES

Allen v. District Atty's Office of Phila.,
  644 F. Supp. 2d 600, 609 (E.D. Pa. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . 39
Anderson,
  483 U.S. at 639. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Anderson v. Liberty Lobby, Inc.,
  477 U.S. 242 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Ashcroft v. Iqbal,
  —U.S. —, 129 S. Ct. 1937 (2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Bell Atlantic Corp. v. Twombly,
  550 U.S. 544 (2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Bethea v. Reid,
  445 F.2d 1163 (1971). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics,
  403 U.S. 388 (1971). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Celotex Corp. v. Catrett,
  477 U.S. 317 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  22, 23

Dells, Inc. v. Mundt,
  400 F. Supp. 1293 (S.D.N.Y. 1975). . . . . . . . . . . . . . . . . . . . . . . . . .  30, 32

Griffin v. Breckenridge,
  403 U.S. 88 (1971). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  30, 31

Grigsby v. Kane,
  250 F. Supp. 2d 453, 458 (M.D. Pa. 2003). . . . . . . . . . . . . . . . . . . . . . . . 24

Harlow v. Fitzgerald,
  457 U.S. 800 (1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  33, 40

Hartsfield v. Lemacks,
    50 F.3d 950 (11th Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . 35, 36, 37, 39

Hunter v. Bryant,
    502 U.S. 224 (1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Jordan v. Fox, Rothschild, O'Brien & Frankel,
    20 F.3d 1250 (3d Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Lake v. Arnold,
    112 F.3d 682 (3d Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . 30, 31, 32

Malley v. Briggs,
    475 U.S. 335 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Maryland v. Garrison,
    480 U.S. 79 (1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

Melo v. Haffer,
    912 F.2d 628 (3d Cir. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Mitchell v. Forsyth,
    472 U.S. 511 (1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Pearson v. Callahan,
    —U.S. —, 129 S. Ct. 808 (2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Quiles v. United States Department of Defense,
    Civ. No. 1:09-CV-580, 2009 WL 4810188
    (M.D. Pa. Dec. 10, 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 29

Riley v. Potter,
    Civ. No. 08-5167, 2010 WL 125841 (D.N.J. Jan 7, 2010). . . . . . . . . . . . . 29

Rogin v. Bensalem Township,
    616 F.2d 680 (3d Cir. 1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 32

Saucier v. Katz,
    533 U.S. 194 (2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Slater v. Susquehana County,
    613 F. Supp. 2d 653 (M.D. Pa. 2009). . . . . . . . . . . . . . . . . . . .   24, 25, 26, 29

United States ex. rel. Moore v. Koelzer,
    457 F.2d 892 (3d Cir. 1972). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

## FEDERAL STATUTES

42 U.S.C. § 1981. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   21, 24, 28

42 U.S.C. § 1983. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   21, 23, 27

42 U.S.C. §§ 1985(3). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   21, 30

42 U.S.C. § 1986. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   32

Fed. R. Civ. P. 12(b)(6). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   21

Fed. R. Civ. P. 56. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   22

This a civil rights action asserted against numerous municipal, state, and federal law enforcement officers concerning the service of a state issued search warrant at 11 West Monroe Avenue in West Hazleton, Pennsylvania on September 5, 2007.  Based on the following, the federal officers should be dismissed from this action.

## I. FACTUAL BACKGROUND

**A.     The Investigation**

In 2007, Agents of the Pennsylvania Attorney General's Office, Bureau Of Narcotics Investigation and Drug Control (PA-BNI), Hazleton Police, and members of the Luzerne County Drug Task force comprised of police officers from various local police departments in Luzerne County were investigating the illegal trafficking of controlled substances in the greater Hazleton, Pennsylvania area. (Statement of Material Facts (SMF) ¶ 1.)  Initial investigating officers included Defendant John Soprano, a PA-BNI Agent, and Defendant William Feissner, a corporal with the Butler Township Police Department and a Luzerne County Drug Task Force member, and Defendant Jason Zola, a Hazleton City Police detective. (SMF ¶ 2.)  The investigation concerned numerous individuals located throughout the greater Hazleton area.  (SMF ¶ 3.)  Law enforcement officers conducted numerous activities to identify the individuals involved in the illicit activity.  (SMF ¶ 4.)

The state law enforcement officers engaged numerous undercover purchases of controlled substances including crack cocaine and powder cocaine.  (SMF ¶ 5.) The state law enforcement officers also engaged confidential informants, pen registers and trap and trace techniques were utilized to identify the telephone and cellular telephone numbers and persons who were subscribers and users of the numbers, surveillance, and wiretaps.  (SMF ¶¶ 6-9.)  Throughout the course of the investigation, subjects spoke to each other in Spanish during their communications in furtherance of the unlawful sale of controlled substances.  (SMF ¶ 10.)

During the investigation, state law enforcement officers became aware of Bienviendo Guerrero's involvement in the unlawful sale of controlled substances including cocaine.  (SMF ¶ 11.)  Intercepted communications revealed that a person of significant interest in orchestrating the sale of controlled substances named Lanuncio Dippiton, aka Jorge Rivera (hereafter referred to as "Rivera"), would receive calls from persons seeking to purchase controlled substances.  (SMF ¶ 12.)  Rivera would then call a runner, or person who possessed the controlled substance or could access the substance at a "stash house", and instruct them on where to conduct the sale with the buyer.  (SMF ¶ 13.)  Guerroro was identified as one of these runners.  (SMF ¶ 14.)

State law enforcement officers intercepted communications from Rivera to Guerrero. (SMF ¶ 15.) Rivera would call Guerrero and instruct him on how much of a substance, including cocaine, to bring to the sale and where the sale was to occur. (SMF ¶ 16.) Surveillance officers observed Guerrero leave his residence at 11 West Monroe Avenue in West Hazleton, Pennsylvania. (SMF ¶ 17.) Guerrero would use a silver minivan that was located at his residence which was observed at times in the garage attached to 11 West Monroe Avenue. (SMF ¶ 18.) On occasion, surveillance officers observed Guerrero drive to the location of the where the sale of the controlled substance was to take place, complete the transaction, and then return to 11 West Monroe Avenue. (SMF ¶ 19.)

The building that 11 West Monroe Avenue occupies is a single building with a door on the south side of the building, two doors on the east side of the building, and two garage doors on the west side of the building. (SMF ¶ 20-21.) Plaintiffs Willian Taveras Gomez, Barbara Gomez - his mother, Wilfredo Taveras - his son, and Williana Taveras - his daughter, reside in the portion of the building that is described as 9 West Monroe Avenue. (SMF ¶ 22.) Plaintiffs are of Hispanic decent. (SMF ¶ 23.) Plaintiff Willian Taveras Gomez owns the building which occupies 11 and 9 West Monroe Avenue. (SMF ¶ 24.) Mr. Taveras Gomez rented 11 West Monroe Avenue to Edwin Cruz who resided with his mother, Ana Cruz,

and Bienviendo Guerrero.  (SMF ¶ 26.)

Surveillance officers had seen Guerrero on two occasions enter 9 West Monroe Avenue.  (SMF ¶ 27.)  More often, surveillance observed Guerrero enter 11 West Monroe Avenue and utilized a key to do so.  (SMF ¶ 28.)  Guerrero was also observed by surveillance officers speaking with a person in the yard in front of the east side doors leading into 9 West Monroe Avenue.  (SMF ¶ 29.)

Special Agents Christino and Eppley were not involved at all in the investigation prior to the execution of the search warrant at 11 West Monroe Avenue.  (SMF ¶ 30.)

**B.**     **The Application for a Search Warrant for 11 West Monroe Avenue**

Based on the investigation conducted over several months, the state law enforcement officers applied for multiple arrest and search warrants.  (SMF ¶ 31.) On September 4, 2007, PA-BNI Agent John Soprano and Corporal William Feissner, of the Butler Township Police Department and a Luzerne County Drug Task Force member, applied for a search warrant for Bienviendo Guerrero's residence located at 11 West Monroe Avenue.  (SMF ¶ 32.)  The warrant application was accompanied by a photograph of the premises and a 184 page affidavit of probable cause  (SMF ¶ 33.)   A Pennsylvania District Judge approved the warrant that same day.  (SMF ¶ 34.)  The warrant authorized Defendant

Soprano and Defendant Feissner to search 11 West Monroe Avenue and search for, inter alia, evidence of drug trafficking, records of drug trafficking, bank statements, cellular phones, United States currency, controlled substances, and any persons found inside the premises. (SMF ¶¶ 35-36.)

Special Agents Christino and Eppley did not provide any information or have any involvement at all in the preparation and obtaining of the search warrant for 11 West Monroe Avenue. (SMF ¶ 37.)

## C.   State Law Enforcement Request for Assistance from ICE

The state law enforcement officers organized the execution of the warrants that were conducted on a single day, September 5, 2007, with several law enforcement agencies including the Pennsylvania Attorney General's Office, local police departments, and federal law enforcement agencies. (SMF ¶ 38.) Although not involved in the investigation up to the date of the request for assistance, federal ICE Special Agents David Christino and Dane Eppley agreed to provide assistance. (SMF ¶¶ 39-40.) Special Agent Christino has over twenty-two years of federal law enforcement experience as a special agent with ICE and has some proficiency in Spanish but is not fluent. (SMF ¶¶ 41-42.) Special Agent Eppley has over seventeen years of federal law enforcement experience as a special agent with ICE and speaks some Spanish but is not fluent. (SMF ¶¶ 43-44.) Both Defendants

Christino and Eppley were contacted to provide assistance only days prior to the

state law enforcement operation conducted on September 5, 2007. (SMF ¶ 45.)

## D.     Briefing by the Pennsylvania Attorney General's Office

On September 5, 2007, Defendants Christino and Eppley arrived at the

National Guard Center in Hazleton, Pennsylvania in the early morning hours to be

briefed on their assignments in the operation.  (SMF ¶ 46.)  The briefing was

conducted by Frank Noonin, the Regional Director of the Pennsylvania Attorney

General's Office at that time, who informed the law enforcement officers of their

respective assignments.  (SMF ¶¶ 47-48.)  Some officers were assigned to execute

arrest warrants while other officers were assigned to conduct search warrants.

(SMF ¶ 49.)  Each search team would have received a packet of information with a

copy of the search warrant and evidence packaging material. (SMF ¶ 50.)  The

operation consisted of approximately 30 arrests and the execution of eight to eleven

search warrants.  (SMF ¶ 51.)

One group was assigned to execute the search warrant and search for items

covered under the warrant at 11 West Monroe Avenue.  (SMF ¶ 52.)  Corporal

Feissner was assigned to lead the group tasked with searching the premises after it

was secured.  (SMF ¶ 53.)  Additionally, assigned to assist with the execution of

the warrant were West Hazleton Police Chief Gerard Gallagher, Special Agent

Christino, Special Agent Eppley, and Hazleton Police Officer Leonard Ramirez

(collectively referred to the "search team").  (SMF ¶ 54.)

According to Corporal Feissner, Special Agent Christino and Eppley were to

provided assistance in translating with Spanish speaking persons located in the

premises and conduct biographical interviews.  (SMF ¶ 55.)  Special Agents

Christino and Eppley may have seen a copy of the search warrant for 11 West

Monroe Avenue.  (SMF ¶ 56.)

The members of the Hazleton City Police Department Special Operations

Group (SOG) (also known as a Special Weapons And Tactics or SWAT team) were

assigned to make the initial entry of 11 West Monroe Avenue and secure the

premises.  (SMF ¶ 57.)  The SOG team included Defendants Jason Zola, Robert

Ferdinand, David Coffman, Mark Zola, James Dixon, Darryl Ledger, Kevin

Wagner, and Christopher Orozco.  (SMF ¶ 58.)  The SOG team was lead by

Corporal David Coffman and Detective Jason Zola.  (SMF ¶ 59.)  Special Agents

Christino and Eppley are not members of the Hazleton SOG team.  (SMF ¶ 60.)

Special Agent Eppley may have worn a raid jacket that identified him as

"ICE".  (SMF ¶ 63.)  He was wearing body armor bearing the identification of

"POLICE-ICE".  (SMF ¶ 64.)  Special Agent Christino may have been wearing a

tee shirt bearing "Police" or "ICE POLICE".  (SMF ¶ 65.)  They were not wearing a mask or hood of any sort.  (SMF ¶ 66.)  The SOG team were all dressed alike in black clothing with helmets and face masks or hoods, known as a balaclava.  (SMF ¶ 67.)

Special Agents Christino and Eppley were not assigned to conduct any part of the briefing and were not assigned to make entry into 11 West Monroe Avenue. (SMF ¶ 68.)  Special Agents Christino and Eppley were to determine if there were any immigration issues related to any persons found at 11 West Monroe Avenue and to assist in the state officers in their search of the premises.  (SMF ¶ 69.)

**E.    Entry of 11 West Monroe**

The SOG team arrived in their vehicle and entered 11 West Monroe Avenue through the doorway on the south side of the building that was depicted in the photograph attached to the search warrant with a satellite dish above it.  (SMF ¶ 70.)  The search team arrived and took positions around the building as perimeter security officers to prevent the escape or ambush of the officers.  (SMF ¶ 71.)

Specifically, Special Agents Christino and Eppley were located outside of 11 West Monroe Avenue and waited until the SOG team informed them that they could enter.  (SMF ¶ 72.)  Special Agents Christino and Eppley were not part of the SOG team and they did not enter 11 West Monroe Avenue until they were

instructed that the premises was secure.  (SMF ¶ 73.)

After the SOG team entered the door on the south side of the premises for 11 West Monroe Avenue, the team went up a stair case.  (SMF ¶ 74.)  At the top of the stair case, the team divided into different directions.  (SMF ¶ 75.)  Officer Kevin Wagner of the Hazleton SOG team and Detective Zola  entered a bathroom and encountered a door inside the bathroom.  (SMF ¶ 76.)  The door had no apparent markings indicating that it led to a separate and distinct residence.  (SMF ¶ 77.)  There was no apparent locking device or other barrier indicating that the door was secured and not accessible from any person on the other side.  (SMF ¶ 78.)  The door represented a threat area to the safety of the law enforcement officers conducting the entry and the search. (SMF ¶ 79.) [1]

**F.      Entry into 9 West Monroe**

Detective Zola and Officer Wagner made entry through the door in the bathroom.  (SMF ¶ 81.)  On the other side of the door, the entry team officers encountered a hallway and stairway leading to a third floor.  (SMF ¶ 82.)  These additional areas represented more potential threats to the safety of the officers.  (SMF ¶ 83.)     Officer Wagner asserts that he and Detective Zola came to a door

---

[1]A threat area is any area where a person may be located and could cause harm a person on the entry team or search team.   (SMF ¶ 80.)

off the hallway.  (SMF ¶ 84.)  The door was opened and entry made into the room.

(SMF ¶ 85.)  The room was a bedroom where Plaintiff, Barbara Gomez and her

granddaughter, Plaintiff, Williana Taveras, were sleeping.  (SMF ¶ 86.)

Mrs. Gomez states that she encountered the police officers in the hallway

and an officer escorted her to her bedroom.  (SMF ¶ 87.)  She further testified that

the officer told her to get down on the floor.  (SMF ¶ 88.)  According to Mrs.

Gomez, she had previously injured her eye approximately four days prior to

September 5, 2007, while walking to bank when her foot went into a hole when she

tried to avoid a car and she fell to the ground.  (SMF ¶ 89.)  Her glasses broke and

her eye was bruised.  (SMF ¶ 90.)  On September 5, 2007, when the officers

entered her residence, she did not have her glasses because the doctor had not

replaced them yet.  (SMF ¶ 91.)  She was also on medication for her injury from

when she slipped.  (SMF ¶ 92.)  Mrs. Gomez states that because she did not have

her glasses, she could not identify who the officers in the hallway and in her

bedroom were.  (SMF ¶ 93.)

According to Williana Taveras, the minor daughter of Willian Taveras

Gomez, she was in the bedroom that she shares with her grandmother, Barbara

Gomez, when the police entered their residence.  (SMF ¶ 94.)  When she awoke,

her grandmother was on the floor.  (SMF ¶ 95.)  Ms. Taveras attempted to call her

aunt by using a cell phone because her aunt knows more English than Ms. Taveras. (SMF ¶ 96.)  However, an officer grabbed her hand, took the cell phone away, and turned it off.  (SMF ¶ 97.)  The police did not handcuff Ms. Taveras. (SMF ¶ 98.)

Wilfredo Taveras at the time of the incident was a minor child age 16 years old and is the son of Willian Taveras Gomez.  (SMF ¶ 99.)  He states that he was on the third floor of 9 West Monroe Avenue when he awoke to officers entering his room and pointing at him.  (SMF ¶ 100.)  He got down on the ground and the officers handcuffed him.  (SMF ¶ 101.)  The officers took Mr. Taveras Gomez to a room on the second floor.  (SMF ¶ 102.)  The officers then took Mr. Taveras Gomez to his bedroom, took off the handcuffs, and permitted Mr. Taveras Gomez to get dressed.  (SMF ¶ 103.)

Willian Taveras Gomez testified that he woke up on September 5, 2007 to police officers in masks around him and he was handcuffed.  (SMF ¶ 104.)  He does not remember who handcuffed him.  (SMF ¶ 105.)  Mr. Taveras Gomez further testified that from the officers that were in with him after he woke up, he recognized Corporal Feissner and Special Agent Christino.  (SMF ¶ 106.)  He asked to be taken to his mother's, Barbara Gomez, and daughter's, Williana Taveras, bedroom because he had heard them scream.  (SMF ¶ 107.)  According to

Mr. Taveras Gomez, Special Agent Christino took him to his mother's bedroom at

Mr. Taveras Gomez's request.  (SMF ¶ 108.)  Of the Plaintiffs, only Willian

Taveras Gomez and Wilfredo Taveras were handcuffed.  (SMF ¶ 109.)

Special Agent Christino and Special Agent Eppley did not make the initial

entry into 11 West Monroe Avenue.  (SMF ¶ 110.)   Once the premises was secured

by the SOG team, Special Agent Christino and Special Agent Eppley entered the

residence to assist in the search and to conduct field interviews of any person found

there relative to their lawful presence in the United States.  (SMF ¶ 111.)

## G.   Custody of Persons and Search of the Premises

After the premises was secured by the SOG team, Corporal Feissner

requested that all the Plaintiffs be moved from 9 West Monroe Avenue to the

kitchen in 11 West Monroe Avenue.  (SMF ¶ 112.)  The Plaintiffs were centrally

located in the kitchen of 11 West Monroe Avenue along with Ana Cruz, the only

person found in 11 West Monroe Avenue by the SOG team.  (SMF ¶ 113.)  The

state law enforcement officers took all persons located in the premises, that

includes 11 West Monroe Avenue and 9 West Monroe Avenue, to the kitchen in 11

West Monroe Avenue to control all persons located at the premises while the

search was conducted pursuant to the search warrant.  (SMF ¶ 114.)

At some point, Sergeant Joshua Winters of the Sugarloaf Township Police

Department arrived at 11 West Monroe Avenue.  (SMF ¶ 115.)  According to Sergeant Winters, he may have walked to 11 West Monroe Avenue with other officers after completing the service of a search warrant on another location nearby 11 West Monroe Avenue.  (SMF ¶ 116.)  He stated that he believes he took Wilfredo Taveras to Wilfredo Taveras' bedroom on the third floor to permit him to get dressed for school.  (SMF ¶ 117.)  Sergeant Winters further stated that he searched various rooms in the building.  (SMF ¶ 118.)

Special Agent Eppley conducted field interviews[2] relative to the immigration status of two individuals in the kitchen of 11 West Monroe Avenue.  (SMF ¶ 119.) He interviewed an adult male approximately 30 years of age and an adult female approximately 30 years of age.  (SMF ¶ 120.)  He determined that both person he interviewed in the second floor kitchen were lawfully present in the United States. (SMF ¶ 127.)  Special Agent Eppley and Christino did not arrest anyone during the service of the search warrant on September 5, 2007.  (SMF ¶ 128.)

---

[2]A field interview is conducted to determine the immigration status of a subject.  (SMF ¶ 121.)  During a field interview the agent will ask for the subject's name, date of birth, or any other identifiers.  (SMF ¶ 122.)  Supporting documentation such as a passport or resident alien card may also be inspected. (SMF ¶ 123.)  Additionally, the officer may call for a database search of the Law Enforcement Support Center ("LESC"). (SMF ¶ 124.)  The nature of the interview is determined on a case by case basis. (SMF ¶ 125.)  In this case, Special Agent Eppley took notes on 3 by 5 index cards. (SMF ¶ 126.)

Wilfredo Taveras, the minor child (at the time of the incident) of Willian Taveras Gomez, was taken in handcuffs to the portion of the premises that is described as 11 West Monroe Avenue.  (SMF ¶ 129.)  According to Mr. Taveras Gomez, he told officers in the kitchen of 11 West Monroe Avenue that he needed to go to school.  (SMF ¶ 130.)  Mr. Taveras stated that the officers told him that he could go to school and that they would take him.  (SMF ¶ 131.)

At some point, Chief Gallagher of the West Hazleton Police Department took custody of Wilfredo Taveras and transported him to the National Guard Center in Hazleton where other persons who were taken into custody were located as well as members of state law enforcement.  (SMF ¶ 132.)  According to Chief Gallagher, someone from the "task force" told him to take Mr. Taveras to the National Guard Armory.  (SMF ¶ 133.)  Chief Gallagher did know why he was transporting Mr. Taveras.  (SMF ¶ 134.)  Chief Gallagher turned Mr. Taveras over to some unknown agent at the Armory.  (SMF ¶ 135.)  Mr. Taveras was released from the Armory and walked home.  (SMF ¶ 136.)

According to Willian Taveras Gomez, when he arrived in the kitchen of 11 West Monroe Avenue he observed Special Agent Eppley, Special Agent Christino, Corporal Feissner, and Chief Gallagher.  (SMF ¶ 137.)  He further testified that Special Agent Eppley asked him some questions but he did not understand the agent.  (SMF ¶ 138.)  The officers also asked questions of Ana Cruz.  (SMF ¶ 139.)

Mr. Taveras Gomez stated the first time that he became aware of the reason for the law enforcement officers' presence at the premises was from what he understood from the officers' questioning of Ana Cruz.  (SMF ¶ 140.)  He further stated that Special Agent Eppley was gathering information and he told Special Agent Eppley that his residence was 9 West Monroe Avenue and not 11 West Monroe Avenue. (SMF ¶ 141.)

Special Agent Christino searched certain areas of 11 West Monroe Avenue and discovered what he thought was a handgun but turned out to be a bb handgun, drug paraphernalia, and suspected cocaine residue.  (SMF ¶ 142.)  Special Agent Christino left the items in place to be photographed and collected by the state law enforcement officers.  (SMF ¶ 143.)  Corporal Fiessner photographed the items and took them into evidence.  (SMF ¶ 144.)

Pennsylvania State Attorney General BNI Agent John Soprano, one of the two signatories to the search warrant, submitted an Evidence and Property Record of the above items seized at 11 West Monroe Avenue to the Pennsylvania State Attorney General's Office custodian/receiving officer indicating the Pennsylvania State Attorney General retained custody of the items.  (SMF ¶ 145.)  Pennsylvania State BNI Agent Soprano submitted additional Evidence and Property Records indicating the following items were seized from 11 West Monroe Avenue on

September 5, 2007: $605.00 in U.S. currency; a passport; and miscellaneous documents. (SMF ¶ 146.)

According to Barbara Gomez, while her and her family were in 11 West Monroe Avenue the officers asked questions, including if they had residency and how long they had been in the United States. (SMF ¶ 147.) An officer obtained a cold bottle of water from the refrigerator and gave it to her to place on her eye. (SMF ¶ 148.) While in the kitchen of 11 West Monroe Avenue, officers searched the cabinets and drawers. (SMF ¶ 149.) Mrs. Gomez heard the officers state that they found a gun. (SMF ¶ 150.) Mrs. Gomez stated that the officers asked Ana Cruz about the gun. (SMF ¶ 151.)

According to Mrs. Gomez, the officers eventually took her and her family back to their portion of the premises described as 9 West Monroe Avenue. (SMF ¶ 152.) She stated that her son, Willian Taveras Gomez, asked the officers why they were at their house when they had an order for the other house. (SMF ¶ 153.) Mrs. Gomez stated that an officer whom she could not identify told her son to be quiet because he was not a United States Citizen. (SMF ¶ 154.) The officers asked if the family wanted something to eat. (SMF ¶ 155.) At no point was Mrs. Gomez handcuffed. (SMF ¶ 156.)

Williana Taveras stated that at the end of the events on September 5, 2007, her father was speaking in Spanish to Special Agent Christino and asking him why

the officers came to their house which was not 11 West Monroe Avenue.  (SMF ¶ 157.)  According to Ms. Taveras, Special Agent Christino, did not respond to Willian Gomez in Spanish but told her to tell her father to "shut up or they would put the handcuff [sic] on again because he was not a citizen."  (SMF ¶ 158.)

Willian Taveras Gomez stated that he was eventually taken to his residence in the portion of the premises described as 9 West Monroe Avenue.  (SMF ¶ 159.) He stated that he was then taken back to the portion of the premises that is 11 West Monroe Avenue and then returned again to his residence at the portion of the premises that is described as 9 West Monroe Avenue.  (SMF ¶ 160.)  Once back in his residence, Mr Taveras Gomez told the officers that the handcuffs were too tight. (SMF ¶ 161.)  The officers then took the handcuffs off of Mr. Taveras Gomez. (SMF ¶ 162.)  Special Agent Eppley asked if Mr. Taveras Gomez or any of his family wanted any food or coffee.  (SMF ¶ 163.)  Mr. Taveras Gomez stated that Special Agents Christino and Eppley eventually left the portion of the premises that is 9 West Monroe Avenue.  (SMF ¶ 164.)

Special Agents Christino and Eppley had been called by another officer or officers to interview Mrs. Gomez on the first floor of the building.  (SMF ¶ 165.) Special Agent Eppley exited the kitchen in 11 West Monroe Avenue by walking down a set of stairs that led from the kitchen on the second floor of 11 West Monroe Avenue to the first floor of the building.  (SMF ¶ 166.)  At the bottom of

the stairs, he observed an opened door leading into another kitchen.  (SMF ¶ 167.)

Other officers in tactical gear were in the room.  (SMF ¶ 168.)  Special Agent

Christino also exited the kitchen of 11 West Monroe Avenue by descending the

stairs that led from the kitchen on the second floor to first floor of the building and

joined Special Agent Eppley. (SMF ¶ 169.)

Special Agent Eppley conducted field interviews relative the immigration

status of two individuals while on the first floor.  (SMF ¶ 170.)  He conducted an

interview of an adult female and an adult male whom he could not identify.  (SMF

¶ 171.)  Both persons were legally present in the United States.  (SMF ¶ 172.)

Both Special Agents Eppley and Christino deny making or hearing any statement to

any person to be quiet or handcuffs would be placed on the person because the

person is not a United States' citizen.  (SMF ¶ 173.)

Special Agents Christino and Eppley exited the premises through a door on

the first floor of the building's east side.  (SMF ¶ 174.)  Upon exiting, Special

Agents Christino and Eppley noticed for the first time that there was a number 9

next to the door that they just had exited.  (SMF ¶ 175.)  The first time Special

Agent Christino and Eppley realized that they may have been in a separate

residence was when they noticed the number 9 as they left the building.  (SMF ¶

176.)

According to Corporal Feissner, he was told by an ICE agent that the premises may have contained two separate residences. (SMF ¶ 177.) Corporal Feissner believes that the ICE agents obtained this information during their field interviews. (SMF ¶ 178.) Special Agent Eppley and Christino deny ever having such a conversation. (SMF ¶ 179.) Corporal Feissner stated that in response to this conversation he walked through the premises which included both the portions described as 11 and 9 West Monroe Avenue. (SMF ¶ 180.) Corporal Feissner further stated that he conferred with other officers about the possibility that the premises may have contained two residences. (SMF ¶ 181.) He does not believe he would have conferred with the ICE agents, rather, he stated that he would probably have talked to his own officers because the ICE agents "were just there for translation. I had never met them before[.]" (SMF ¶ 182.)

Corporal Feissner stated that he contacted PA AG BNI Agent Soprano to discuss the issue. (SMF ¶ 183.) Corporal Feissner stated that his opinion at this point was to stop the search and not search 9 West Monroe Avenue for contraband. (SMF ¶ 184.) He then prepared an inventory sheet and did a final walk through of the premises to take "exit photographs." (SMF ¶ 185.) According to Corporal Feissner, he learned about the possibility that there were two residences at the premises within 25 minutes of leaving the premises. (SMF ¶ 186.)

According to Corporal Fiessner, when law enforcement encounter the problem of seemingly connected living spaces that may be different residences, they must independently verify the information because people lie to them.  (SMF ¶ 187.)  The bathroom door represented just another door that people could access that could lead anywhere and it was necessary to secure that area.  (SMF ¶ 188.)

According to members of the Hazleton SOG team, the layout of the building that includes 11 and 9 West Monroe Avenue presented a threat area to the safety of the officers.  (SMF ¶ 189.)  Additionally, the layout of the building that included an adjoining door through the bathroom of 11 West Monroe Avenue led the officers believe that the building was in fact one, undivided premises.  (SMF ¶ 190.)  Sergeant Winters also recalled the confusing nature of the building.  (SMF ¶ 191.)

## II.  PROCEDURAL BACKGROUND

On August 5, 2008, Plaintiffs filed an Amended Complaint naming as Defendants. inter alia, Special Agents Christino and Eppley (Doc. 10),  and Special Agents Christino and Eppley filed their answer on April 28, 2009 (Doc. 20).  Motions to amend pleadings were to be filed by October 1, 2009 (Doc. 29), and discovery closed on June 1, 2010 (Doc. 39).  This brief is timely submitted contemporaneously with Special Agents Christino and Eppley's motion to dismiss

and for summary judgment, statement of material facts, and supporting

documentation.

### III.  QUESTIONS PRESENTED

A.    Should the Court dismiss Plaintiffs' first four causes of action as to Special
      Agents Christino and Eppley or grant judgment in their favor because 42
      U.S.C. § 1983 does not apply to federal officers acting under color of
      federal law and because Plaintiffs fail to allege or establish a conspiracy?

B.    Should the Court dismiss Plaintiffs' fifth cause of action as to Special
      Agent Christino and Eppley or grant judgment in their favor because 42
      U.S.C. § 1981does not apply to federal officers acting under color of federal
      law and because Plaintiffs fail to allege or establish a conspiracy?

C.    Should the Court dismiss Plaintiffs' sixth and seventh cause of action
      as to Special Agents Christino and Eppley or grant judgment in their favor
      because Plaintiffs have failed to allege a conspiracy under 42 U.S.C. §§
      1985(3) and 1986?

D.    Should the Court grant summary judgment on all seven of Plaintiffs' causes
      of action in favor of Special Agent Christino and Eppley because they are
      entitled to qualified immunity?

      Suggested Answers:      In the affirmative.


### IV.  LEGAL STANDARDS

**A.    Dismissal**

      Pursuant to Rule 12(b)(6), a complaint may be dismissed for "failure to state a

claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  In considering a

Rule 12(b)(6) motion to dismiss, a court must accept as true all allegations in a

plaintiff's complaint, and all reasonable inferences that can be drawn therefrom are to be construed in the light most favorable to the plaintiff.  <u>Jordan v. Fox, Rothschild, O'Brien & Frankel</u>, 20 F.3d 1250, 1261 (3d Cir. 1994).  To sustain a motion to dismiss under Rule 12(b)(6), a plaintiff is required to allege grounds for relief, which "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007).  "Factual allegations must be enough to raise a right to relief above the speculative level." <u>Id.</u> <u>Twombly</u> applies to all civil cases.  <u>Ashcroft v. Iqbal</u>, — U.S. —, 129 S.Ct. 1937, 1953 (2009).

### B.   Summary Judgment

Summary judgment is appropriate when supporting materials, such as affidavits and other documentation, show there are no material issues of fact to be resolved and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56; <u>see also</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317 (1986).  In <u>Celotex</u>, the Court held that "Rule 56(e) . . . requires that the non-moving party go beyond the pleadings by [his] own affidavits, or by 'depositions, answers to interrogatories and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" 477 U.S. at 324 (quoting Fed. R. Civ. P. 56).  Additionally, an opposing party must produce more than a mere scintilla of evidence in its favor, and cannot simply reassert factually

unsupported allegations contained in its pleadings.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986); Celotex, 477 U.S. at 325.

## V. Argument

**A.     The Court should dismiss Plaintiffs' first four causes of action as to Special Agents Christino and Eppley or grant judgment in their favor because 42 U.S.C. § 1983 does not apply to federal officers acting under color of federal law and because Plaintiffs fail to allege or establish a conspiracy.**

Each of Plaintiffs first four causes of action seek damages under 42 U.S.C. § 1983.  (Doc. 10 at 9-11.)  Plaintiffs pled and acknowledged that Special Agents Christino and  Eppley were acting under color of federal law.  (Doc. 10 at 4, ¶ 14.) Additionally, based on the functions that they performed during their assistance, it is apparent that Special Agents Christino and Eppley were acting pursuant to their responsibilities as federal officers acting under color of federal law.  (SMF ¶¶ 55, 119-127, 165-174.) It is well established that liability under § 1983 cannot be based for actions taken under color of federal law.  Bethea v. Reid, 445 F.2d 1163, 1164 (1971). Thus, Plaintiffs first four causes of action seeking monetary damages under § 1983 should be dismissed.

Although Plaintiffs did not plead that Special Agent Christino and Eppley acted under color of state law (Doc. 10), in an abundance of caution, the following analysis is offered in support of dismissal or judgment in their favor on those claims.  In order for a federal employee to be held liable under § 1983, a plaintiff must demonstrate that

the federal employee conspired with a state official acting under color of state law to deny the plaintiff of a constitutional right.  Melo v. Haffer, 912 F.2d 628, 638 (3d Cir. 1990).

Although interpreting a claim under 42 U.S.C. § 1981, this Court has described the necessary requirements that a Plaintiff must demonstrate in order to support a claim of a conspiracy.  See Slater v. Susquehana County, 613 F. Supp. 2d 653, 661-62 (M.D. Pa. 2009)(Caputo, J.).  In Slater, this Court observed as follows: "[O]nly allegations which are particularized, such as those addressing the period of the conspiracy, the object of the conspiracy, and actions taken in furtherance of the conspiracy, will be deemed sufficient.  Id. at 661 (quoting Grigsby v. Kane, 250 F. Supp. 2d 453, 458 (M.D. Pa. 2003)).

After describing the evidence that the plaintiff relied on in her complaint, the Court determined that the allegations were insufficient because the allegations were no more than conclusory assertions "that she was subjected to invidious discriminatory animus."  Slater, 613 F. Supp. 2d at 662.  The Court observed that, instead, the plaintiff alleged that her claim was based on her being a "whistle-blower."  Id. Additionally, the Court noted that the plaintiff did not allege any "specific facts indicating a mutual understanding between the [alleged conspirators] to achieve a deprivation of her [constitutional] rights."  Id.  Thus, the Court determined that the plaintiff failed to allege "the existence of a conspiracy or an invidious, intentional

purpose to discriminate between classes or individuals and dismissed the claim.  Id.

Similar to the case present in Slater, the record evidence is completely void of any evidence to establish Special Agent Christino or Eppley came to the meeting of the minds with a state official to deprive Plaintiffs of their constitutional rights based on their citizenship status or Hispanic descent.  It is undisputed that Special Agents Christino and Eppley were not part of the state investigation until requested to assist state law enforcement officers on September 5, 2007.  (SMF ¶¶ 39-40.)  Special Agents Christino and Eppley did not apply for the search warrant for 11 West Monroe Avenue or assist in its preparation.  (SMF ¶¶ 32-37.)

Special Agents Christino and Eppley first learned about the service of the search warrant for 11 West Monroe Avenue on the day of its execution, September 5, 2007.  (SMF ¶¶ 46-56.)  Further, they did not know where they would be assigned until the morning of the execution of the search warrant at the briefing conducted by the Pennsylvania Attorney General's Office on September 5, 2007. (Id.) The warrant that was shown to them was for 11 West Monroe Avenue in West Hazleton, Pennsylvania and did not mention the Plaintiffs by name or address.  (SMF ¶ 56, Ex. 1, PA AG Search Warrant.)

The first time Special Agents Christino and Eppley became aware of the Plaintiffs was after the Hazleton City Police SOG team entered 11 West Monroe

Avenue.  (SMF ¶ 73.)  Special Agents Christino and Eppley were not on the entry team and did not make the decision to breach the adjoining door between residences and did not order any person to the ground.  (SMF ¶¶ 73-88, 111.)  Special Agents Christino and Eppley did not make the decision to move Plaintiffs from 9 West Monroe Avenue to 11 West Monroe Avenue.  (SMF ¶ 112.) Special Agents Christino and Eppley did not arrest anyone at the premises of 11 and 9 West Monroe Avenue.  (SMF ¶ 128.)  Special Agents Christino and Eppley did not seize any property at 11 and 9 West Monroe Avenue.   (SMF ¶¶ 144-46.)

Plaintiffs allege that Willian Taveras stated, in Spanish, to Special Agent Christino that he asked why the officers came to his house that was not 11 West Monroe Avenue.  (SMF ¶ 152-53, 157.)  According to Plaintiffs, Special Agent Christino told Williana Taveras in English to tell her father to "shut up or they would put the handcuff [sic] on again because he was not a citizen."  (SMF ¶ 154, 158.) Special Agent Christino denies making or hearing any such statement.  (SMF ¶ 173.) Special Agent Eppley denies hearing any such statement.  (Id.)

Assuming *arguendo* that the above statement is true for the purposes of this motion, the statement does not demonstrate that any rights were deprived in furtherance of a conspiracy motivated by invidious racial bias or citizenship status. At most, the statement is an unprofessional remark that falls far short of establishing the necessary animus to show a conspiracy between any two persons to deprive the

constitutional rights of another person based on racial animus or citizenship status.

At best, the remark was an effort to retain order and control at the premises and the persons in the premises while Special Agent Christino determined what his next action should be under the circumstances.  Based on the fact that Willian Taveras was speaking Spanish at the time of his statement and Plaintiffs admit that Special Agent Christino responded in English and through Willian Taveras' daughter, it is not clear that Special Agent Christino understood what Willian Taveras was saying before the alleged statement.  (SMF ¶¶ 157-58.)

Further, assuming *arguendo* that Special Agent Christino made the alleged statement, he did not handcuff Willian Taveras after making the statement.  (SMF ¶¶ 161-64.)  Plaintiffs do not allege that any state action was taken to deprive them of their constitutional rights based on the alleged statement.  (Doc. 10.)  Rather, Special Agents Christino and Eppley left the premises.  (SMF ¶¶ 157-58, 161-64.)  Therefore, the statement does not demonstrate that Willian Taveras' constitutional rights were deprived under color of state law based on the alleged statement.

All of Plaintiffs first four causes of action seek monetary damages pursuant to 42 U.S.C. § 1983.  (Doc 10 at 9-11.)  Thus, Plaintiffs' first four causes of action should be dismissed as to Special Agents Christino and Eppley or they should be granted summary judgment because Plaintiffs have not pled any facts, and the record is void of any evidence, that would establish that Special Agents Chrsitino and Eppley

conspired with any state official acting under color of state law to deprive Plaintiffs

of their constitutional rights.

**B.    The Court should dismiss Plaintiffs' fifth cause of action as to Special
       Agent Christino and Eppley or grant judgment in their favor because 42
       U.S.C. § 1981 does not apply to federal officers acting under color of
       federal law and because Plaintiffs fail to allege or establish a conspiracy.**

In order to establish liability under 42 U.S.C. § 1981, a plaintiff must establish

that they were deprived of the equal protection of the laws under color of state law.

42 U.S.C. § 1981(a), (c); see also United States ex. rel. Moore v. Koelzer, 457 F.2d

892, 893 (3d Cir. 1972)(observing that an action does not accrue under § 1981 for

alleged violations by federal officers acting under color of federal law); Quiles v.

United States Dep't of Defense, Civ. No. 1:09-CV-580, 2009 WL 4810188 *5 (M.D.

Pa. Dec. 10, 2009)(Judge Conner adopting Magistrate Judge Carlson's Report and

Recommendation to dismiss plaintiff's § 1981 claim against federal official acting

under color of federal law)(unpublished opinion)(copy attached).

As discussed above, Plaintiffs have pled and acknowledged that Special Agents

Christino and Eppley were acting under color of federal law.  (Doc. 10 at 4, ¶ 14.)

Additionally, based on the functions that they performed during their assistance, it is

apparent that Special Agents Christino and Eppley were acting pursuant to their

responsibilities as federal officers acting under color of federal law. (SMF ¶¶ 55, 119-

127, 165-174.)   Thus, Plaintiffs' fifth cause of action pursuant to § 1981 should be

dismissed as to Special Agents Christino and Eppley. Quiles, 2009 WL 4810188 *5.

Although not specifically pled (Doc. 10), in an abundance of caution, Special Agents Christino and Eppley will address Plaintiffs' claims to the extent that they may be construed as alleging that Special Agents Christino and Eppley were acting under color of state law.  This claim should be dismissed for the same reasons as discussed with regard to Plaintiffs § 1983 claim.  Like their § 1983 claim, Plaintiffs must establish a conspiracy under color of state law to deprive Plaintiffs of equal protection under the law motivated by racial animus in order to establish a § 1981(a). Riley v. Potter, Civ. No. 08-5167, 2010 WL 125841 *4 (D.N.J. Jan 7, 2010)(unpublished)(copy attached).

For the same reasons discussed in reference to Plaintiffs' § 1983 claim, Plaintiffs failed to plead any facts, and the record is void of any evidence, demonstrating that, if true, Special Agents Christino and Eppley engaged in a conspiracy motivated by racial animus with any state official acting under color of state law to deprive Plaintiffs of equal protection under the law. See Slater, 613 F. Supp. 2d at 661-62.  Thus, Plaintiffs fifth cause of action should be dismissed as to Special Agents Christino and Eppley or they should be granted summary judgment.

**C.    The Court dismiss Plaintiffs' sixth and seventh cause of action as to
        Special Agents Christino and Eppley or grant judgment in their favor
        because Plaintiffs have failed to allege a conspiracy under 42 U.S.C. §§
        1985(3) and 1986.**

Plaintiffs sixth cause of action alleges a conspiracy to deny their constitutional

rights under 42 U.S.C. § 1985(3).  Pursuant to § 1985(3), a plaintiff must demonstrate

that a defendant: 1) engaged in a conspiracy; 2) motivated by racial invidious

discriminatory intent; 3) for the purpose of depriving either directly or indirectly, any

person equal protection of the laws; 4) an act in furtherance of the conspiracy; and, 5)

that the plaintiff was injured in his person or property or was deprived of having and

exercising any right or privilege of a citizen of the United States.  Griffin v.

Breckenridge, 403 U.S. 88, 102-03 (1971); see also Lake v. Arnold, 112 F.3d 682, 685

(3d Cir. 1997).  A plaintiff must further show that their rights were, in fact, violated

by the conspirators.  Dells, Inc. v. Mundt, 400 F. Supp. 1293, 1298 (S.D.N.Y. 1975).

In their sixth cause of action, Plaintiffs specifically base their claim on their

Hispanic descent.  (Doc. 10 at 11-12.)  As previously discussed above, the record is

completely void of any evidence that Special Agents Christino and Eppley conspired

with any person to deprive non-citizen Hispanics of their constitutional rights.

Plaintiffs have not alleged, and the record is void of, any facts that demonstrate that

Special Agents Chrsitino and Eppley came to a meeting of the minds with any person

to deprive any other person of their rights based on invidious racial discrimination or citizenship status.

Further, it is undisputed that the alleged statement by Special Agent Christino references citizenship, not race.  (Doc. 10 at 6, ¶ 25; SMF ¶¶ 154, 158.)  The United States Supreme Court has specifically reserved the question of whether a conspiracy motivated by an "invidiously discriminatory intent other than racial bias" could form the basis of a § 1985(3) claim.  Griffin, 403 U.S. at 102 n.9; see also Rogin v. Bensalem Twp., 616 F.2d 680, 696 n.84, 697 (3d Cir. 1980).  However, the Third Circuit has extended § 1985(3) claims to classes beyond race.  Lake v. Arnold, 112 F.3d 682, 688 (3d Cir. 1997)(determining that the mentally retarded are a protected class under § 1985(3)).  The undersigned has been unable to locate any Third Circuit precedent extending protection under  under 1985(3) to non-citizens as a class.

Regardless, Plaintiffs alleged only that their Hispanic decent was the basis of their § 1985(3) claim.  (Doc. 10 at 10 at 11-12.)  The statement does not support a private conspiracy to deprive Plaintiffs of their constitutional rights motivated by their Hispanic descent.   It is undisputed that the alleged statement only references citizenship and not race.  (Doc. 10 at 6, ¶ 25; SMF ¶¶ 154, 158.)  Therefore, the claim should be dismissed as to Special Agents Christino and Eppley or judgement granted in their favor.

Further, assuming *arguendo* that Special Agent Christino made the alleged statement and the § 1985(3) claim could be based on citizenship status, Special Agent Christino did not handcuff Willian Taveras after making the statement. (SMF ¶¶ 157-58, 161-64.) Plaintiffs do allege that any action was taken to deprive them of their constitutional rights based on the alleged statement. Rather, Special Agents Christino and Eppley left the premises. (Id.) Thus, the statement does not demonstrate that Willian Taveras' rights were deprived based on the alleged statement.

Absent some action in furtherance of the alleged conspiracy and an actual deprivation of their rights, their § 1985(3) claim must fail. Dells, Inc., 400 F. Supp. at 1298. Therefore, Plaintiffs sixth count alleging a private conspiracy based on the Plaintiffs' Hispanic descent against Special Agents Christino and Eppley under § 1985(3) should be dismissed or summary judgment granted in their favor because Plaintiffs have failed to allege, and the undisputed record evidence fails to demonstrate, any facts that Special Agents Christino or Eppley engaged in a conspiracy motivated by invidious discrimination based on race.

Likewise, any claim under 42 U.S.C. § 1986 against Special Agents Christino and Eppley fails for the same basis as the § 1985(3) claim. The Third Circuit has observed that a claim under § 1986 "by definition depend on a preexisting violation of § 1985, if the claimant does not set forth a cause of action under the latter, its claim under the former necessarily must fail also." Rogin, 616 F.2d at 696. Thus, based on

the discussion above concerning Plaintiffs § 1985(s) claim, their § 1986 claim also fails and should be dismissed as as to Special Agents Christino and Eppley or judgment granted in their favor.

**D.    The Court should grant summary judgment on all seven of Plaintiff's causes of action in favor of Special Agent Christino and Eppley because they are entitled to qualified immunity.**

Qualified immunity completely protects law enforcement officers from suit in their   individual capacities unless their conduct violates clearly established constitutional rights that a reasonable officer in their position would have known. Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986).  The doctrine provides a true "*immunity from suit* rather than a mere defense to liability[.]" Mitchell v. Forsyth, 472 U.S. 511, 526 (1985)(emphasis original).   This immunity allows "ample room for mistaken judgments," so that law enforcement officials do not "always err on the side of caution because they fear being sued." Hunter v. Bryant, 502 U.S. 224, 229 (1991) (citations and internal quotations omitted).

The analysis for qualified immunity generally starts by determining if the law enforcement officer violated a clearly established constitutional or statutory right that a reasonable person would have known. Harlow, 457 U.S. at 818.  It further turns on the objective legal reasonableness of the action in light of the standards established at

the time of the incident.  <u>Anderson</u>, 483 U.S. at 639.  In <u>Pearson v. Callahan</u>, — U.S.

—, 129 S.Ct. 808 (2009), the Supreme Court stated that it is not required that a court

rigidly follow the order of this two-step analysis (thus abrogating <u>Saucier v. Katz</u>, 533

U.S. 194 (2001)), although it is still a useful model.

In this case, Plaintiffs allege in their first four causes of action claims that

concern the entry of their home (first cause); the seizure of their persons (second); the

search of their property (third); and the seizure of their property (fourth).[3]  (Doc. 10

at 9-11.)  To the extent that the Court may construe Plaintiffs first four causes of

action as stating a <u>Bivens</u>[4] claim, Special Agent Christino and Eppley are entitled to

qualified immunity.  Additionally, to the extent that Plaintiffs fifth, sixth, and seventh

causes of action may be cognizable against Special Agents Christino and Epply, they

are entitled to qualified immunity.

_____

[3]Plaintiffs also assert a claim under the Fourteenth Amendment that does not apply to Special Agents Christino and Eppley as federal officers acting under color of federal law.  To the extent that the Court may determine that they were acting uder color of state law, the above analysis is equally applicable.  It is unclear what Plaintiffs allege as a Fifth Amendment violation.  To the extent that it may be based on an equal protection claim, Plaintiffs have failed to allege, and the record evidence does not demonstrate, that Special Agents Christino and Eppley treated Plaintiffs differently then other persons not of a protected class.  Based on the allegations in the first four causes of action, the claims are properly analyzed under the Fourth Amendment.

[4]<u>Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics</u>, 403 U.S. 388 (1971).

In <u>Maryland v. Garrison</u>, the United States Supreme Court determined that officers did not violate the Fourth Amendment when they reasonably and understandably executed a valid warrant for one premises and did not realize their mistake that they had entered a second, separate apartment.  480 U.S. 79, 87-88 (1987).  Although not addressed in this Circuit, the Eleventh Circuit Court of Appeals addressed a similar issue to that presented in this case as to Special Agents Christino and Eppley of whether supporting officers with inferior information and knowledge may rely on those officers with superior knowledge of the investigation such as to be entitled to qualified immunity.

In <u>Hartsfield v. Lemacks</u>, officers mistakenly entered the wrong residence to execute a presumably valid search warrant for a nearby house.  50 F.3d 950 (11th Cir. 1995).  One law enforcement officer erroneously led other law enforcement agents to 5128 Middlebrooks Drive to execute a search warrant, despite the fact that the warrant designated the residence to be searched as 5108 Middlebrooks Drive.  The Circuit Court affirmed the grant of summary judgment for all defendants except the lead officer. The Circuit Court observed that the supporting officers were entitled to qualified immunity as there was nothing in the record to indicate that they acted unreasonably in following the first officer's lead, or that they should have know that their conduct might result in a violation of constitutional rights.  <u>Id.</u> at 956.

Rather, they may rely upon information provided by other law enforcement officers that a warrant has been obtained.  Id.  The Court of Appeals explained that "nothing in the record indicates that these officers acted unreasonably in following Newton's lead, or that they knew or should have known that their conduct might result in a violation of [plaintiffs'] Fourth Amendment rights.  Consequently, the district court did not err in granting summary judgment on the basis of qualified immunity[.]" Hartsfield, 50 F.3d at 956.

Here, it is undisputed that Special Agents Christino and Eppley were not part of the state investigation until requested to assist state law enforcement officers on September 5, 2007.  (SMF ¶¶ 39-40.)  Additionally, based on the functions that they performed during their assistance , namely conducting field interviews to determine the lawful presence of the persons encountered during the state operation, it is apparent that Special Agents Christino and Eppley were acting pursuant to their responsibilities as federal officers acting under color of federal law. (SMF ¶¶ 55, 119-127, 165-174.)

Further, Special Agents Christino and Eppley did not apply for the search warrant for 11 West Monroe Avenue or assist in its preparation.  (SMF ¶¶ 32-37.) Special Agents Christino and Eppley first learned about the service of the search warrant for 11 West Monroe Avenue on the day of its execution, September 5, 2007. (SMF ¶¶ 46-56.)  They did not know where they would be assigned until the morning

of the execution of the search warrant at the briefing conducted by the Pennsylvania Attorney General's Office on September 5, 2007.  (Id.)  The warrant that was shown to them was for 11 West Monroe Avenue in West Hazleton, Pennsylvania and did not mention the Plaintiffs by name or address.  (SMF ¶ 56, Ex. 1, PA AG Search Warrant.)

Special Agents Christino and Eppley were not on the entry team and did not make the decision to breach the adjoining door between residences or order any person down on the floor.  (SMF ¶¶ 73-88, 111.)  Special Agents Christino and Eppley did not make the decision to move Plaintiffs from 9 West Monroe Avenue to 11 West Monroe Avenue.  (SMF ¶ 112.)  Special Agents Christino and Eppley did not arrest anyone at the premises of 11 and 9 West Monroe Avenue.  (SMF ¶¶ 128.)  Special Agents Christino and Eppley did not seize any property at 11 and 9 West Monroe Avenue.  (SMF ¶¶ 144-46.)

According to Corporal Feissner, he alleges that he was told by one of the ICE Agents that the premises may have contained two separate residences.  (SMF ¶ 177.)  Although Special Agents Christino and Eppley deny any such conversation  (SMF ¶ 179), assuming *arguendo* that it is true, it would demonstrate that they acted reasonably in notifying the person in charge of the search who had the responsibility and superior knowledge to determine what limitations should be made in the execution of the warrant.  (SMF ¶ 53.)  Conversely, Special Agents Christino and Eppley

maintain that the first time they were aware that the premises may contain two separate residences was when the exited the building.  (SMF ¶¶ 174-76)

Moreover, it is undisputed that Corporal Feissner was the team leader and responsible for the search at 11 West Monroe Avenue.  (SMF ¶ 53.)  Further, he states that he had conversations with members of the Pennsylvania Attorney General's Office regarding whether to continue the search at 11 and 9 West Monroe Avenue once he became aware that the residence may include two separate residences and did not confer with Special Agents Christino and Eppley.  (SMF ¶ 181-83.)  Corporal Feissner stated this discovery occurred within 25 minutes of leaving the premises. (SMF ¶ 186.)  Corporal Feissner stated that he decided to discontinue the search. (SMF ¶ 184.)

He stated that law enforcement must independently verify that a premises contains two separate residence because people lie to law enforcement.  (SMF ¶ 187.) In this case the Hazleton City SOG team entered the proper residence to encounter an un marked, interior, adjoining door to another residence that gave no indication that it was a separate residence.  (SMF ¶¶ 176-81, EX. 13, Deposition Exhibit 10 at pages 2-3 (depicting door).)  The door represented a threat area to the safety of the officers and was required to be secured for officer safety.  (SMF ¶¶ 79-80, 188-91.)

As the federal defendants in this case followed the lead of the Pennsylvania state law enforcement officers who investigated the case, obtained the warrant and executed the warrant, and who would be more knowledgeable about their own community, Special Agents Christino and Eppley are entitled to qualified immunity on Plaintiffs first four claims. See Hartsfield, 50 F.3d at 956; see also Allen v. Dist. Atty's Office of Phila., 644 F. Supp. 2d 600, 609 (E.D. Pa. 2009)(determining that qualified immunity was appropriate as to claims of illegal entry and seizure by detectives following a lead detective).

Additionally, at the time of the execution of the warrant, it was not clearly established that a federal officer assisting in the service of a state search warrant was not entitled to rely on the more knowledgeable state officers in limiting any over broad execution of the warrant.  Further, it was not clearly established that federal officers assisting state officers during the execution of a state search warrant under the circumstances described above amounts to a conspiracy.

Moreover, it was not clearly established that federal officers offering to provide their assistance and interview persons at the premises for violations of federal immigration law subjects them to the control and supervision of the state officers to an extent that they are deemed acting under color of state law.  If such a determination was made, it could chill federal officers from assisting state officials in future

operations throughout the country.  Federal officers may not provide assistance to state officers if they may be subject to liability for acting under color of state law when they offer to assist state officers and jointly investigate whether there are any concurrent violations of federal law.  Thus, based on the above, Special Agents Christino and Eppley are entitled to qualified immunity.  Harlow, 457 U.S. at 818.

## VI.  Conclusion

Based on the above, Special Agents David Christino and Dane Eppley requests the Court to grant their motion, enter judgment in their favor, and dismiss them from the instant action.

Respectfully submitted,

PETER J. SMITH
UNITED STATES ATTORNEY

/s/ Timothy S. Judge
TIMOTHY S. JUDGE
Assistant U.S. Attorney
Atty. I.D. #PA 203821
P.O. Box 309
Scranton, PA 18501
Phone 348-2800
Fax: 348-2830
E-Mail: timothy.judge@usdoj.gov

Dated:      July 29, 2010

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

WILLIAN TAVERAS GOMEZ,          :
BARBARA GOMEZ, WILFREDO     :
RAFAEL TAVERAS, WILIANA     :     CIVIL NO.  3:CV-08-0619
TAVERAS, by their next friend     :          (Caputo, J.)
WILIAN TAVERAS GOMEZ,       :
               Plaintiffs          :
                                   :
      v.                           :
                                   :
DAVID CHRISTINO, et al.,           :
               Defendants          :

## CERTIFICATE OF SERVICE BY MAIL

The undersigned hereby certifies that she is an employee in the Office of the United States Attorney for the Middle District of Pennsylvania and is a person of such age and discretion as to be competent to serve papers.

That on July 29, 2010, she served a copy of the attached

## DEFENDANTS CHISTINO'S AND EPPLEY'S
## BRIEF IN SUPPORT OF
## MOTION TO DISMISS AND FOR SUMMARY JUDGMENT

by electronic service pursuant to Local Rule 5.7 to the following individual:

Addressee:

Laurence E. Norton, Esquire          Patrick S. Cawley
Community Justice Project            Deputy Attorney General
118 Locust Street                    Office of Attorney General
Harrisburg, PA 17101                 15th Floor, Strawberry Square
                                     Harrisburg, PA 17120


                                     /s/ Jodi Matuszewski
                                     Jodi Matuszewski
                                     Legal Assistant