# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **WILIAN TAVERAS GOMEZ**, *et al.*, | |
| Plaintiffs, | No. 3:08-CV-619 |
| v. | (Judge Caputo) |
| **WILLIAM J. FEISSNER**, *et al.*, | **Electronically Filed** |
| Defendants. | |

## STATEMENT OF DEFENDANTS WINTERS, ZOLA, FEISSNER, AND GALLAGHER OF MATERIAL AND UNDISPUTED FACTS

Defendants Joshua Winters, Jason Zola, William Feissner, and Gerry Gallagher, by their attorneys and pursuant to Middle District Local Rule 56.1, submit this statement of material facts as to which there can be no genuine dispute.

1. John J. Soprano ("Soprano") is a regional director of the Pennsylvania Office of Attorney General Bureau of Narcotics. (Exhibit A, Soprano Deposition, at 4).

2. Soprano was the case agent who oversaw an investigation of cocaine distribution in the greater Hazleton area. (Exhibit A, Soprano Deposition, at 14-15).

3. The investigation involved a number of nonconsensual wiretaps, surveillance, numerous drug buys, and background investigation. (Exhibit A,

Soprano Deposition, at 14-15; Exhibit B, Feissner Deposition, at 22; Exhibit C, Zola Deposition, at 8-10).

  4. During the course of the investigation, a number of "stash houses" were identified where illegal drugs were being stored. (Exhibit A, Soprano Deposition, at 17-19).

  5. One of the stash houses was located at 11 West Monroe Avenue. (Exhibit A, Soprano Deposition, at 17).

  6. Soprano gathered the information that was developed by other agents and obtained the search warrant that was signed by a judge. (Exhibit A, Soprano Deposition, at 14; Exhibit A-1).

  7. When the search warrant was executed, Soprano expected that crack cocaine, money, and paraphernalia would be found. (Exhibit A, Soprano Deposition, at 19).

  8. The target of the investigation at 11 West Monroe Avenue was Bienvenido Guerrero ("Guerrero"), who was involved in the delivery of illegal drugs. (Exhibit A, Soprano Deposition, at 19-21; Exhibit B, Feissner Deposition, at 20-21; Exhibit C, Zola Deposition, at 18).

  9. In the early morning hours of September 5, 2007, over one hundred local, county, state, and federal law enforcement officers gathered at the National

Guard armory.  (Exhibit A, Soprano Deposition, at 42-43, 45-46; Exhibit B-2, page 1; Exhibit D, Winters Deposition, at 16-17).

10.   During the meeting at the National Guard armory, teams were given envelopes that contained search warrants.  (Exhibit A, Soprano Deposition, at 47).

11.   Before the execution of the search warrant at 11 West Monroe Avenue, defendant William Feissner considered the possibility that there may be two residential units inside the building.  (Exhibit B, Feissner Deposition, at 29).

12.   Before the execution of the search warrant at 11 West Monroe Avenue, defendant William Feissner knew that surveillance showed Guerrero entering and exiting the door marked with the number "11" facing Monroe Avenue.  (Exhibit B, Feissner Deposition, at 42, 52).

13.   Before the execution of the search warrant at 11 West Monroe Avenue, defendant William Feissner did not observe the number "9" on or near the doors on the side of the building, but there was no intention to enter those doors because surveillance showed Guerrero using the door marked "11" facing Monroe Avenue.  (Exhibit B, Feissner Deposition, at 37, 42-43).

14.   Before the execution of the search warrant at 11 West Monroe Avenue, defendant William Feissner anticipated that there may be two apartment doors at the top of the stairs inside the door marked with the number "11." (Exhibit B, Feissner Deposition, at 46, 53-54).

15. Before the execution of the search warrant at 11 West Monroe Avenue, however, Guerrero was arrested and he explained to officers that there was only one door at the top of the stairs inside the door marked with the number "11." (Exhibit B, Feissner Deposition, at 81).

16. The Special Operations Group from the Hazleton Police Department was tasked with entering the building first and making the residence safe for the remaining officers on the team. (Exhibit B, Feissner Deposition, at 60; Exhibit C, Zola Deposition, at 25-28).

17. The objective of the Special Operations Group is to go through a building to find any threat, which can be any person inside the building, and they search anywhere a human being could fit to secure the entire building. (Exhibit C, Zola Deposition, at 30-31).

18. On September 5, 2007, Zola and the Special Operations Group entered the door marked "11" on the south side of the building facing Monroe Avenue. (Exhibit C, Zola Deposition, at 45-46; Exhibit C-1).

19. Zola ascended the stairs, came to a bathroom, and found a door on the other end of the bathroom. (Exhibit B-1, pages 1-2; Exhibit C, Zola Deposition, at 46-49).

20. Zola perceived the other door in the bathroom to be a potential threat and so he went through the door to secure the area on the other side. (Exhibit B-1, page 2; Exhibit C, Zola Deposition, at 49-52).

21. No force was necessary to open the door, because it was unlocked. (Exhibit B-1, page 2; Exhibit C, Zola Deposition, at 51-52).

22. After going through the door on the far side of the bathroom, Zola observed a set of stairs to the left and a hallway with bedrooms. (Exhibit B-1, pages 3-5; Exhibit C, Zola Deposition, at 53).

23. Zola went down the hallway, descended a set of stairs, and secured the first-floor kitchen and dining area and the garage. (Exhibit B-1, pages 5, 8-9; Exhibit C, Zola Deposition, at 57, 61-62, 64).

24. At some point, Zola observed a woman who was upset and screaming, and he joined others in asking her to be calm. (Exhibit C, Zola Deposition, at 58-59).

25. According to the woman, Barbara Gomez, an unidentified officer told her to get on the ground, but no officer pushed her to the ground. (Exhibit G, Barbara Gomez Deposition, at 8, 20).

26. Zola realized that they had cleared and secured the entire space within the building and he recognized the door off of the first-floor kitchen area as being

the door marked on the outside as number "9." (Exhibit B-1, page 9; Exhibit C, Zola Deposition, at 67-68; Exhibit C-1).

27. Because there was a door connecting 9 and 11 West Monroe Avenue, and not a wall or some other solid form of construction, Zola perceived the entire space within the building as a potential threat area that had to be secured. (Exhibit B-1, page 2; Exhibit C, Zola Deposition, at 68-70).

28. Zola perceived there to be nothing dividing or separating the living spaces in the building, such that it was one residence for purposes of the search. (Exhibit C, Zola Deposition, at 71-75).

29. Zola and the Special Operations Group left the building by going back through the bathroom and down the stairs to the door marked with the number "11." (Exhibit B-1, page 2; Exhibit C, Zola Deposition, at 76; Exhibit C-1).

30. While the Special Operations Group entered the building, defendants William Feissner and Gerry Gallagher waited outside with two federal ICE agents and an officer named Ramirez, each of them positioned around the perimeter of the building. (Exhibit B, Feissner Deposition, at 74, 78).

31. Defendant Feissner waited approximately two to three minutes after the entry by the Special Operations Group, and he entered the building upon hearing a call for help on the radio. (Exhibit B, Feissner Deposition, at 78).

32. Feissner ascended the stairway, turned left at the top of the steps, entered a bathroom, and then turned left into another hallway. (Exhibit B, Feissner Deposition, at 82, 86).

33. Feissner observed a woman on the floor screaming and at least one member of the Special Operations Group in the room, but he was told that help was needed in a different room. (Exhibit B, Feissner Deposition, at 86, 89).

34. Feissner observed in a different room plaintiff Wilian Taveras Gomez in handcuffs, where efforts were made to explain to Mr. Gomez what was happening. (Exhibit B, Feissner Deposition, at 97-98).

35. Feissner confirmed with the Special Operations Group members that the initial search of the house was completed to determine who was inside the residence. (Exhibit B, Feissner Deposition, at 105).

36. Feissner's objective was to conduct a secondary search for weapons and contraband while the federal ICE agents interviewed the occupants of the building. (Exhibit B, Feissner Deposition, at 62, 73-74, 113).

37. Feissner recalls no indication that they were inside a separate residence at the time of the secondary search. (Exhibit B, Feissner Deposition, at 107).

38. The occupants of the building were brought into a kitchen while the search was conducted. (Exhibit B, Feissner Deposition, at 114; Exhibit G, Barbara Gomez Deposition, at 13-15).

39. Wilfredo Taveras was brought down from his third-floor room to the second floor, through the bathroom of 11 West Monroe, and to the kitchen of 11 West Monroe. (Exhibit F, Wilfredo Taveras Deposition, at 8-9).

40. Wilfredo Taveras alleges that an officer put his foot in Wilfredo's face while Wilfredo was lying down in his bedroom, but Wilfredo cannot identify the officer. (Exhibit F, Wilfredo Taveras Deposition, at 4, 7-9).

41. Both Wilian Taveras Gomez and a woman who lived in 11 West Monroe Avenue were handcuffed while waiting in the kitchen of 11 West Monroe Avenue. (Exhibit F, Wilfredo Taveras Deposition, at 11).

42. Currency in the amount of $605 was found in a drawer in Wilian Taveras Gomez's room. (Exhibit A, Soprano Deposition, at 59; Exhibit A-2; Exhibit B, Feissner Deposition, at 124; Exhibit B-2, page 2).

43. The search also uncovered plates with drug residue, a scale, baggies, and a gun in Guerrero's room. (Exhibit A, Soprano Deposition, at 59; Exhibit A-2; Exhibit B, Feissner deposition, at 132-33).

44. A search dog was used in the building, but no additional contraband was discovered. (Exhibit B, Feissner Deposition, at 143).

45. Feissner did not have the understanding that there were two separate residences in the building when the dog was used to search the building. (Exhibit B, Feissner Deposition, at 143).

46. After Feissner had conducted the search and after the officer with the search dog left the building, one of the federal ICE agents informed Feissner that Mr. Taveras told the ICE agent that there were two separate residences in the building. (Exhibit B, Feissner Deposition, at 154-55).

47. Feissner investigated this allegation of two residences by walking through the building once or twice and taking photographs. (Exhibit B, Feissner Deposition, at 155-165).

48. Despite the identification of "9 West Monroe Avenue" by Wilian Taveras Gomez as his address, Feissner concluded that there were not separate units in the building, because the door in the bathroom that allegedly separated 9 and 11 West Monroe Avenue was not boarded up, was an interior door of the kind commonly used for closets or attics, and was only locked by a bolt mechanism that suggested that the person on that side had access to the other side. (Exhibit B, Feissner Deposition, at 171-75).

49. With regard to Wilfredo Taveras, Feissner knew that he had been taken to the National Guard armory and would be interviewed by federal ICE

agents and released if there were not immigration issues. (Exhibit B, Feissner Deposition, at 166-67).

50. Defendant Gerry Gallagher's role on September 5, 2007 was to provide security for the officers who were conducting the search. (Exhibit E, Gallagher Deposition, at 8).

51. Gerry Gallagher ("Gallagher") entered the building through the door facing Monroe Avenue immediately after the members of the Special Operations Group. (Exhibit E, Gallagher Deposition, at 18-22).

52. Gallagher observed Wilfredo Taveras handcuffed in a room on the second floor of the building. (Exhibit E, Gallagher Deposition, at 32).

53. One of the members of the task force asked Gallagher to take Wilfredo Taveras to the National Guard armory, but Gallagher does not recall which member of the task force made this request or the specific reasons for doing so. (Exhibit E, Gallagher Deposition, at 33-35).

54. Gallagher took Wilfredo Taveras to the armory, where Gallagher left Wilfredo Taveras in the custody of someone. (Exhibit E, Gallagher Deposition, at 35-38; Exhibit F, Wilfredo Taveras Deposition, at 13).

55. After leaving Wilfredo Taveras at the National Guard armory, Gallagher did not return to 11 West Monroe Avenue. (Exhibit E, Gallagher Deposition, at 38).

56. Gallagher was not aware that he entered what plaintiffs considered to be a separate residential unit. (Exhibit E, Gallagher Deposition, at 44-45).

57. Wilfredo Taveras told certain unnamed officers at the armory that he was sixteen years old, and the officers asked whether Wilfredo could call an adult to pick him up. (Exhibit F, Wilfredo Taveras Deposition, at 6).

58. Because Wilfredo could not remember anyone's telephone number, he sat in the armory for three hours before the unnamed officers decided to let him go. (Exhibit F, Wilfredo Taveras Deposition, at 6).

59. Joshua Winters ("Winters") had been executing a search warrant at a different address before he walked to 11 West Monroe Avenue. (Exhibit D, Winters Deposition, at 22-23).

60. Winters entered the door on the south side of the building, ascended the stairs, and encountered Wilfredo Taveras, Wiliana Taveras, and other occupants of the building in the kitchen, where they were speaking with other officers. (Exhibit D, Winters Deposition, at 29-31).

61. Winters also observed officers searching the residence. (Exhibit D, Winters Deposition, at 31-32).

62. Winters stood in the kitchen for a while and watched the people there while other officers searched the house, and then Winters assisted with the search

of Wilfedo Taveras's room in the third-floor attic.  (Exhibit D, Winters Deposition, at 34).

                        **Respectfully submitted,**

                        **THOMAS W. CORBETT, JR.**
                        **Attorney General**

                      **By:**    *s/ Patrick S. Cawley*

**OFFICE OF ATTORNEY GENERAL**    **PATRICK S. CAWLEY**
**Civil Litigation Section**    **Deputy Attorney General**
**15th Floor, Strawberry Square**    **PA 85575**
**Harrisburg, PA 17120**
**Direct:  (717) 783-3146**    **SUSAN J. FORNEY**
**Fax:  (717) 772-4526**    **Chief Deputy Attorney General**
                                              **Chief, Civil Litigation Section**

**Date: July 29, 2010**

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| WILIAN TAVERAS GOMEZ, *et al.*, | |
| Plaintiffs, | No. 3:08-CV-619 |
| v. | (Judge Caputo) |
| WILLIAM J. FEISSNER, *et al.*, | |
| Defendants. | Electronically Filed |

## CERTIFICATE OF SERVICE

I, Patrick S. Cawley, Deputy Attorney General for the Commonwealth of Pennsylvania, hereby certify that on July 29, 2010, I caused to be served a true and correct copy of the foregoing Statement of Defendants Winters, Zola, Feissner and Gallagher of Material and Undisputed Facts to the following:

| **VIA ELECTRONIC FILING** | |
|---|---|
| Laurence E. Norton, II, Esq.<br>Community Justice Project, Inc.<br>118 Locust Street<br>Harrisburg, PA 17101<br>*Counsel for Plaintiffs* | Timothy S. Judge, Esquire<br>Assistant U.S. Attorney<br>235 N. Washington Avenue<br>Scranton, PA 18507<br>*Counsel for Defendants Eppley and Christino* |

    *s/ Patrick S. Cawley*
**PATRICK S. CAWLEY**
**Deputy Attorney General**