IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| Wilian Taveras Gomez, | ) | |
| Barbara Gomez, and Wilfredo Rafael | ) | |
| Taveras and Wiliana Taveras, by their | ) | |
| next friend Wilian Taveras Gomez, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | No. 3:08 CV 619 |
| | ) | |
| William J. Feissner, Joshua Winters, | ) | (Judge Caputo) |
| Gerry Gallagher, Jason Zola, Dane | ) | |
| Eppley, and David Christino, in their | ) | (electronically filed) |
| individual capacities, | ) | |
| | ) | |
| Defendants. | ) | |

### Statement of Material Facts in Opposition to State and Federal Defendants' Motion for Summary Judgment

Pursuant to PA R USDCTMD LR 56.1, Plaintiffs file this

Statement of Material Facts in opposition to the motion of state defendants,

William Feissner, Jason Zola, Gerry Gallagher, and Joshua Winters for

Summary Judgment. This same statement is filed in opposition to the motion

of the federal defendants, Dane Eppley and David Christino.

As more fully set forth in the consecutively numbered facts below

that include citations to the Exhibits attached thereto, Exhibits A-V,

Plaintiffs contend genuine issues are to be tried and exist with respect to the following paragraphs of "undisputed facts" stated by the state defendants:

21. Plaintiffs dispute that no force was necessary to enter their apartment, as set forth in their factual statement;

28. Plaintiffs dispute that Defendant Zola perceived nothing separating the units, as set forth in their factual statement;

37. Plaintiffs dispute that Defendant Feissner recalls no indication they were in a separate residence, as set forth in their factual statement;

45. Plaintiffs dispute that Defendant Feissner had no understanting there were two separate residences in the building when the dog was used to conduct a further search, as set forth in their factual statement;

48. Plaintiffs dispute that Defendant Feissner concluded there were not separate units in the building and that he concluded the interior door was not "boarded up" and that persons had access one side to the other, as set forth in their factual statement;

49. Plaintiffs dispute that Defendant Feissner believed Wilfredo Taveras was taken to the armory to be interviewed by ICE agents there and that he would be released if there were no immigration issues, as set forth in their factual statement.

As more fully set forth in the consecutively numbered facts below that include citations to the Exhibits attached thereto, Exhibits A-V, Plaintiffs contend genuine issues are to be tried and exist with respect to the following paragraphs of "undisputed facts" stated by the federal defendants:

35. Plaintiffs dispute that the warrant authorized search of premises "as described in the photographs of the premises attached to the application" as opposed to authorizing search of 11 West Monroe Avenue;

85. Plaintiffs dispute that the door to Plaintiff Barbara Gomez' door "was opened" by officers, because as more fully set forth in their factual statement, Barbara Gomez was looking from the hallway toward the bathroom door of Number 11 West Monroe when she encountered the officers;

146. Plaintiffs dispute that records show $605.00 in currency was taken from 11 West Monroe Avenue as opposed to 9 West Monroe Avenue, as more fully set forth in their factual statement;

176. Plaintiffs dispute that Agent Christino and Agent Eppley first realized they may have been in a separate residence when they noticed the number 9 on the door as they were leaving, as more fully set forth in their factual statement;

190. Plaintiffs dispute that the officers believed that the building "was in fact one, undivided premises," as more fully set forth in their factual statement.

## Background Facts –Taveras Family

1. On the morning of Wednesday, September 5, 2007, Plaintiffs Wilian Taveras Gomez, Barbara Gomez, Wifredo Rafael Taveras, and Wiliana Taveras lived in one side of a two apartment building Mr. Taveras owns at Number 9 West Monroe Avenue, West Hazleton, Pennsylvania. (Exh. A, Wilian Taveras Declaration at ¶¶1, 2, 5, and Attachments I thereto, including page two of the deed).

2. Wilian Taveras is the son of Barbara Gomez and the father of Wilfredo and Wiliana Taveras. (Exh. A, Wilian Taveras Declaration at ¶2).

3. On September 5, 2007, Wilan was 40 years old, his mother Barbara was 65 years old, and Wilfredo and Wiliana were 16 and 9 years of age respectively. (Exh. A, Wilian Taveras Declaration at ¶2).

4. Wilian Taveras, Barbara Gomez, Wilfredo Taveras, and Wiliana Taveras were not citizens but were all legal permanent residents of the United States on September 5, 2007. The wife of Wilian Taveras and the mother of Wilfredo and Wiliana is Maria Vargas, who now lives with her family but who was not a legal resident on September 5, 2007, and who was

then living in the Dominican Republic. Plaintiffs are Latinos, originally from the Dominican Republic (Exh. A, Wilian Taveras Declaration at ¶4).

5. The other side of the two-unit building was Number 11 West Monroe Avenue, and at the time Mr. Taveras bought the building in late 2006, and at all times thereafter, Numbers 9 and 11 had always been separate living units with separate electrical and mailing service. (Exh. A, Wilian Taveras Declaration at ¶10).

6. On September 5, 2007, Number 11 West Monroe was leased to Edwin Monero Cruz a co-worker of Mr. Taveras. (Exh. A, Wilian Taveras Declaration at ¶12).

7. Living with Edwin Cruz on September 5, 2007 was the boyfriend of his mother, Ana Cruz, whose name is Bienvenido Guerrero and who was the target of a state drug task force investigation. (Exh. B, Dep. of William Feissner at 20; Exh. Q, Dep. of Agent John Soprano, at 19-20 ).

8. From the time Mr. Taveras bought the two unit building containing Numbers 9 and 11 West Monroe Avenue, the building had separate outdoor entrances, Number 9 through two doors on the east side of the building, and Number 11 through one door on the south side of the building. (Exh. A, Wilian Taveras Declaration at ¶14 and Attachment IV thereto, including

photograph of the building – deposition "Exhibit 6" - containing Numbers 9 and 11 West Monroe Avenue).

9. Inside the two-unit building both No. 9 and No. 11 had separate access to the four car garage. (Exh. A, Wilian Taveras Declaration at ¶13).

10. There was also a sealed door between the units that connected a hallway in Number 9 and the bathroom in Number 11. (Exh. A, Wilian Taveras Declaration at ¶¶6-9 and Attacment II, including photo of the sealed doorway – deposition "Exhibit 11" seen from Number 9).

11. This door was not locked, because no key for the lock was given to Mr. Taveras when he purchased the building, but at the time of the purchase and at all times thereafter until the morning of September 5, 2007, the door was sealed with a plastic material nailed to both the door and the frame on the Number 9 side. (Exh. A, Wilian Taveras Declaration at ¶¶8-9; Exh. F, Dep. of Wilian Taveras, at 30-31).

12. From the time Mr. Taveras purchased the building until the morning of September 5, 2007, the sealed doorway had never been unsealed and no one had used the doorway to access either side of the building. (Exh. A, Wilian Taveras Declaration at ¶¶7-8).

13. The plastic seal nailed to the door was strong enough to prevent it from being opened by simply pushing it, and the use of very heavy force had

6

to be applied from the bathroom of Number 11 West Monroe Avenue to break through the seal. (Exh. C, Declaration of Wilfredo Taveras at ¶¶2-3).

14. September 5, 2007 was a Wednesday, the usual day for trash and recyclable collection at 9 and 11 West Monroe Avenue. (Exh. A, Wilian Taveras Declaration at ¶17).

## Background Facts – Defendants Knowledge

### Two Set of Trash and Recycling Containers at the Building

15. On the morning of September 5, 2007, trash bags and recycling containers were out on the sidewalk in separate places near the separate entrances to both 9 and 11 West Monroe Avenue. (Exh. A, Wilian Taveras Declaration at ¶17 and Attachments III and IV thereto, including photograph of the building – deposition "Exhibit 6" - depicting Numbers 9 and 11 West Monroe Avenue and Exh. B, Dep. of William Feissner at 72, 84, including the photograph looking down the stairway of Number 11 on that morning – deposition "Exhibit 10," and photograph, deposition "Exhibit 9, page 1).

16. The location of these bags and recycling containers in separate places indicated on the morning of September 5, 2007, that there was more than one apartment in the building. (Exh. Q, Dep. of Agent John Soprano, at 73-74).

### Two Electrical Boxes and Satellite Dishes

17.  The photograph of the building containing Numbers 9 and 11 West Monroe that all defendants saw before the search warrant was executed on the morning of September 5, 2007, shows clearly the presence of two electrical boxes, two satellite dishes, and two garages, all indicating that the building contained two dwelling units. (Exh. D; Exh. B,  Dep. of William Feissner, at  29, 50; Exh. Q, Dep. of Agent John Soprano, at 56-7; Exh. N, Dep. of Dane Eppley, at 16).

### Two Sets of Entrances and Posted Addresses on Doors

18. From the surveillance of the two-unit building, done by Defendant Jason Zola and other officers, Jason Zola knew the building contained two units, Numbers 9 and 11, with separate entrances on the East and South sides of the building. (Exh. E, Dep. of Jason Zola, at 17, 22, 93).

19. The search warrant sought and obtained for the building on West Monroe Avenue in West Hazelton was only for 11 West Monroe Avenue and not for 9 West Monroe Avenue. (Exh. E, Dep. of Jason Zola, at 11, 20).

### Defendants Admit Knowing Likelihood of Two Residences

20. Prior to the morning of September 5, 2007, Defendant William Feissner had reviewed surveillance photos of the building, he had observed that there were two doorways on the East side of the building and he knew

that the building containing No. 11 West Monroe Avenue might have more that one apartment in it.(Exh. B, Dep. of William Feissner, at 28-9, 30, 36, 46).

21. Prior to the morning of September 5, 2007, Defendant Jason Zola and Defendant William Feissner discussed the real possibility that upon entering the door at 11 West Monroe to execute the warrant for that address, they would encounter doors leading to the two units in the building. (Exh. E, Dep. of Jason Zola, at 21-22; Exh. B, Dep. of William Feissner, at 49-50, 54).

22. Before executing the warrant on 11 West Monroe Avenue, Corporal Feissner was aware that the telephone company listed the target of the drug investigation, Bienvenido Guerrero, as living at 11 West Monroe, "second floor." (Exh. B, Dep. of William Feissner, at 21, 50).

23. Although Bienvenido Guerrero was a target of the drug investigation and he was known to live at 11 West Monroe Avenue, no sales of drugs were known to have been made at the Monroe Avenue location. (Exh. Q, Dep. of Agent John Soprano, at 19-20).

24. None of the Plaintiffs was a target of the drug investigation. (Exh. Q, Dep. of Agent John Soprano, at 75).

## Actual Knowledge of the Law From Police Training

25. From their police academy training, officers responsible for execution of the search warrant had actual knowledge that the right to conduct a protective sweep of areas to be searched that day and areas accessible to such areas was limited to "check[ing] the area, to make sure there's nobody that is there that could harm you, [and] no weapons that anybody that is there could use to harm you." (Exh. Q, Dep. of Agent John Soprano, at 11-12.)

26. From police academy training, officers responsible for execution of the search warrant understood that once an officer learns he is in a residence not covered by the search warrant, he has a duty to withdraw from such premises, after concluding any needed protective sweep to protect the officers. (Exh. Q, Dep. of Agent John Soprano, at 78-79.)

27. Officers responsible for execution of the search warrant understood that once an officer learns he is in a residence not covered by the search warrant, he has a duty to seek another search warrant for such premises if he wishes to do a full search of premises not covered by the warrant. (Exh. Q, Dep. of Agent John Soprano, at 100).

28. The Attorney General's Task Force running the execution of search and arrest warrants on the morning of September 5, 2007, had

lawyers available to it and access to a local Magistrate Judge to get any additional warrants needed that day. (Exh. Q, Dep. of Agent John Soprano, at 43-45).

**ICE Agents Acted In Concert with State Officers Under State Control**

29. The federally employed ICE agents (Exh. N. Dep. of Agent Eppley, at 5-6) present for the search of 11 West Monroe, Agents Eppley and Christino, were acting "under" the authority of the state Attorney General's Office task force that morning. (Exh. Q, Dep. of Agent John Soprano, at 45-6).

30. Agents from the Attorney General's office had obtained the warrants needed to conduct searches and make arrests that morning (Exh. Q, Dep. of Agent John Soprano, at 45-6), and they ran the operation, including assigning the ICE officers to teams. (Exh. S, Dep. of David Christino, at 11-12). The warrant for 11 West Monroe authorized Agent Soprano and Defendant Feissner (and persons acting under their authority) to enter and search that location. (Exh. V (search warrant for 11 West Monroe Avenue)).

31. Defendants Eppley and Christino were assigned by the Attorney General's office to the team led by Defendant William Feissner, (Exh. B, Dep. of William Feissner, at 64-65), and were responsible that morning to him as their team leader. (Exh. S, Dep. of David Christino, at 17).

**Role and Authority of Defendants Feissner, Zola and ICE Agents**

32. Corporal William Feissner was acting as an employee of a local township police department that morning, (Exh. B, Dep. of William Feissner, at 5), and he was assigned the responsibility for executing the warrant at 11 West Monroe Avenue by Agent Soprano of the state Attorney General's office. (Exh. B, Dep. of William Feissner, at 10-11).

33. Team leader Feissner assigned Defendants Eppley and Christino responsibility for interviewing the occupants of the house and obtaining information the task force needed to complete its forms, checking any outstanding warrants and citizenship status, and being custodians of the residents, (Exh. B, Dep. of William Feissner, at 73-74, 116), and told them when they could leave. (Exh. N, Dep. of Dane Eppley, at 70).

34. As members of Defendant Feissner's search team, (Exh. S, Dep. of David Christino, at 17), Defendants Eppley and Christino also assisted with the search of the premises, (Exh. N, Dep. of Dane Eppley, at 35, 46), and Defendant Eppley handcuffed one member of the household himself. (Exh. N, Dep. of Dane Eppley, at 45).

35. Corporal Feissner was responsible for the search of the premises and interrogation of the occupants. (Exh. B, Dep. of William Feissner, at 10-11).

36. As the officer in charge of executing the search warrant that day, Corporal Feissner was responsible for getting any additional search warrants needed, and he was responsible for calling off the search, if that was required. (Exh. Q, Dep. of Agent John Soprano, at 45, 90-91).

37. The SOG team responsibilities that morning were controlled by Detective Sergeant Zola and Corporal Coffman, and Defendant Zola was Corporal Feissner's contact person on the SOG team and part of the surveillance and planning for the raid. (Exh. B, Dep. of William Feissner, at 66; Exh. L, Dep. of David Coffman, at 19, 30).

## Execution of the Search Warrant for 11 West Monroe – The First 5 to 15 Minutes

38. Before 5:00 a.m. on September 5, 2007, Plaintiff Wilian Taveras returned home from working at the Excel meatpacking plant and immediately went to bed. (Exh. F, Dep. of Wilian Taveras, at 6-7).

39. Mr. Taveras' mother, Barbara Gomez, and his son and daughter, Wilfredo and Wiliana, were all asleep in their rooms at 9 West Monroe Avenue. (Exh. G, Dep. of Barbara Gomez, at 5; Exh. H, Dep. of Wiliana Taveras, at 5; Exh. I, Dep. of Wilfredo Taveras, at 4).

40. At about 6:00 a.m., sixty-five year old Barbara Gomez was awakened by a banging from the door to the other side of the building, 11 West Monroe. (Exh. G, Dep. of Barbara Gomez, at 5).

41.  At the time, Ms. Gomez was sleeping in her room along with her granddaughter, Wiliana. (Exh. G, Dep. of Barbara Gomez, at 5-6; Exh J, Declaration of Barbara Gomez at ¶¶2-3, attaching deposition Exhibit 10,[1] page 6 as Attachment I (showing her bedroom)).

42. Ms. Gomez got out of bed and went out through the door of her bedroom into the hallway. (Exh. G, Dep. of Barbara Gomez, at 6-7).

43. The door from Ms. Gomez' bedroom to the hallway opens out into the hall, not into the bedroom. (Exh. J., Declaration of Barbara Gomez at ¶3, attaching photograph of the door to her bedroom as Attachment II).

**Whether Defendant Zola "kicked in" the Bathroom Door Between the Units is Disputed.**

44. When she got into the hall Barbara Gomez saw men who had come out of the sealed door they had "knocked down," leading from the bathroom of No. 11 to the hall in No. 9 (Exh. G, Dep. of Barbara Gomez, at 6-7; Exh. J, Declaration of Barbara Gomez at ¶4, attaching Attachment III showing, inter alia, deposition Exhibit 10, page 5 and 3 (showing the hallway and the door through which the men came)).

45. After Defendants left the Plaintiffs' home at 9 West Monroe Avenue on September 5, 2007, Plaintiff Wilfredo Taveras noticed a boot or shoe mark on the bathroom side of the door leading from the bathroom of

---

[1] All depositions taken in the case have used a uniform set of exhibits marked serially 1-21.

No. 11 to the hallway in No. 9, the door that had been sealed with plastic stripping. (Exh. C, Declaration of Wilfredo Taveras at ¶4).

46. Patrolman Wagner admits that Defendant Zola "kicked in" one door while clearing the building that morning, and he admits that the door Defendant Zola kicked in opened into the room he and Defendant Zola were entering at the time. (Exh. K, Dep. of Kevin Wagner, at 34-35).

47. The door to Barbara Gomez' bedroom does not and did not at the time open into her bedroom. (Exh. J, Declaration of Barbara Gomez at ¶3 and Attachment II).

48. The door leading from the bathroom in No. 11 to No. 9, which Barbara Gomez says the officers knocked down, opened in the direction Defendant Zola and Patrolman Wagner were proceeding from No. 11 to No. 9. (Exh. J, Declaration of Barbara Gomez at ¶4, and Attachment III, deposition Exhibit 10, page 3 (showing the door through which the men came).

49. Defendant Zola kicked in the bathroom door leading from No. 11 to No. 9. (Exh. C, Declaration of Wilfredo Taveras; Exh. H, Dep. of Kevin Wagner, at 34-35; Exh. J, Declaration of Barbara Gomez at ¶4, and Attachment III, attaching, inter alia, deposition Exhibit 10, page 3 (showing

the door through which the men came); Exh. G, Dep. of Barbara Gomez, at 6-7).

## Defendant Zola's and Patrolman Wagner's Claims

50. Defendant Zola and Patrolman Wagner had been two of the first SOG officers to enter the door at 11 West Monroe Avenue that morning. (Exh. K, Dep. of Kevin Wagner, at 10).

51. Zola and Wagner went up the stairs of No. 11 and into its bathroom. (Exh. K, Dep. of Kevin Wagner, at 12).

52. Zola and Wagner admit encountering a door in the bathroom and going through it, though they claim it opened without offering resistance and without the use of force. (Exh. K, Dep. of Kevin Wagner, at 13; Exh. E. Dep. of Defendant Zola, at 50-51).

53. The claim of Zola and Wagner that they did not kick in the door leading from Numbers 11 to 9 is disputed by Barbara Gomez, Wilfredo Gomez, and other corroborative evidence, including evidence that the door out of the bathroom opened away from the officers and that the door Wagner claims was kicked in opened toward the officers. (Exh. G, Dep. of Barbara Gomez, at 6-7; Exh. J., Declaration of Barbara Gomez at ¶¶3-4, and Attachments II and III, attaching, inter alia, deposition Exhibit 10, page 5 and 3 (showing the hallway and the door through which the men came) and

attaching photograph of her bedroom door; Exh. C, Declaration of Wilfredo Taveras at ¶4).

54. Defendant Zola and Patrolman Wagner went through the door to No. 9 West Monroe and encountered Barbara Gomez. (Exh. K, Dep. of Kevin Wagner, at 14, 16).

55. The men Ms. Gomez saw first were members of the Special Operations Goup (SOG), the SWAT unit, from Hazleton, Patrolman Wagner and Detective Sergeant Zola, who led the way through the door they "knocked down," the door leading from the bathroom in Number 11 to the hallways in Number 9. (Exh. E, Dep. of Jason Zola, at 50-52; Exh. K, Dep. of Patrolman Wagner, at 12-15; Exh.G, Dep. of Barbara Gomez, at 6-7).

56. Patrolman Wagner, Detective Sergeant Zola and the other approximately eight members of the SOG team were dressed in tactical gear, including black BDUs and uniforms, tactical vests, black balaclava hoods over their heads, goggles, helmets, and they carried handguns and/or long guns that included M-16 and M-4 automatic rifles. (Exh. L, Dep. of Corporal David Coffman, at 7, 21-24).

57. When she saw the armed men with rifles, hoods, and flashlights, Barbara Gomez thought they were thieves coming to rob the family, so she went down to her knees on the floor of the hallway and told them "[I]n the

name of God, we [don't] have anything." (Exh.G, Dep. of Barbara Gomez, at 6, 19).

58. Officers Zola and Wagner took Ms. Gomez back to her bedroom and told her to get down on the floor, and she immediately threw herself onto the floor, because she thought they were going to kill her. (Exh.G, Dep. of Barbara Gomez, at 20).

59. In throwing herself onto the floor as directed by the heavily armed men, Ms. Gomez exacerbated an eye injury she had recently suffered when she fell on a sidewalk. (Exh. I, Dep. of Wilfredo Taveras, at 12; Exh. J, Dep. of Wiliana Taveras, at 8; Exh. F, Dep. of Wilian Taveras, at 31-32).

60. Minutes later, Barbara Gomez was seen by Defendant Feissner wailing, curled up on the floor. (Exh. B, Dep. of William Feissner, at 90).

61. For the following 5-15 minutes, SOG team members secured the entire building at 9 and 11 West Monroe Avenue, by going through each room of the building to ensure that no persons were present, armed, and able to injure them or the officers who would later execute the search authorized for 11 West Monroe. (Exh. M, Dep. of Darryl Ledger, at 22; Exh. L, Dep. of Corporal David Coffman, at 28; Exh. E, Dep. of Jason Zola, at 75 (5-8 min.); Exh. B, Dep. of William Feissner, at 176 (5-10 minutes).

62. The officers grabbed both Wilian and Wilfredo from their beds and placed their hands in handcuffs behind their backs. (Exh. F, Dep. of Wilian Taveras, at 5-6; Exh. I, Dep. of Wilfredo Taveras, at 4-5).

63. Within approximately 5 to 15 minutes the SOG team had secured the entire building so that it was safe for the officers conducting the search. (Exh. M, Dep. of Darryl Ledger, at 22; Exh. L, Dep. of Corporal David Coffman, at 28; Exh. E, Dep. of Jason Zola, at 75 (5-8 min.); Exh. B, Dep. of William Feissner, at 176 (5-10 minutes).

64. During this 5-15 minute period of time, Detective Sergeant Zola realized that the officers had entered the premises on the ground floor of the East side of the building, which had the address of Number 9 on the door. (Exh. E, Dep. of Jason Zola, at 67-68, 86).

65. Defendant Zola realized where he was in the building when he entered the kitchen on the ground floor of Number 9, and this was confirmed when he saw the doors exiting the building on the East side. (Exh. E, Dep. of Jason Zola, at 67-68, 86).

66. Even after realizing he and his team were in the residence at 9 West Monroe Avenue, Defendant Zola and his team "continued with their duties" as he "recalls that the surveillance team had seen several of the targets going in and out of the entrance for 9 West Monroe Street." (Exh. R,

Interrogatory Responses of Jason Zola, No.13), and Defendant Zola at the time thought Plaintiffs also must have been "involved" in the drug activity. (Exh. E, Dep. of Jason Zola, at 79).

67. After realizing he was in No. 9, though the warrant was for No. 11, Defendant Zola justifies continuing his and his team's duties and the subsequent complete search of No. 9 on the basis that Plaintiffs had not sufficiently secured the door leading from the bathroom of No. 11 to the hallway of No. 9 through use of a dead bolt lock or some other means, which he believed was needed to ensure privacy protection. (Exh. E, Dep. of Jason Zola, at 79).

68. Upon seeing that the building contained two kitchens, other officers realized they may have entered and secured two dwelling units. (Exh. N, Dep. of Dane Eppley, at 57-58; Exh. E, Dep. of Jason Zola, at 86).

69. Members of the SOG team who were present at the building for only 5-15 minutes engaged in discussions about the odd layout of the building with a connection between units through a bathroom door. (Exh. P, Dep. of Chistopher Orozco, at 26, ("I was told, 'Look at the bathroom. There's a door that goes over to the other side.'").

70. Within the first 15 minutes of the entry into Numbers 11 and 9, Corporal Feissner had gone through the downstairs kitchen on the East side

of the building with the Plaintiffs at least once. (Exh. A, Declaration of Wilian Taveras at ¶20, Exh. G, Dep. of Barbara Gomez, at 13; Exh. O, Declaration of Wiliana Taveras at ¶2).

71. Defendant Feissner denies going to the first floor during the early stages of the three hour search of the premises, saying instead that he did not go into this area until the end of search. (Exh. B, Dep. of William Feissner, at 141).

72. Defendant Feissner denies seeing the side of the bathroom door facing No. 9 West Monroe Avenue, which had the hard, white plastic seal nailed onto it (Exh. B, Dep. of William Feissner, at 109-110, including deposition "Exhibit 11"), but his testimony shows that he had examined the lock on that door. (Exh. B, Dep. of William Feissner, at 174 "It has an antiquated lock that is opened by a skeleton key").

73. Corporal Feissner admits that after one of the ICE agents "complained that there were two separate residences" he called off the search of Number 9 West Monroe Avenue, because he thought his team had exceeded the scope of their search warrant, but he states this occurred only after he and his search team had brought in a search dog and had thoroughly searched Number 9 and detained all Plaintiffs for nearly three hours. (Exh. B, Dep. of William Feissner, at 154, 176-177).

74. At some point after September 5, 2007, Corporal Feissner admitted to Agent Soprano that his team "ended up in the wrong apartment or something." (Exh. Q, Dep. of Agent John Soprano, at 89).

## Execution of the Search Warrant for 11 West Monroe – The Last Three Hours

75. Execution of the search warrant at 11 West Monroe Avenue involved securing the premises by the SOG team, which took about 5-15 minutes, and search of the premises and interviewing the occupants, which took approximately three hours. (Exh. B, Dep. of William Feissner, at 176-177; Exh. A, Declaration of Wilian Taveras at ¶28).

76. During the time Plaintiffs were detained and interrogated, Wilian Taveras was handcuffed and taken to his mother's and daughter's bedroom, where his mother, Barbara Gomez, was distraught and crying. (Exh. F, Dep. of Wilian Taveras, at 9)

77. Wilfredo Taveras was handcuffed and taken from his third floor bedroom in 9 West Monroe to the second floor kitchen in 11 West Monroe. (Exh. I, Dep. of Wilfredo Taveras, at 5).

78. Wilian Taveras, Barbara Gomez, and Wiliana Taveras were taken by Defendants Feissner and Christino down the hallway of No. 9 through the first floor kitchen of No. 9, out the door leading to the garage, and up stairs and into the second floor kitchen of No. 11. (Exh. G, Dep. of  Barbara

Gomez, at 13-17; Exh. A, Declaration of Wilian Taveras at ¶¶19-21; Exh. 0, Declaration of Wiliana Taveras at 2-3).

79. From the first floor kitchen of No. 9, Corporal Feissner could easily see the two doors leading from the Plaintiffs' kitchen and living area out of the building on the east side of the building. (Exh. B. Dep. of William Feissner, at 144-146, and Exhibit 10, pages 8 and 9).

80. When the Plaintiffs were in the second floor kitchen of No. 11, they were questioned by ICE Agent Eppley. (Exh. N, Dep. of Dane Eppley, at 36-37).

81. All Plaintiffs were determined by Agents Eppley and Christino to be legally present in this country, though not citizens of the United States. (Exh. N, Dep. of Dane Eppley, at 36-37; Exh. S, Dep. of David Christino, at 42; Exh. A, Declaration of Wilian Taveras, at ¶3).

82. After being in the second floor kitchen of No. 11 for some time, Wilfredo Taveras asked if he could go to school and was told that he could. (Exh. I, Dep. of Wilfredo Taveras, at 5).

83. After Plaintiffs thought Wilfredo had been taken to school by the police officers, Defendant Feissner and the ICE Agents took the remaining three Plaintiffs to the first floor kitchen/living area of No. 9, so that

Defendants could take a search dog through No. 11. ( Exh. A, Declaration of Wilian Taveras at ¶¶21-22).

84. Plaintiffs were then taken back to the kitchen of No. 11 a second time, while the search dog was used to search their residence at No. 9. ( Exh. A, Declaration of Wilian Taveras at ¶22).

85. Ultimately, Plaintiffs were taken again to the kitchen/living area of their residence in No. 9. (Exh. A, Declaration of Wilian Taveras at ¶23).

86. While in their own kitchen this final time, Plaintiff Taveras asked ICE Agents Eppley, why they had done this to his family when the warrant was for No. 11 and not their residence at No. 9 West Monroe. (Exh. A, Declaration of Wilian Taveras at ¶24). He asked this in Spanish to this agent, because the agent was at the time speaking a bit of Spanish to Plaintiffs. (Exh. A, Declaration of Wilian Taveras at ¶24).

87. Agent Christino said to nine year old Wiliana, who spoke English, that she should tell her father to shut up, because he was not a citizen and otherwise "they" would put the handcuffs back on him. (Exh. H, Dep. of Wiliana Taveras, at 10).

88. This statement was made in the presence of Agent Eppley and he said nothing. (Exh. A, Declaration of Wilian Taveras at ¶26).

89. This threat was interpreted by Wiliana to her father Wilian and her grandmother, and Wilian Taveras then stopped talking. (Exh. A, Declaration of Wilian Taveras at ¶27).

90. During the search of Wilian Taveras' dresser in his bedroom of No. 9, Defendant Feissner took $605.00 of Plaintiff Taveras' money that he was saving to pay his mortgage, which was not returned when the search was called off on September 5, 2007, and which has never been returned by Corporal Feissner or anyone from the drug task force. (Exh. F. Dep. of Wilian Taveras, at 34-35; Exh. B, Dep. of William Feissner, at 124-25, 167-68).

91. In his written report, signed and dated by Defendant Feissner on September 5, 2007, Defendant Feissner listed the $605.00 as having been taken from the dresser in the bedroom of Wilian Taveras and listed his address as 9 West Monroe Avenue. (Exh. B. Dep. of William Feissner, at 169-71, and deposition Exhibit 7, page 5 and Exhibit 2, page 2).

92. None of the Plaintiffs was a target of the drug task force investigation, no evidence of illegal activity was found in their home, and there was no Plaintiff was charged with a crime. (Exh. Q, Dep. of Agent John Soprano, at 75; Exh. A, Declaration of Wilian Taveras at ¶29).

**Plaintiff Wilfredo Taveras Was Taken in Handcuffs to the Temporary Detention Facility and Held in Custody for Three Additional Hours**

93. Although he and his family were told he was being released to go to school that morning, instead Wilfredo Taveras was taken in handcuffs to the Armory in Hazleton and placed with other persons arrested that day. (Exh. I, Dep. of Wilfredo Taveras, at 5; Exh. T, Dep. of Gerry Gallagher, at 33, 36-38; Exh. S, Dep. of David Christino, at 42; Exh. N, Dep. of Dane Eppley, at 47-48; Exh. B, Dep. of William Feissner, at 136; Exh. Q, Dep. of Agent John Soprano, at 62-63).

94. Defendant Feissner says he had been instructed to send persons with questionable immigration status to the Armory (Exh. B. Dep. of William Feissner, at 136), that Wilfredo Taveras was taken to the Armory that morning because the ICE agents told him Wilfredo did not have proper identification. (Exh. B. Dep. of William Feissner, at 136-7), and that he took no action have Wilfredo released when he finally called off the search after three hours in Number 9. (Exh. B. Dep. of William Feissner, at 166-67).

95. Both ICE Agents, Defendants Christino and Eppley, state, however, that Wilfredo's immigration status checked out, there was no immigration-related reason to hold him, and both thought he had been taken to school as he had requested. (Exh. N, Dep. of Dane Eppley, at 36-37, 42, 47-48; Exh. S, Dep. of David Christino, at 42-3).).

96. Defendant Gerry Gallagher admits that although Wilfredo Taveras asked to go to school that morning, he took Wilfredo to the Armory because he was told by someone to do so. (Exh. T, Dep. of Gerry Gallagher, at 33-34, 36-7).

97. The only other officers present at the time were members of the search team, team leader Feissner and the two ICE agents. (Exh. T, Dep. of Gerry Gallagher, at 35).

98. Wilfredo Taveras was handcuffed and upset when Defendant Gallagher held him in custody and transported him to the Armory, where those arrested by drug task force officers at other locations that morning were being detained and questioned. (Exh. T, Dep. of Gerry Gallagher, at 35, 37; Exh. Q, Dep. of Agent John Soprano, at 62-63).

99. Plaintiff Wilfredo Taveras was held in custody with handcuffs on at the Armory for about three hours, before he was released and had to walk about 40 minutes to get back home. (Exh. I, Dep. of Wilfredo Taveras, at 5-7, 11, 15).

100. None of the officers apologized to Plaintiffs for seizing them and searching their home and no one returned Mr. Taveras' money taken in the search. (Exh. A, Declaration of Wilian Taveras at ¶28).

101. After the raid, Wilfredo and Wiliana Taveras had difficulty sleeping at night, and Wiliana is still nervous about police and has been reluctant to be by herself. (Exh. I, Dep. of Wilfredo Taveras, at 20; Exh. O, Declaration of Wiliana Taveras at ¶3; Exh. J, Declaration of Barbara Gomez, at ¶5).

COMMUNITY JUSTICE PROJECT, INC.

By:  s/Laurence E. Norton, II
     Peter Zurflieh
     Laurence E. Norton, II
     118 Locust Street
     Harrisburg, PA 17101
     (717) 236-9486
     (717) 233-4088 (fax)
     lnorton@palegalaid.net
     PA Bar 21153