IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| Wilian Taveras Gomez, Barbara Gomez, and Wilfredo Rafael Taveras and Wiliana Taveras, by their next friend Wilian Taveras Gomez, ) ) ) ) ) ) Plaintiffs, ) ) v. ) ) ) ) William J. Feissner, Joshua Winters, ) Gerry Gallagher, Jason Zola, Dane ) Eppley, and David Christino, in their ) individual capacities, ) ) Defendants. ) | No. 3:08 CV 619  (Judge Caputo)  (electronically filed) |

**Plaintiffs' Brief in Opposition to <u>State</u> Defendants' Motion for Summary Judgment**

COMMUNITY JUSTICE PROJECT, INC.

By:  s/Laurence E. Norton, II
Laurence E. Norton, II
Peter Zurflieh
118 Locust Street
Harrisburg, PA 17101
(717) 236-9486
(717) 233-4088 (fax)
lnorton@palegalaid.net
PA Bar 21153
pzurflieh@palegalaid.net
PA Bar 34998

# TABLE OF CONTENTS

Counter Statement of Facts.....................................................1

Questions Presented...........................................................10

Argument.......................................................................11

    I.     Plaintiffs Do <u>Not</u> Claim That Defendants' Entry Into Their Home, Followed by a Short "Protective Sweep" Without a Search Warrant for Their Home, Violated Their Rights.............................11

    II.    On September 5, 2007, Clearly Established Law Required Officers Executing Search Warrants to Withdraw When They Found Themselves Mistakenly in Premises Beyond the Scope of a Search Warrant.................................................................13

    III.   Defendants Feissner and Zola Knew or Should Have Known They Were in Plaintiffs' and Not Guerrero's Residence, and They Failed to Discontinue Their Search and Seizure...........................17

    IV.   Defendants Are Not Entitled to Qualified Immunity, Because Their Actions Were not Objectively Reasonable Under Clearly Established Law.....................................................25

Conclusion.....................................................................26

# TABLE OF AUTHORITIES

## <u>Cases</u>

<u>Anderson v. Creighton</u>,
        483 U.S. 635 (1987)…………………………………………………25

<u>Byrd v. Duffy</u>,
        1998 WL 961902 at *5 (E.D. Pa.)……………………...……………25

<u>Dorman v. United States</u>,
        435 F. 2d 38 (D.C. Cir. 1970)……………………………….......13

<u>Gillard v. Schmidt</u>,
        579 F2d 825 (3d Cir. 1978)……………………………………...16n

<u>Kyllo v. United States</u>,
        533 U.S. 27 (2001)…………………………………………………13

<u>Maryland v. Buie</u>,
        494 U.S. 327 (1990)……………………………………………......11

<u>Maryland v. Garrison</u>,
        480 U.S. 79 (1987)……………………………………...14, 15, 16

<u>Michigan v. Summers</u>,
        452 U.S. 692 (1981)………………………………………….......21

<u>Michigan v. Tyler</u>,
        436 U.S. 499 (1976)………………………………………...……24

<u>Payton v. New York</u>,
        445 U.S. 573 (1980)…………………………………….…………...13

<u>Sharrar v. Felsing</u>,
        128 F.3d 823 (3d Cir. 1997)……………………………12, 13, 23, 25

<u>Shea v. Smith</u>,
        966  F.2d 127 (3d Cir. 1992)…………………………………...…….24

Stoner v. State of California,
    376 U.S. 483 (1964)……………………………………………….16n

U.S. Dept. of Defense v. Federal Labor Relations Authority,
    510 U.S. 487 (1994)…………………………………………….....13

United States ex rel. McArthur v. Rundle,
    402 F.2d 701 (3d Cir. 1968)……………………………………..16n

United States v. Ford,
    56 F.3d 265 (D.C. Cir.1995)……………………………....…….12

United States v. Hogan,
    38 F.3d 1148 (10th Cir. 1994)..........................................…..12

United States v. Lavallee,
    2006 WL 1455727 (M.D.Pa.) at 5………………………..…..12

United States v. Ritter,
    416 F.3d 256 (3d Cir. 2005)………………………………...16, 17n

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| Wilian Taveras Gomez, | ) | |
| Barbara Gomez, and Wilfredo Rafael | ) | |
| Taveras and Wiliana Taveras, by their | ) | |
| next friend Wilian Taveras Gomez, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | No. 3:08 CV 619 |
| | ) | |
| William J. Feissner, Joshua Winters, | ) | (Judge Caputo) |
| Gerry Gallagher, Jason Zola, Dane | ) | |
| Eppley, and David Christino, in their | ) | (electronically filed) |
| individual capacities, | ) | |
| | ) | |
| Defendants. | ) | |

**Brief in Opposition to <u>State</u> Defendants' Motion for Summary Judgment**

**<u>Counter Statement of Facts</u>**

Plaintiffs are a father, forty year old Wilian Taveras Gomez (hereinafter "Wilian Taveras"), his mother, sixty five year old Barbara Gomez, and Wilian's two children, sixteen year old Wilfredo and nine year old Wiliana.[1] (FOSJ ¶¶2-3).[2]

All Plaintiffs are permanent resident aliens of Hispanic origin, and none was a target of the drug investigation giving rise to the search of their

---

[1] All ages of Plaintiffs are as of the date of the search of their home, September 5, 2007.
[2] Plaintiffs file their Facts Opposing Summary Judgment ("FOSJ") with this brief. The same statement of facts is filed in opposition to the state defendants' motion and the federal defendants' motion.

home on the morning of September 5, 2007. (FOSJ ¶¶4, 24). No weapons, drugs, or drug paraphernalia were found in their home during the three hour search, and no Plaintiff was charged with a crime. (FOSJ ¶87).

On the morning of September 5, 2007, Plaintiffs lived at 9 West Monroe Avenue, West Hazleton, Pennsylvania, in one side of a two-apartment building owned by Mr. Taveras. (FOSJ ¶1).[3] The other side of the building is 11 West Monroe Avenue. (FOSJ ¶ 5). Since Mr. Taveras purchased the building in 2006, the two apartments have always been separated, with unrelated families leasing Number 11 West Monroe from Mr. Taveras, and with the units having separate electrical service and separate mailing addresses. (FOSJ ¶5).

The two entrances to 9 West Monroe are on the east side of the building leading to a small yard, (FOSJ ¶8), and the entrance to 11 West Monroe is on the south side of the building leading to the sidewalk on West Monroe Avenue. (FOSJ ¶8). Inside the building, each unit has access to the garages. (FOSJ ¶9).

For the entire time Mr. Taveras had owned the property, a doorway that connected the bathroom of Number 11 to a hallway in Number 9 had

---

[3] Wilian Taveras' wife and the mother of Wilfredo and Wiliana is Maria Vargas. (FOSJ ¶4). She was not legally permitted to be in the country on September 5, 2007, and was therefore living in the Dominican Republic. (FOSJ ¶4). She is now a legal permanent resident and lives with her husband and children at 9 West Monroe Avenue in West Hazleton. (FOSJ ¶4).

been sealed with plastic stripping, nailed to the door and the door frame on Plaintiffs' side of the building, so that great force was needed to break through from one side to the other. (FOSJ ¶¶10-13). While the building was owned by Mr. Taveras, this door had never been unsealed and the doorway had never been used by the two families living in the apartments to get from one side to the other. (FOSJ ¶¶10-13).

Though no sales of drugs at or around the building had been observed during the extensive surveillance done in preparation for the execution of the search warrant on September 5, 2007, a target of the drug investigation, Bienvenido Guerrero, lived at 11 West Monroe with his girlfriend and the girlfriend's son. (FOSJ ¶¶7, 23).

Defendants obtained a search warrant to conduct a search of 11 West Monroe Avenue on September 5, 2007. (FOSJ ¶19).

The Defendants in the case are local law enforcement officers who were members of the Pennsylvania State Attorney General's Drug Task Force investigating drug sales in the Hazleton area, and two federally employed ICE[4] agents assigned to the Task Force for that day, who were acting that morning under the direction and control of Defendant William

---

[4] Department of Homeland Security, U.S. Immigration and Customs Enforcement.

Feissner, the person designated by the Attorney General's Office to be in charge of the search warrant for 11 West Monroe Avenue. (FOSJ ¶¶29-31).

While Defendant Feissner was responsible for execution of the search warrant at Number 11, a Special Operations Group (SOG) entry team from Hazleton was responsible for securing the premises prior to the search. (FOSJ ¶¶32, 35-36). The assistant leader of that team and Defendant Feissner's contact on that team was Defendant Jason Zola, who had also conducted surveillance of the building in preparation for obtaining the search warrant. (FOSJ ¶37).

Defendants Feissner and Zola each had substantial knowledge of the building before the morning of September 5, 2007.  Defendant Zola knew the building contained both Number 11 and Number 9 West Monroe. (FOSJ ¶18). Defendant Feissner knew doorways led from the building on the south side and the east side. (FOSJ ¶20), and he knew Bienvenido Guerrero's telephone carrier listed him as living at 11 West Monroe, "second floor." (FOSJ ¶22).  Feissner had noticed on the photograph of the building he was given days before the raid that the building was large, with multiple garages, two electrical boxes, and two satellite dishes. (FOSJ ¶17). Defendants Feissner and Zola had met on a day before the raid to discuss their plan for

the raid, including the "real possibility" there were two separate living units within the building. (FOSJ ¶21).

September 5, 2007, was trash collection day on West Monroe Avenue, and the location that morning of trash bags and recycling containers in separate places near the separate entrances to Numbers 9 and 11 indicated that there was more than one apartment in the building. (FOSJ ¶15-16).

At shortly after 6 am on September 5, 2007, Defendant Zola and about ten members of SOG team entered No. 11 West Monroe armed with handguns and automatic long guns. (FOSJ ¶56). They were dressed in black BDUs and protective vests, and they wore helmets, black hoods, and goggles. (FOSJ ¶56).   Defendant Zola and Patrolman Kevin Wagner were two of first officers through the door that morning. (FOSJ ¶45).

Zola and Wagner went up the stairs to the second floor in Number 11 and into its bathroom. (FOSJ ¶46). There they encountered a door leading from the bathroom that met resistance when they tried to open it. (FOSJ ¶¶40, 43, 44, 45-49).  Wagner stood back and Zola kicked the door in. (FOSJ ¶¶40, 43, 44, 45-49). This was the doorway sealed with plastic stripping nailed to the other side in No. 9. (FOSJ ¶44, 45).

After kicking it in, Officers Zola and Wagner went through the door into Number 9 West Monroe Avenue, followed by other SOG team

members. (FOSJ ¶54). They first encountered sixty-five year old Barbara
Gomez. (FOSJ ¶55).

When she saw the armed men with rifles, hoods, and flashlights,
Barbara Gomez thought they were thieves coming to rob the family, so she
went down to her knees on the floor of the hallway and told them "[I]n the
name of God, we [don't] have anything." (FOSJ ¶57).

The SOG team members handcuffed Wilian Taveras and Wilfredo
Taveras, both of whom had been sleeping in their bedrooms. (FOSJ ¶62). It
took the SOG officers between 5 to 15 minutes to go through all the rooms
and clear both sides of the building, Numbers 9 and 11, so it was safe for
Defendant Feissner's search team to execute the search warrant. (FOSJ ¶63).

When the building was cleared by the SOG team, Plaintiffs were
taken by Defendants Feissner and Christino to the second floor kitchen in
No. 11. (FOSJ ¶65, 78). Plaintiffs Wilian Taveras, Barbara Gomez, and
Wiliana Taveras were taken by Feissner and Christino down the stairs of
their apartment in No. 9 into their kitchen, out the kitchen door to the garage,
and up to the kitchen of No. 11. (FOSJ ¶78). On this walk, Defendant
Feissner was easily able to observe the second kitchen, in No. 9, and the
doorways leading out to the yard on the south side of the building in Number
9. (FOSJ ¶79).

During the 5 to 15 minutes Defendant Zola was present in the building, he entered the first floor kitchen in No. 9, realized where he was in the building, and he confirmed he was in No. 9 when he saw the doors exiting the building on the east side. (FOSJ ¶¶64-65). While on the scene during the first 5-15 minutes, other SOG members engaged in discussions about the odd layout of the building with a connection between units through a bathroom door. (FOSJ ¶69).

While Defendant Feissner noted many details about the previously sealed door between Numbers 11 and 9, such as, "It has an antiquated lock that is opened by a skeleton key," (FOSJ ¶72), he denies that he ever saw the side of the bathroom door facing No. 9 West Monroe Avenue, which had the white, plastic stripping nailed onto it to prevent access to Number 9 from Number 11. (FOSJ ¶72).

After being able to confirm within the first 15 minutes that there were indeed two units in the build and that they had gone beyond the scope of the search warrant by entering and "clearing" Number 9 West Monroe Avenue, Defendants Zola and Feissner, nevertheless, continued with the search of both sides of the building, including taking a search dog through the entire building. (FOSJ ¶¶75, 83-84). Feissner and Zola continued with the search of Plaintiffs' home and continued to restrain and detain Plaintiffs, because

they thought Plaintiffs' failure to have outside doors and/or deadbolt locks protecting them from intrusion through the bathroom door in Number 11, permitted the officers to consider Number 9 a part of Number 11 West Monroe Avenue under the warrant. (FOSJ ¶67).

Defedant Zola also justifies the continued search and detention on the basis that he thought at the time that the Taveras family was probably involved with the drug selling. (FOSJ ¶66).

All plaintiffs were detained in the custody of the defendants for about two and one half to three hours past the time the building had been cleared by the SOG team. (FOSJ ¶75-77). During this time, Wilfredo Taveras and his father were handcuffed, and all the rooms of their house were searched by the search team officers and an officer using a police dog. (FOSJ ¶¶75-77, 83-84).  Defendant Feissner took $605.00 from Mr. Taveras' dresser drawer that he was saving to pay his mortgage. (FOSJ ¶¶90-91). The money has never been returned, and Defendant Feissner made no effort to return the money after he called off the search much later that morning. (FOSJ ¶¶90-91).

When all of the Plaintiffs were taken over to the second floor kitchen of 11 West Monroe, their immigration status was checked by the ICE agents, Dane Eppley and David Christino. (FOSJ ¶¶80-81). All were found to be

legal permanent residents of the United States, though not citizens. (FOSJ ¶81).

In the kitchen of Number 11, sixteen year old Wilfredo asked if he could go to school that day and was told he should get his clothes on and he would be taken there. (FOSJ ¶¶93, 96). Although the ICE agents say his immigration status had been cleared and there was no immigration-related reason to hold him, (FOSJ ¶95), Defendant Feissner, nonetheless, instructed Sergeant Gerry Gallagher to take Wilfredo to the armory where all those arrested in other related raids that morning were being held. (FOSJ ¶¶94, 96-98). Defendant Feissner justifies his actions by contradicting the ICE agents, now saying they told him Wilfredo needed to have documentation checked and this is the reason he was taken in handcuffs to the armory. (FOSJ ¶94).

Wilfredo Taveras was held in custody at the armory for an additional three hours that morning, the entire time in handcuffs. (FOSJ ¶99). When he was finally released, he had to walk forty minutes to get back home. (FOSJ ¶99).

After about three hours of searching both Nos. 11 and 9 West Monroe that morning, Defendant Feissner finally called off the search in Number 9, when the ICE agents complained to him that Mr. Taveras said he lived in Number 9 and not Number 11. (FOSJ ¶73). But even when he called off the

search, Defendant Feissner took no steps to make sure Wilfredo Taveras was released from custody at the armory or to return Mr. Taveras' $605.00, (FOSJ ¶¶94, 90),  and he did not apologize for the extensive seizure of the Taveras family and the lengthy and extensive search of their home. (FOSJ ¶¶90, 100).

When Mr. Taveras asked ICE agent Eppley why he and his family had been treated this way since the warrant was for the adjoining apartment and not his, Defendant Christino in the presence of Defendant Eppley told nine year old Wiliana in English words to the effect "Tell you father to shut up or we will put the cuffs back on him. He is not a citizen!" Agent Eppley said nothing. (FOSJ ¶¶86-88). Wiliana interpreted this threat to her father and he stopped talking. (FOSJ ¶89).

## **Questions Presented**

Whether Plaintiffs can introduce evidence allowing a finder of fact to conclude that (1) Defendants Zola and Defendant Feissner knew or should have known within the first 5-15 minutes of entering Plaintiffs' apartment that they had entered and secured a residence different from No. 11 West Monroe Avenue and (2) then failed to withdraw from such residence and release Plaintiffs from custody.

Whether the failure to withdraw and release Plaintiffs after securing the premises violated Plaintiffs' clearly established right to be secure in their persons and home, protected by the Fourth Amendment and Section 1983.

## Argument

I.  **Plaintiffs Do Not Claim That Defendants' Entry Into Their Home, Followed by a Short "Protective Sweep" Without a Search Warrant for Their Home, Violated Their Rights.**

After completing discovery in this case, contrary to the thrust of much of the state Defendants' summary judgment motion and brief, Plaintiffs do not claim that entry into their home and the short "protective sweep" to clear the premises from potential threats violated their Constitutional rights. Even though Defendants had no warrant authorizing them to enter Plaintiffs' home at 9 West Monroe Avenue and had no exigent reasons for entering the home, Plaintiffs accept Defendants' right to protect themselves while executing the search warrant in adjacent No. 11 West Monroe Avenue. A "quick and limited" sweep by officers of areas where a person could be hiding is permitted for a period "no longer than is necessary to dispel the reasonable suspicion of danger." Maryland v. Buie, 494 U.S. 327, 333 (1990).

Given the unusual layout of the two adjoining apartments, Plaintiffs also accept Defendants' right to knock down the door leading from the bathroom in No. 11 to the hallway in No. 9. In the heat of the moment, the SOG team officers may not have known that the second bathroom door led to a separate residence and, in any event, because they could reasonably

11

have believed the door allowed access from one unit to the other, they probably had the right to secure the area on the other side of the door even if they had knowledge at the time that it led to another apartment.

But, courts authorizing protective sweeps also set limits on such sweeps and had established clearly on September 5, 2007, that going beyond such limits constitutes a violation of constitutional rights. Sharrar v. Felsing, 128 F.3d 823 (3d Cir. 1997); United States v. Lavallee, 2006 WL 1455727 (M.D.Pa.) at 5 (holding that a 45 minute sweep was too long) (attached hereto as Exhibit U); see also . United States v. Ford, 56 F.3d 265, 271 (D.C. Cir.1995) (holding that a sweep was unconstitutional because officers intruded into areas where no person could hide); United States v. Hogan, 38 F.3d 1148, 1150 (10th Cir. 1994) (holding that officers conducted an impermissible fishing expedition in continuing a "protective sweep" for two hours).

As shown below, both the SOG team officers and the officers searching the premises quickly finalized their sweep, "cleared" the building for dangers to officers, and in the process discovered they had entered a separate residence. As shown below, once they knew or *should have known* they were in a residence other than 11 West Monroe Avenue, Defendants had a clearly established Constitutional duty to discontinue the search and

12

withdraw from the premises. Defendant's Feissner and Zola knew or should have known this by the time the protective sweep was concluded, i.e., approximately 15 minutes after the raid began. Because Defendants Feissner and Zola did not withdraw, but instead continued with a search lasting approximately three hours, and because they continued with their physical restraint and detention of the Plaintiffs for three or more hours beyond the time required for the protective sweep, the search and seizure was unreasonable.

II.    **On September 5, 2007, Clearly Established Law Required Officers Executing Search Warrants to Withdraw When They Found Themselves Mistakenly in Premises Beyond the Scope of a Search Warrant.**

Protection of families from police intrusion into their homes "is the archetype of privacy protection secured by the Fourth Amendment. <u>Payton v. New York</u>, 445 U.S. 573, 586, (1980) quoting <u>Dorman v. United States</u>, 435 F. 2d 38, 3895 (D.C. Cir. 1970); <u>U.S. Dept. of Defense v. Federal Labor Relations Authority</u>, 510 U.S. 487 (1994) (privacy of the home is given special consideration under the Constitution); <u>Kyllo v. United States</u>, 533 U.S. 27 (2001) (people have greater expectations of privacy in their homes because of the intimate activities that take place there). Clearly established Fourth Amendment law provided in September 2007 that "searches and seizures inside a home without a warrant are presumptively unreasonable."

Sharrar v. Felsing, 128 F.3d 810, 829 (3d Cir. 1997), quoting Payton v. New York, 445 U.S. 573, 586.

Like all of us, police officers can make mistakes and in doing so can enter living quarters not covered by a warrant or living quarters mistakenly covered in a warrant because the warrant includes, for example, and entire floor of a building, but the target of the search resides only in one portion of that floor. When officers, know or objectively should know, however, that they are in the residence of persons not targeted, they are "required to discontinue their search." Maryland v. Garrison, 480 U.S. 79, 87 (1987).

In Maryland v. Garrision, Baltimore police officers obtained a search warrant for the apartment of a man named McWebb at "the premises known as 2036 Park Avenue third floor apartment." Officers reasonably thought that the third floor contained only one apartment. Id at 80. Actually, the third floor was divided into two apartments, one occupied by the target, McWebb, and one occupied by Mr. Garrison. Id.

When the police entered the third floor vestibule, Mr. Garrison was present and the doors leading to both apartments were open. Police entered the door to Garrison's apartment, reasonably believing they were entering the living quarters of the target, McWebb. Id at 81. Police soon realized,

14

however, that there were two apartments on the third floor and upon discovering the potential for being in the wrong apartment discontinued their search. Id at 81. Before discovering they were possibly in Garrison's apartment and not that of McWebb, police found heroin, cash, and drug paraphernalia.

The Supreme Court held the search and discovery of the evidence was not unreasonable, because objectively the officers acted reasonably at all times up to the discovery of the contraband and only after discovering the evidence did they objectively know of their mistake. In reaching its decision, the Court clearly established the standard for police action when they know or reasonably should know they are in the wrong residence.

> If the officers had known, or should have known, that the third floor contained two apartments before they entered the living quarters on the third floor, and thus had been aware of the error in the warrant, they would have been obligated to limit their search to McWebb's apartment.  Moreover, as the officers recognized, *they were required to discontinue the search of respondent's apartment as soon as they discovered that there were two separate units on the third floor and therefore were put on notice of the risk that they might be in a unit erroneously included within the terms of the warrant.*

Maryland v. Garrison, 480 U.S. 79, 87 (1987) (emphasis supplied).

Thus, case law governing defendants' actions in September of 2007 clearly distinguished between the right of officers to go into areas accessible to the area being searched for a protective sweep of limited scope and

duration, and the constitutional obligation of officers to withdraw from such

accessible areas once they know or *should know* they have intruded into an

area beyond the scope of the search warrant. As shown by the facts in

Garrison, this duty to withdraw from areas beyond the scope of the warrant

clearly exists even when such areas are easily accessible from the search

location.[5] In Garrison, the door to the apartment the officers were required to

leave was actually open, when the officers entered, Id at 81, not closed and

sealed as was the door broken down by the officers in this case.[6]

More recently, the Third Circuit has applied Garrison's rule to the

same effect. In United States v. Ritter, 416 F.3d 256, 266 (3d Cir. 2005), a

warrant was issued for a building that was not previously known to contain

multiple residences. Under Garrison, the Court set forth the officers'

constitutional obligation:

> once the officers knew or should have known of the error in what they
> encountered versus what was authorized by the warrant, they were
> obligated to either limit the search to those areas clearly covered by
> the warrant or to discontinue entirely their search.

---

[5] The lead agent in this search, Agent Soprano, had actual, subjective knowledge of this established law and recognized the duty to withdraw once a mistake is recognized. (FOSJ ¶¶ 25-26).
[6] The reasonable expectation of privacy and the resulting right to protection under the Fourth Amendment does not require a person to bolt, lock, or even close a door to keep the government from intruding. So, for example, people have the expectation of privacy in a hotel room, Stoner v. State of California, 376 U.S. 483 (1964), in a partially opened envelope that police could see in plain sight, United States ex rel. McArthur v. Rundle, 402 F.2d 701 (3d Cir. 1968), and in a partially opened school desk in a suite shared with four other counselors, Gillard v. Schmidt, 579 F2d 825 (3d Cir. 1978).

United States v. Ritter, 416 F.3d at 266.[7] Because the officers in Ritter did not cease their search when they reasonably should have realized they were in multiple dwellings, the Court remanded with instructions to suppress all evidence discovered after the officers knew or should have known of their mistake.

### III.   Defendants Feissner and Zola Knew or Should Have Known They Were in Plaintiffs' and Not Guerrero's Residence, and They Failed to Discontinue Their Search and Seizure.

Based on the depositions taken and the declarations of Plaintiffs, a reasonable fact finder could readily conclude that Defendants Feissner and Zola knew or should have known when the protective sweep was concluding, within 15 minutes from the time the raid began, that they had entered into and secured a residential unit other than Bienvenido Guerrero's apartment at 11 West Monroe Avenue. Under these circumstances, the Fourth Amendment required them to discontinue immediately their search and their detention of all family members. Having failed to stop the search and seizure immediately, Defendants are liable to Plaintiffs for violation of their liberty and privacy rights and the humiliation, embarrassment, and other consequential damages they suffered.

---

[7] Even the government conceded in Ritter that "once the officers discovered that the house had multiple dwelling units, they could no longer rely on the warrant to justify their search of the building." United States v. Ritter, 416 F.3d at 267.

Corporal Feissner and Detective Sergeant Zola both knew <u>before</u> the morning of Sepember 5, 2007, that the building contained or likely contained two residences. Defendant Zola knew the door on the south side had a number "11" on it and a door on the east side had on it the number "9."    The search warrant photo they both saw clearly shows two electrical boxes and two satellite dishes on the building, and the target's phone listing carried the address as "11 W. Monroe Ave., 2nd Floor." These two Defendants admit that they coordinated the entry and search that day and met in advance to discuss, among other things, the "real possibility" there were two apartments in the building.

On the morning of the raid, before the officers entered the building, trash bags and recycling containers were set out and visible in two separate places on the sidewalk, one next to the door to Number 11 and another next to the gate entering the yard in front of Number 9. Therefore, both Zola and Feissner knew or should have known before entering Number 11 to search that unit that there was also another apartment in the building.

Defendant Zola was one of the first men into the building, and he and Patrolman Wagner admit they went through the door leading from the

second floor bathroom of No. 11[8] into the hall of No. 9. While they claim they merely opened the door and went through, there is much evidence that this is not true and that Defendant Zola kicked the door in.

For instance, Barbara Gomez testified that she heard them breaking down the sealed door and saw them in the hall directly in front of the door just after hearing the door being broken down. Wilfredo Taveras says he saw a foot or boot mark on the door after the raid and he also says that he had once tried to push through the door from Number 11's bathroom when he forgot his keys to Number 9, but he was unsuccessful, because the stripping sealing the other side was provided too much resistance.

Plaintiffs' claim that the bathroom door was kicked in is also supported by the admission of Patrolman Wagner that Zola kicked in one door in the building that morning and the evidence that the door he claims was kicked in, Barbara Gomez' bedroom door, swings out and could not have been kicked in. In addition, Barbara Gomez also testified that Zola and Wagner did not break down her bedroom door, but instead she exited her door to the hallway and looked into the landing for the stairs to the attic and at that time saw the officers in front of the bathroom door. With all of this evidence, a fact-finder could find that Zola kicked that bathroom door in.

---

[8] All of the living space in number 11 is on the second floor. The living space in number 9 is on the first, second and third floors.

Even though Jason Zola does not admit he kicked the bathroom door in, he does admit that while present on the premises only 5-15 minutes that morning he realized he and the entry team had entered into Number 9. Significantly, Defendant Zola says he knew he was in the other unit, i.e., No. 9, when he went down the stairs into the kitchen and saw the doors leading outside to the east of the building. Other members of the entry team, also present for only 5-15 minutes, discussed the odd layout with bathroom doors connecting two separate apartments. Even Defendant Eppley, who had no advance knowledge of the building, was startled when he says he first came into the first floor kitchen of No. 9, saying "Oh, another kitchen." (FOSJ ¶66).

Each of these officers knew he had gone into another apartment at least by the time he entered the first floor kitchen and living area of Number 9. Given his prior understanding that the building probably contained two apartments, a fact finder could easily conclude that Defendant Feissner, also knew, or at least should have known he was in Number 9 when he took Wilian Taveras, Barbara Gomez, and Wiliana Taveras, through the downstairs kitchen and out the garage door and up the stairs to the second floor kitchen in No. 11. Based on the testimony of Wilian and Wiliana, this walk through their first floor kitchen with Feissner occurred right after the

building had been cleared by the entry team, well before the police dog came in to search the premises. Occurring approximately 15 minutes into the raid, this walk through provided Defendant Feissner information from which he knew or should have known that he and his team had gone beyond the scope of their warrant.

Corporal Feissner was in charge of the search, he had the responsibility for calling off the search or limiting it if need be, and he was the person responsible for getting another warrant if that were required. (FOSJ ¶36). He, therefore, is accountable for the search continuing past the 15 minute time period needed for the "protective sweep," and he is the person responsible for continuing the seizure of Plaintiffs for the next three hours that morning.

A finder of fact could also find that Defendant Feissner was directly responsible for the "arrest" and three hour detention of Wilfredo Taveras without probable cause. (see FOSJ ¶¶96-97). The right to detain any of the occupants of No. 9 depended on the "limited authority to detain the occupants of the premises while a proper search [was] conducted." Michigan v. Summers, 452 U.S. 692, 705 (1981). Once the protective sweep was complete and Feissner knew or should have known he had intruded into another residence, and he knew or should have known that his authority to

seize and detain Plaintiffs, based on his authority to search their premises, had ended. From that point on the search of Plaintiffs' home and their restraint and detention was unreasonable.

Feissner says he was instructed to send people to the armory if they needed to be checked out for immigration problems, and that the ICE agents told him Wilfredo did not have proper identification. (FOSJ ¶94). Both ICE agents deny this, saying there was no immigration-related reason to detain Wilfredo, and they thought he had been released to go to school. (FOSJ ¶95). Sergeant Gerry Gallagher took Wilfredo in handcuffs to the armory after being asked to do so by someone that could only have been the person in charge at that time, Defendant Feissner. (FOSJ ¶¶96-97).

Feissner had no apparent concern that this teenager from Number 9 West Monroe had been manacled and detained with drug dealers for hours that morning at the armory, solely because the entry team had gone into the wrong place. Even when Feissner called off the search, hours later, he took no action to see to it that Wilfredo was released. (FOSJ ¶94).

After a reasonable officer would have discontinued the search of the Taveras home, Feissner also personally took $605.00 of Wilian Taveras' money, and he took no action to return the money when he later ended the search. (FOSJ ¶90).

Detective Sergeant Zola had conducted surveillance and helped plan the raid that morning. He was one of the SOG team leaders and the person responsible for interacting with Feissner before and during the execution of the warrant. (FOSJ ¶37). But, when he discovered that he and his team had entered into No. 9 West Monroe Avenue that morning, he did not discontinue the search of those premises, and he did not release the persons handcuffed and detained from No. 9. Instead, he simply "continued with his duties," and did nothing to release the Plaintiffs his team held in custody. (FOSJ ¶66).

Detective Sergeant Zola believes his actions were justified, because he thought at the time the Taveras family was probably involved in drugs. (FOSJ ¶66). The clear inference from this statement is that he wanted to continue the search at the time, because thought it would yield evidence of criminal activity by Plaintiffs.

Zola's actions in not discontinuing the search violated the rule set out in Garrison, requiring officers to discontinue searches when they know they have gone beyond the residence of the search target. His actions to continue the search without a warrant for the expanded premises also violated his duty to get a warrant, if he felt there was probable cause justifying such a further intrusion. Sharrar v. Felsing, 128 F.3d 823 (3d Cir.

1997) ("searches and seizures inside a home without a warrant are presumptively unreasonable"); Michigan v. Tyler, 436 U.S. 499, 509 (1976) (holding that intrusion into a home is not permitted without a warrant unless there are exigent circumstances allowing no time to obtain one). On the morning of September 7, 2007, drug task force lawyers were available to get any needed warrants and a Magistrate Justice was available to issue such warrants, but neither Zola nor Feissner made an attempt to obtain a warrant for 9 West Monroe Avenue. (FOSJ ¶28).

Given his role as the contact with Feissner's search team and his role as a leader of the entry team, Defendant Zola is accountable for the continuation of the search after he knew both teams had entered the wrong apartment. Along with Defendant Feissner, Zola is accountable to Plaintiffs for their three hour detention, the search of their home by officers and a dog, the loss of $605.00, and the arrest and detention of Wilfredo Taveras.

As employees of state municipalities and as police officers acting under the authority of the State Attorney General's task force, (FOSJ ¶32, 37, Complaint (Doc. 10) ¶¶9, 13, 15), Defendants Feissner and Zola were "acting under color of law" within the meaning of 42. U.S.C §1983, and are liable for violations of the Fourth Amendment's prohibition against unreasonable searches and seizures. Their failure to follow clearly

24

established United States Supreme Court direction to discontinue the search when they knew of should have known they were in the wrong apartment makes them legally accountable for damages to Plaintiffs.

IV.   **Defendants Are Not Entitled to Qualified Immunity, Because Their Actions Were not Objectively Reasonable Under Clearly Established Law.**

While qualified immunity is a defense to individual liability under section 1983 for Fourth Amendment violations, Anderson v. Creighton, 483 U.S. 635, 643 (1987), it is only available upon showing that the Defendants *reasonably* believed that their conduct was lawful. Shea v. Smith, 966 F.2d 127, 130 (3d Cir. 1992). A good faith belief by an officer that he is complying with the law is not a defense, if the belief was not objectively reasonable under the circumstances. Anderson, supra, 483 U.S. 641. Thus, "if the law was clearly established at the time of the conduct, then the court must determine 'whether the actions of the officers, equipped with the knowledge of clearly established law, were *objectively reasonable.*'" Byrd v. Duffy, 1998 WL 961902 at *5 (E.D. Pa.) quoting Sharrar v. Felsing, 128 F.3d 810, 828 (3d Cir. 1997) (emphasis supplied).

As shown above, Defendants Zola and Feissner actually knew or at minimum they should have known, had they been acting as reasonable officers, that they were in the wrong apartment within 15 minutes of entry

25

into the building. They had a clearly established duty to discontinue the search and seizure at that point, and their failure to do so when officers acting reasonably would have withdrawn precludes a qualified immunity defense.

## Conclusion

For the reasons stated above, the motion for summary judgment, filed on behalf of state Defendants William Feissner and Jason Zola should be denied.

COMMUNITY JUSTICE PROJECT, INC.

By:  s/Laurence E. Norton, II
Laurence E. Norton, II
Peter Zurflieh
118 Locust Street
Harrisburg, PA 17101
(717) 236-9486
(717) 233-4088 (fax)
lnorton@palegalaid.net
PA Bar 21153
pzurflieh@palegalaid.net
PA Bar 34998