IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| Wilian Taveras Gomez, | ) | |
| Barbara Gomez, and Wilfredo Rafael | ) | |
| Taveras and Wiliana Taveras, by their | ) | |
| next friend Wilian Taveras Gomez, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | No. 3:08 CV 619 |
| | ) | |
| William J. Feissner, Joshua Winters, | ) | (Judge Caputo) |
| Gerry Gallagher, Jason Zola, Dane | ) | |
| Eppley, and David Christino, in their | ) | (electronically filed) |
| individual capacities, | ) | |
| | ) | |
| Defendants. | ) | |

**Plaintiffs' Brief in Opposition to <u>Federal</u> Defendants' Motion for
Summary Judgment**

COMMUNITY JUSTICE PROJECT, INC.

By: <u>s/Laurence E. Norton, II</u>
Laurence E. Norton, II
Peter Zurflieh
118 Locust Street
Harrisburg, PA 17101
(717) 236-9486
(717) 233-4088 (fax)
<u>lnorton@palegalaid.net</u>
PA Bar 21153
<u>pzurflieh@palegalaid.net</u>
PA Bar 34998

# TABLE OF CONTENTS

Table of Authorities…………………………………………………………ii

Counter Statement of Facts……………………………………………...1

Question Presented…………………………………………………………10

Argument……………………………………………………………...11

    I.    ICE Agents Christino and Eppley Were Acting As Federal Agents, But They Were Also Acting Under Color of State Law, Within the Meaning of Section 1983 and Section 1981(a)…………………..11

    II.    Agent Christino's Threat to Manacle Mr. Taveras in Response to his Question to Agent Eppley Violated Plaintiff's Right to Equal Protection of the Law…………………………………......16

    III.    Defendants Are Not Entitled to Qualified Immunity, Because Their Actions Were not Objectively Reasonable Under Clearly Established Law………………………………………..…...20

Conclusion……………………………………………………………22

# TABLE OF AUTHORITIES

## Cases

Anderson v. Creighton,
    483 U.S. 635 (1987)…………………………………………………21

Bivens v. Six Unknown Federal Narcotics Agents,
    403 U.S. 388 (1971)…………………………………………………19

Bridges v. Wixon,
    326 U.S. 135 (1945)………………………………………....16, 17, 21

Byrd v. Duffy,
    1998 WL 961902 at *5 (E.D. Pa.)……………………………...……21

Chaplinsky v. New Hampshire,
    315 U.S. 568 (1942)………………………………………………....18

Connick v. Myers,
    461 U.S. 138 (1983)………………………………………….……...17

Davis v. Passman,
    442 U.S. 228 (1979)…………………………………………………19

Eichenlaud v. Twp. of Indiana,
    385 F.3d 274 (3d Cir. 2004)………………………………………....17

Graham v. Richardson, 403 U.S.365 (1971)……………………………..11n

Lugar v. Edmondson Oil Company, Inc.,
    457 U.S. 922 (1982)……………………………………………..13, 14

Quiles v. United States Department of Defense,
Civ. No. 1:09-CV-580, 2009 WL 4810188 (M.D. Pa. Dec. 10, 2009) at
5………………………..………………………………………………11n

Riley v. Potter,
    2010 WL 125841 (D.N.J.)…………………………………………..14

Scott v. Rosenberg,
    702 F.2d 1263, 1269 (9th Cir.1983), cert. denied, 465 U.S. 1078, 104
    S.Ct. 1439, 79 L.Ed.2d 760 (1984)……………………………...…16n

Sharrar v. Felsing,
    128 F.3d 810 (3d Cir. 1997)……………………………………………21

Shea v. Smith,
    966 F.2d 127 (3d Cir. 1992)……………………………………….…20

United States v. Classic,
    313 U.S. 299 (1941)…………………………………………...…13n, 16n

United States v. Price,
    383 U.S. 787, at 794, n. 7 (1966)…………………………………...….13

Yick Wo v. Hopkins,
    118 U.S. 356 (1886)…………………………………………..11n, 18, 21

## Statutes – Federal

42 U.S.C. §1983……………………………………………………...…...13n, 19

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| Wilian Taveras Gomez, | ) | |
| Barbara Gomez, and Wilfredo Rafael | ) | |
| Taveras and Wiliana Taveras, by their | ) | |
| next friend Wilian Taveras Gomez, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | No. 3:08 CV 619 |
| | ) | |
| William J. Feissner, Joshua Winters, | ) | (Judge Caputo) |
| Gerry Gallagher, Jason Zola, Dane | ) | |
| Eppley, and David Christino, in their | ) | (electronically filed) |
| individual capacities, | ) | |
| | ) | |
| Defendants. | ) | |

**Brief in Opposition to <u>Federal</u> Defendants' Motion for
Summary Judgment**

**<u>Counter Statement of Facts</u>**

Plaintiffs are a father, forty year old Wilian Taveras Gomez ("Wilian

Taveras" hereinafter), his mother,  sixty five year old Barbara Gomez, and

Wilian's two children, sixteen year old Wilfredo and nine year old Wiliana.[1]

(FOSJ ¶¶2-3).[2]

All Plaintiffs are permanent resident aliens of Hispanic origin, and

none was a target of the drug investigation giving rise to the search of their

_____

[1] All ages of Plaintiffs are as of the date of the search of their home, September 5, 2007.
[2] Plaintiffs file their Facts Opposing Summary Judgment ("FOSJ") with this brief. The same statement of
facts is filed in opposition to the state defendants' motion and the federal defendants' motion

home on the morning of September 5, 2007. (FOSJ ¶¶4, 24). No weapons, drugs, or drug paraphernalia were found in their home during the three hour search, and no Plaintiff was charged with a crime. (FOSJ ¶87).

On the morning of September 5, 2007, Plaintiffs lived at 9 West Monroe Avenue, West Hazleton, Pennsylvania, in one side of a two-apartment building owned by Mr. Taveras. (FOSJ ¶1).[3] The other side of the building is 11 West Monroe Avenue. (FOSJ ¶ 5). Since Mr. Taveras purchased the building in 2006, the two apartments have always been separated, with unrelated families leasing Number 11 West Monroe from Mr. Taveras, and with the units having separate electrical service and separate mailing addresses. (FOSJ ¶5).

The two entrances to 9 West Monroe are on the east side of the building leading to a small yard, (FOSJ ¶8), and the entrance to 11 West Monroe is on the south side of the building leading to the sidewalk on West Monroe Avenue. (FOSJ ¶8). Inside the building, each unit has access to the garages. (FOSJ ¶9).

For the entire time Mr. Taveras had owned the property, a doorway that connected the bathroom of Number 11 to a hallway in Number 9 had

---

[3] Wilian Taveras' wife and the mother of Wilfredo and Wiliana is Maria Vargas. (FOSJ ¶4). She was not legally permitted to be in the country on September 5, 2007, and was therefore living in the Dominican Republic. (FOSJ ¶4). She is now a legal permanent resident and lives with her husband and children at 9 West Monroe Avenue in West Hazleton. (FOSJ ¶4).

been sealed with plastic stripping, nailed to the door and the door frame on Plaintiffs' side of the building, so that great force was needed to break through from one side to the other. (FOSJ ¶¶10-13). While the building was owned by Mr. Taveras, this door had never been unsealed and the doorway had never been used by the two families living in the apartments to get from one side to the other. (FOSJ ¶¶10-13).

Though no sales of drugs at or around the building had been observed during the extensive surveillance done in preparation for the execution of the search warrant on September 5, 2007, a target of the drug investigation, Bienvenido Guerrero, lived at 11 West Monroe with his girlfriend and the girlfriend's son. (FOSJ ¶¶7, 23).

Defendants obtained a search warrant to conduct a search of 11 West Monroe Avenue on September 5, 2007. (FOSJ ¶19).

The Defendants in the case are local law enforcement officers who were members of the Pennsylvania State Attorney General's Drug Task Force investigating drug sales in the Hazleton area, and two federally employed ICE[4] agents assigned to the Task Force for that day, who were acting that morning under the direction and control of Defendant William

---

[4] Department of Homeland Security, U.S.  Immigration and Customs Enforcement.

Feissner, the person designated by the Attorney General's Office to be in charge of the search warrant for 11 West Monroe Avenue. (FOSJ ¶¶29-31).

While Defendant Feissner was responsible for execution of the search warrant at Number 11, a Special Operations Group (SOG) entry team from Hazleton was responsible for securing the premises prior to the search. (FOSJ ¶¶32, 35-36). The assistant leader of that team and Defendant Feissner's contact on that team was Defendant Jason Zola, who had also conducted surveillance of the building in preparation for obtaining the search warrant. (FOSJ ¶37).

Defendants Feissner and Zola each had substantial knowledge of the building before the morning of September 5, 2007.  Defendant Zola knew the building contained both Number 11 and Number 9 West Monroe. (FOSJ ¶18). Defendant Feissner knew doorways led from the building on the south side and the east side. (FOSJ ¶20), and he knew Bienvenido Guerrero's telephone carrier listed him as living at 11 West Monroe, "second floor." (FOSJ ¶22).  Feissner had noticed on the photograph of the building he was given days before the raid that the building was large, with multiple garages, two electrical boxes, and two satellite dishes. (FOSJ ¶17). Defendants Feissner and Zola had met on a day before the raid to discuss their plan for

the raid, including the "real possibility" there were two separate living units within the building. (FOSJ ¶21).

September 5, 2007 was trash collection day on West Monroe Avenue, and the location that morning of trash bags and recycling containers in separate places near the separate entrances to Numbers 9 and 11 indicated that there was more than one apartment in the building. (FOSJ ¶15-16).

At about 6 am on September 5, 2007, Defendant Zola and about ten members of SOG team entered No. 11 West Monroe armed with handguns and automatic long guns. (FOSJ ¶56). They were dressed in black BDUs and protective vests, and they wore helmets, black hoods, and goggles. (FOSJ ¶56).   Defendant Zola and Patrolman Kevin Wagner were two of first officers through the door that morning. (FOSJ ¶45).

Zola and Wagner went up the stairs to the second floor in Number 11 and into its bathroom. (FOSJ ¶46). There they encountered a door leading from the bathroom that met resistance when they tried to open it. (FOSJ ¶¶40, 43, 44, 45-49).  Wagner stood back and Zola kicked the door in. (FOSJ ¶¶40, 43, 44, 45-49). This was the doorway sealed with hard plastic stripping nailed to the other side in No. 9. (FOSJ ¶44, 45).

Officers Zola and Wagner went through the door into Number 9 West Monroe Avenue, followed by other SOG team members. (FOSJ ¶54). They first encountered sixty-five year old Barbara Gomez. (FOSJ ¶55).

When she saw the armed men with rifles, hoods, and flashlights, Barbara Gomez thought they were thieves coming to rob the family, so she went down to her knees on the floor of the hallway and told them "[I]n the name of God, we [don't] have anything." (FOSJ ¶57).

The SOG team members handcuffed Wilian Taveras and Wilfredo Taveras, both of whom had been sleeping in their bedrooms. (FOSJ ¶62). It took the SOG officers between 5 to 15 minutes to go through all the rooms and clear both sides of the building, so it was safe for Defendant Feissner's search team to execute the search warrant. (FOSJ ¶63).

When the building was cleared by the SOG team, Plaintiffs were taken by Defendants Feissner and Christino to the second floor kitchen in No. 11. (FOSJ ¶65, 78). Plaintiffs Wilian Taveras, Barbara Gomez, and Wiliana Taveras were taken by Feissner and Christino down the stairs of their apartment into their kitchen, out the kitchen door to the garage, and up to the kitchen of No. 11. (FOSJ ¶78). On this walk, Defendant Feissner was able to observe the second kitchen, in No. 9, and the doorways leading out to the yard on the south side of the building in Number 9. (FOSJ ¶79).

During the 5 to 15 minutes Defendant Zola was present in the
building, he entered the first floor kitchen in No. 9 and realized where he
was in the building, and he confirmed he was in No. 9 when he saw the
doors exiting the building on the east side.  (FOSJ ¶¶64-65). While on the
scene during the first 5-15 minutes, other SOG members engaged in
discussions about the odd layout of the building with a connection between
units through a bathroom door. (FOSJ ¶69).

While Defendant Feissner noted many details about the previously
sealed door between Numbers 11 and 9, such as, "It has an antiquated lock
that is opened by a skeleton key," (FOSJ ¶72), he denies that he ever saw the
side of the bathroom door facing No. 9 West Monroe Avenue, which had the
white, plastic stripping nailed onto it to prevent access to Number 9 from
Number 11.  (FOSJ ¶72).

After being able to confirm within the first 15 minutes that there were
indeed two units in the build and that they had gone beyond the scope of the
search warrant by entering and clearing the Number 9 West Monroe
Avenue, Defendants Zola and Feissner, nevertheless, continued with the
search of both sides of the building, including taking a search dog through
the entire building. (FOSJ ¶¶75, 83-84).  Feissner and Zola continued with
the search of Plaintiffs' home and continued to restrain and detain Plaintiffs,

because they thought Plaintiffs' failure to have outside doors and/or deadbolt locks protecting them from intrusion through the bathroom door in Number 11, permitted the officers to consider Number 9 a part of Number 11 West Monroe Avenue under the warrant. (FOSJ ¶67).

Defedant Zola also justifies the continued search and detention on the basis that he thought at the time that the Taveras family was probably involved with the drug selling. (FOSJ ¶66).

All plaintiffs were detained in the custody of the defendants for about two and one half to three hours past the time the building had been cleared by the SOG team. (FOSJ ¶75-77). During this time, Wilfredo Taveras and his father were handcuffed and all the rooms of their house were searched by the search team officers and an officer using a police dog. (FOSJ ¶¶75-77, 83-84). Defendant Feissner took $605 from Mr. Taveras' dresser drawer that he was to saving to pay his mortgage. (FOSJ ¶¶90-91). The money has never been returned, and Defendant Feissner made no effort to return the money after he called off the search much later that morning. (FOSJ ¶¶90-91).

When all of the Plaintiffs were taken over to the second floor kitchen of 11 West Monroe, their immigration status was checked by the ICE agents, Dane Eppley and David Christino. (FOSJ ¶¶80-81). All were found to be

legal permanent residents of the United States, though not citizens. (FOSJ
¶81).

In the kitchen, sixteen year old Wilfredo asked if he could go to
school that day and was told he should get his clothes on and he would be
taken there. (FOSJ ¶¶93, 96). Although the ICE agents say his immigration
status had been cleared and there was no immigration-related reason to hold
him, (FOSJ ¶95), Defendant Feissner, nonetheless, instructed Sergeant Gerry
Gallagher to take Wilfredo to the armory where all those arrested in other
related raids that morning were being held. (FOSJ ¶¶94, 96-98). Defendant
Feissner justifies his actions by contradicting the ICE agents, now saying
they told him Wilfredo needed to have documentation checked and this is
the reason he was taken in handcuffs to the armory. (FOSJ ¶94).

Wilfredo Taveras was held in custody at the armory for an additional
three hours that morning, the entire time in handcuffs. (FOSJ ¶99). When he
was finally released, he had to walk forty minutes to get back home. (FOSJ
¶99).

After about three hours of searching both Nos. 11 and 9 West Monroe
that morning, Defendant Feissner finally called off the search in Number 9,
when the ICE agents complained to him that Mr. Taveras said he lived in
Number 9 and not Number 11. (FOSJ ¶73). Defendant Feissner took no

steps to make sure Wilfredo Taveras was released from custody at the

armory or to return Mr. Taveras' $605.00, (FOSJ ¶94, 90),  and he did not

apologize for the extensive seizure of the Taveras family and the lengthy

search of their home. (FOSJ ¶¶90, 100).

When Mr. Taveras asked ICE agent Eppley why he and his family had

been treated this way when the warrant was for the adjoining apartment,

Defendant Christino in the presence of Defendant Eppley told nine year old

Wiliana in English words to the effect "Tell you father to shut up or we will

put the cuffs back on him. He is not a citizen!" Agent Eppley said nothing.

(FOSJ ¶¶86-88). Wiliana interpreted this threat to her father and he stopped

talking. (FOSJ ¶89).

### Question Presented

Whether the threat by Agent Christino to again manacle Mr. Taveras for
asking Agent Eppley about the officers' intrusion into his home, for the
express reason that he was not a citizen, violated Plaintiff's Equal Protection
right to speak on the same basis as a citizen, in violation of the Fifth and
Fourteenth Amendments to the Constitution and 42 U.S.C. §§1981(a) and
1983.

## Argument

I. **ICE Agents Christino and Eppley Were Acting As Federal Agents, But They Were Also Acting Under Color of State Law,[5] Within the Meaning of Section 1983 and Section 1981(a).[6]**

On the morning of September 5, 2007, Agents Christino and Eppley were employed by the federal government (FOSJ ¶29), but in entering Number 11 and Number 9 West Monroe Avenue that morning, they were acting under the authority of the Pennsylvania State Attorney General's Drug Task Force that was executing search and arrest warrants in and around Hazleton, Pennsylvania. (FOSJ ¶29). This entire operation was run by agents from the Attorney General's Office, who assigned people to teams and designated team leaders conduct the searches. (FOSJ ¶¶30, 32).

The Attorney General's Office agents designated Corporal Feissner as the team leader to execute the search at 11 West Monroe Avenue, and the Attorney General's agents assigned ICE Agents Eppley and Christino to Defendant Feissners' team. (FOSJ ¶¶32, 31). As members of

---

[5] Contrary to the assertion of Defendants Eppley and Christino in their brief supporting summary judgment, (see Doc. 50 at 29) Plaintiffs alleged in their complaint that all Defendants, including the ICE agents were acting under color of state law. Complaint (Doc. 10) ¶15. Plaintiffs also alleged the ICE agents were operating under color of federal law as ICE agents. Complaint (Doc. 10) ¶14.

[6] Because federal ICE agents are accountable also as "state actors" under §1981 under the same circumstances as they are accountable under §1983, (Quiles v. United States Department of Defense, Civ. No. 1:09-CV-580, 2009 WL 4810188 (M.D. Pa. Dec. 10, 2009) at 5 (attached to federal defendants brief at Doc 50-2) and because claims for unequal treatment on the basis of alienage are equally protected by the equal protection clause (Yick Wo v. Hopkins, 118 U.S. 356 (1886)) as by section 1981 (Graham v. Richardson, 403 U.S.365, 377(1971)), Plaintiffs rely on their discussion of section 1983 and the Fifth and Fourteenth Amendments to establish the viability of their claims under section 1981(a).

11

this team, the ICE agents were responsible that morning to Defendant Feissner. (FOSJ ¶31).

The authority to enter the residence at 11 West Monroe Avenue that morning arose from a search warrant obtained by the Attorney General's Office from information it obtained during the course of the State Drug Task Force investigation. (FOSJ ¶¶7, 14-15).

The ICE agents' team leader, Defendant Feissner, was employed by a Pennsylvania municipality. (FOSJ ¶32)  That morning Feissner assigned Defendants Eppley and Christino responsibility for interviewing the occupants of the house and obtaining information the task force needed to complete its forms, checking any outstanding warrants and citizenship status, and maintaining custody of the residents. (Exh. B, Dep. of William Feissner, at 73-74, 116).

As members of Defendant Feissner's search team, (Exh. S, Dep. of David Christino, at 17), Defendants Eppley and Christino also assisted with the search of the premises, (Exh. N, Dep. of Dane Eppley, at 35, 46), and Defendant Eppley handcuffed one member of the household himself. (Exh. N, Dep. of Dane Eppley, at 45).

These two agents did the tasks assigned to them that morning by Feissner and then waited until they were told "[Y]ou're done here." (FOSJ ¶33).

Federal agents and others who are not employed by states or instrumentalities of the states act under color of state law when they are "clothed with state authority."[7] So, for example, private parties acting jointly with state officials may act under color of law for purposes of liability under the Fourteenth Amendment and section 1983:

> [W]e have consistently held that a private party's joint participation with state officials in the seizure of disputed property is sufficient to characterize that party as a "state actor" for purposes of the Fourteenth Amendment.

Lugar v. Edmondson Oil Company, Inc., 457 U.S. 922, 942 (1982). The Court in Lugar, held that the "state action" requirement under the Fourteenth Amendment and the "under color of state law" requirement of section 1983[8] are identical. Id at 932, citing United States v. Price, 383 U.S. 787, at 794, n. 7 (1966).

Defendants claim that for either federal agents or private parties to be found "acting under color of state law" under section 1983, they must be

---

[7]See United States v. Classic, 313 U.S. 299, 326 (1941).
[8] 42 U.S.C. §1983 reads: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation or any rights, privileges, or immunities secured by the Constitution and laws shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

shown to have "conspired" with state actors. (See Doc. 50 at 30). But showing a conspiracy with state employees is just one of the ways of showing that actors such as Eppley and Christino were "clothed with state authority." (See, for example, Riley v. Potter, 2010 WL 125841 (D.N.J.), a case attached by Defendants in support of their claim, wherein the court cites another case as holding that federal officers may act under color of state law for purposes of both §§1981 and 1983 where, "*for example* [they act] in a conspiracy with state officials." Id at *4 (emphasis supplied).

The real test for determining whether actions of a private party are fairly attributed to the state, so as to make the actions taken "under color of state law" for purposes of section 1983 was set forth by the Supreme Court in Lugar, supra. First, "the deprivation must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the state or by a person for whom the State is responsible." Second,

> the party charged with the deprivation must be a person who may
> fairly be said to be a state actor. This may be because he is a state
> official, because he has acted together with or has obtained significant
> aid from state officials, or because his conduct is otherwise chargeable
> to the State.

Lugar v. Edmondson Oil Company, Inc., 457 U.S. at 937.

This two-part test is met in the present case. Agents Eppley and Christino were given the right and privilege to come into Plaintiffs' home

and to handcuff occupants of the home by state officials in order to help them execute their state search warrant. Without the authority to enter along with state officers and under the authority of the state officers, Eppley and Christino had no right to enter either No. 11 or No. 9 West Monroe Avenue.

The search warrant was requested by Agent John Soprano of the "Pa. Office of Attorney General" and Corporal William Feissner of the "Butler Twp. Police Dept.," and upon issuance by the Magistrate Judge, it authorized "you," meaning them, to enter and search 11 West Monroe Avenue in West Hazleton, Pennsylvania. (FOSJ ¶30). The only right Agents Eppley and Christino had that morning to enter 11 West Monroe, search the premises, and place occupants in handcuffs, and then later threaten to place manacles on Mr. Taveras, came from the right and privilege granted by the state drug task force, acting through Agent Soprano and Defendant Feissner. Without such authority, the entry into the building by the ICE agents would have been an unlawful trespass.

The actions of these ICE agents is also fairly attributable to the state, not just because they were given the right and privilege to be in the home and to handcuff occupants by state officers, but because they were assigned to the state team and were acting at the direction and control of and for the benefit of the task force and Defendant Feissner. They were not merely

15

conducting federal duties at the scene. They were answerable to the state team leader and doing tasks assigned by him, including searching the building, maintaining custody of occupants, and getting information needed by Feissner to fill out his reports. For these reasons, Eppley's and Christino's actions were fairly attributable to the state and constitute actions taken "under color of state law." [9]

## II. Agent Christino's Threat to Manacle Mr. Taveras in Response to his Question to Agent Eppley Violated Plaintiff's Right to Equal Protection of the Law.

Mr. Taveras and his family members are not citizens but they are, and were in September 2007, legal permanent residents of this country. Agents Eppley and Christino knew these facts at the time, having interviewed the four defendants to check their immigration status.

As legal permanent residents, Plaintiffs were fully protected by the Fourteenth and First Amendments to the same extent as citizens. "[O]nce an alien lawfully enters and resides in this country he becomes invested with the rights guaranteed by the Constitution to all people within our borders." Bridges v. Wixon, 326 U.S. 135, 161 (1945).

Having entered Plaintiffs' residence under the authority of the drug

---

[9] "Misuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law, is action taken 'under color of' state law." Scott v. Rosenberg, 702 F.2d 1263, 1269 (9th Cir.1983), cert. denied, 465 U.S. 1078, 104 S.Ct. 1439, 79 L.Ed.2d 760 (1984) (quoting United States v. Classic, 313 U.S. 299, 326, 61 S.Ct. 1031, 1043, 85 L.Ed. 1368 (1941)).

task force to execute its warrant, and being responsible to and acting under the authority and direction of state Defendant Feisser, Agents Eppley and Christino held Plaintiffs Wilian Taveras, Wiliana Taveras, and Barbara Gomez in custody in the first floor kitchen of Plaintiffs' home, when Agent Eppley spoke a few words of Spanish to Mr. Taveras. (FOSJ ¶86). Mr. Taveras then asked the agent in Spanish why the officers had done this to him and to his family, since they lived in Number 9 and the warrant was for Number 11.

To this question asked of Agent Eppley, Agent Christino responded by saying to nine year old Wiliana in English, that she should tell her father to shut up or they would be handcuff him again, because he was not a citizen. (FOSJ ¶87). Agent Eppley did not say a thing, and once Wiliana translated this threat to her father, he stopped talking. Both ICE agents deny making or hearing any such threats that morning.

First Amendment protection applies to speech that is a matter of public concern, Eichenlaud v. Twp. of Indiana, 385 F.3d 274, 283 (3d Cir. 2004), but it also protects citizens and aliens from the government when they express matters of personal interest. Connick v. Myers, 461 U.S. 138, 147 (1983); Bridges v. Wixon, 326 U.S. at 161 (1945). While there are some limits to the right of free expression, allowing government restraint or

punishment for speech in narrowly defined areas like for "fighting words" or words that by their nature inflict harm, <u>Chaplinsky v. New Hampshire</u>, 315 U.S. 568, 572 (1942), no such exception applies or could apply to the words spoken by Mr. Taveras in his kitchen. Moreover, since the officers deny being a part of or hearing the question followed by the threat, they are in no position to avail themselves of any exception justifying their threat to manacle Mr. Taveras.

We are left then with a question asked by Mr. Taveras of Agent Eppley followed by a threat by Agent Christino that if believed by a finder of fact would certainly be a threat by the one officer in support of the other to take manacle Mr. Taveras, if he did not cease exercising his First Amendment right to speak. If Agent Christino had merely said "Shut up or we will cuff you!" Plaintiff's claim would be a governmental denial of speech by threat of force. But, since Agent Christino gave his reason for the threat, i.e., that Mr. Taveras was not a citizen, the agents also denied Mr. Taveras equal protection of the law, protected by the Fifth and Fourteenth Amendments to the Constitution.

Aliens are protected from discrimination by the Equal Protection Clause of the Fourteenth Amendment. <u>Yick Wo v. Hopkins</u>, 118 U.S. 356 (1886). More than one hundred years ago, the Supreme Court found a local

ordinance discriminatory against non-citizens and therefore a violation of the Fourteenth Amendment. Id at 369.

In the case at bar, a finder of fact could find that the officers together, one by threatening directly and the other by being a participant in the conversation and allowing the other officer to speak for him without objection, forced Mr. Taveras to give up his Constitutionally protected right to speak for the discriminatory reason that he was not a citizen. These actions constitute a violation of equal protection of the law in violation of the Fifth and Fourteenth Amendments and section 1983.

As shown above, Plaintiffs' may bring their Fourteenth Amendment equal protection claims, enforceable under 42 U.S.C. §1983, because the federal agents' actions in the Plaintiffs' home were fairly attributable to the state, so that they were "acting under color of state law." Plaintiffs' Fifth Amendment claims against the federal ICE officers are based on their right to enforce privately their equal protection rights under Bivens v. Six Unknown Federal Narcotics Agents, 403 U.S. 388 (1971) and its progeny, including Davis v. Passman, 442 U.S. 228 (1979).

In Davis v. Passman, a Congressional staffer filed suit against her employer for firing her because she was a woman, alleging she was denied equal protection of the law in violation of the Fifth Amendment.

19

Recognizing that the Fifth Amendment incorporates the Equal Protection Clause of the Fourteenth Amendment and based on the analysis explained in Bivens that direct enforcement of the Amendment is needed to effectuate the purposes of the Constitutional protection, the Supreme Court allowed Plaintiff's claim directly under the Fifth Amendment. Thus, Plaintiff's claim that his right to equal protection was violated by the actions of Agents Christino and Eppley may be brought under both section 1983 and directly under the Fifth Amendment.

### III.   Defendants Are Not Entitled to Qualified Immunity, Because Their Actions Were not Objectively Reasonable Under Clearly Established Law.

Assuming a finder of fact concludes that Defendants Eppley and Christino threatened to manacle Mr. Taveras once again if he did not stop asking why they had intruded into his home without a warrant, and assuming the finder of fact accepts the testimony of the Taveras family that Agent Christino told them he had no right to speak because he was only a legal permanent resident of the United States and not a citizen, Defendants cannot avail themselves of qualified immunity. A qualified immunity defense is only available upon showing that Defendants *reasonably* believed that their conduct was lawful. Shea v. Smith, 966 F.2d 127, 130 (3d Cir. 1992). A good faith belief by an officer that he is complying with the law is not a

defense, if the belief was not objectively reasonable under the circumstances. <u>Anderson v. Creighton</u>, 483 U.S. 635, 641 (1987). Thus, "if the law was clearly established at the time of the conduct, then the court must determine 'whether the actions of the officers, equipped with the knowledge of clearly established law, were *objectively reasonable*.'" <u>Byrd v. Duffy</u>, 1998 WL 961902 at *5 (E.D. Pa.) quoting <u>Sharrar v. Felsing</u>, 128 F.3d 810, 828 (3d Cir. 1997) (emphasis supplied).

As shown above, aliens had been entitled to First Amendment protection and Equal Protection of the laws under the Fourteenth (and Fifth) for many decades prior to September 5, 2007. <u>Bridges v. Wixon</u>, 326 U.S. 135, 161 (1945). Likewise, it was clearly established that the right to equal protection of the laws was violated by discriminating against non-citizens based on alienage. <u>Yick Wo v. Hopkins</u>, 118 U.S. 356, 369 (1886). Reasonable officers would not have believed that they could deny Mr. Taveras the right to speak in his home, because he was not a citizen. The fact that the agents do not defend their actions as being reasonable, but instead deny entirely that this conversation took place, suggests they know such actions, if established in court, are indefensible. Therefore, Defendants may not avail themselves of qualified immunity, if a finder of fact concludes the Taveras family members are telling the truth.

## Conclusion

For the reasons set forth above, the summary judgment motion of

federal Defendants Dane Eppley and David Christino should be denied.

COMMUNITY JUSTICE PROJECT, INC.


By:  s/Laurence E. Norton, II
     Laurence E. Norton, II
     Peter Zurflieh
     118 Locust Street
     Harrisburg, PA 17101
     (717) 236-9486
     (717) 233-4088 (fax)
     lnorton@palegalaid.net
     PA Bar 21153
     pzurflieh@palegalaid.net
     PA Bar 34998