## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

**WILIAN TAVERAS GOMEZ,** *et al.*,

        **Plaintiffs,**

        **v.**

**WILLIAM J. FEISSNER,** *et al.*,

        **Defendants.**

**No. 3:08-CV-619**

**(Judge Caputo)**

**Electronically Filed**

## REPLY BRIEF IN SUPPORT OF MOTION OF DEFENDANTS ZOLA AND FEISSNER FOR SUMMARY JUDGMENT

## STATEMENT OF THE CASE

A.    <u>Procedural History</u>

Defendants Winters, Zola, Feissner, and Gallagher ("Commonwealth Defendants") filed a motion for summary judgment, a statement of material and undisputed facts, a set of exhibits, and a supporting brief on July 29, 2010. Plaintiffs filed a brief in opposition to the Commonwealth Defendants' motion, as well as a counter-statement of material and undisputed facts and a set of exhibits, on August 31, 2010. The parties subsequently filed a joint stipulation to dismiss defendants Winters and Gallagher from the case, and the Court entered an order approving that stipulation. The remaining Commonwealth Defendants, Jason Zola and William Feissner, submit this reply brief in support of their motion for summary judgment.

B.    Facts

Because the lawfulness of the Commonwealth Defendants' actions depends on the objective facts that were known to the Commonwealth Defendants at the time of the incident, this reply brief must address certain mischaracterizations of facts by the plaintiffs.  It is undisputed that, before the execution of the search warrant at plaintiffs' building, defendants Feissner and Zola considered the possibility that there may be two residential units inside the building. (Commonwealth Defendants' SMF 11).  It is undisputed that, before the execution of the search warrant, defendants Feissner and Zola conducted surveillance and only observed the target of the warrant, Bienvenido Geurrero, entering the building by the door marked with the number "11" on the south side of the building. (Commonwealth Defendants' SMF 12).  Accordingly, the Commonwealth Defendants never intended to enter any door other than the door marked "11" through which Guerrero entered the building.  (Commonwealth Defendants' SMF 13).

It is undisputed that the Commonwealth Defendants thought that there might be two residential units at the top of the stairs inside the door marked with the number "11."  (Commonwealth Defendants' SMF 14).  The Commonwealth Defendants, however, learned from Guerrero before the execution of the search warrant that there was only one door at the top of the stairs.  (Commonwealth Defendants' SMF 15).  It has not been, and cannot be, disputed that defendants

2

Feissner and Zola considered in good faith and obtained information to resolve any questions about the residential unit to which their search warrant applied.

The material facts listed by plaintiffs with regard to the doors marked with the number "9" on the east side of the building, the placement of separate trash bags and recycling containers, and the separate utility meters are all irrelevant. Defendants Feissner and Zola had a lawful search warrant for "11 West Monroe Avenue," they intended to enter the door marked "11," and they determined before executing the warrant that there was only one door to a residential unit inside the door marked "11."  When this Court considers whether there were objective facts available to these defendants that would indicate a separation between residential units inside the building, the building's external indicia of residence are irrelevant because the defendants had already ruled out the east-side doors and confirmed that they were entering the correct location.

It is undisputed that defendant Zola and the members of the Special Operations Group of the Hazleton Police Department entered the south-side door marked "11," ascended the stairs, turned left into a bathroom, and found a door at the other end of the bathroom.  (Commonwealth Defendants' SMF 18-19). Because that door could be accessed by occupants of the building, Zola considered it a potential threat and went through the door.  (Commonwealth Defendants' SMF 20-21).  After going through the door, defendant Zola found and secured other rooms.  (Commonwealth Defendants' SMF 22-23).

Plaintiffs admit that this second door in the bathroom of 11 West Monroe Avenue was unlocked and led directly to what they consider 9 West Monroe Avenue.  (Plaintiffs' SMF 10-11).  They allege that the door was sealed with a plastic material "on the Number 9 side."  (Plaintiffs' SMF 11).  Defendants Zola and Feissner do not dispute this point, but simply note that Zola would not have been able to see any such plastic material from the 11 West Monroe side of the door.  Plaintiffs offer Wilfredo Taveras's purely speculative and subjective opinion, which is insufficient to overcome a motion for summary judgment, that the plastic seal was strong enough to prevent it from being opened by simply pushing it and the use of heavy force would be necessary to break the seal. (Plaintiffs' SMF 13).

Regardless of this speculation, plaintiffs clearly and specifically concede that the Commonwealth Defendants were lawfully permitted to forcibly open the door in the bathroom of 11 West Monroe and proceed through it.  Plaintiffs state as follows:

> Given the unusual layout of the two adjoining apartments, Plaintiffs also accept Defendants' right to knock down the door leading from the bathroom in No. 11 to the hallway in No. 9.  In the heat of the moment, the SOG team officers may not have known that the second bathroom door led to a separate residence and, in any event, because they could reasonably have believed the door allowed access from one unit to the other, they probably had the right to secure the area or the other side of the door even if they had knowledge at the time that it led to another apartment.

(Plaintiff's Brief in Opposition at 11-12).  Thus, the Commonwealth Defendants not only took steps to ensure that they were entering the appropriate door and that there was only one residence inside of it, but also defendant Zola[1] lawfully went through the bathroom door from 11 West Monroe to what plaintiffs consider 9 West Monroe.  Plaintiffs' material statement of fact Number 45 with regard to a boot or shoe print on the 11 West Monroe side of the door is, therefore, irrelevant.

It is undisputed that, after going through the bathroom door, defendant Zola proceeded down a hallway, descended a set of stairs, and secured the first-floor kitchen and dining area and the garage.  (Commonwealth Defendants' SMF 23).  It is undisputed that Zola realized that they had cleared and secured the entire space within the building and he recognized the door off of the first-floor kitchen area as being the door marked on the outside of the building as number "9."  (Commonwealth Defendants' SMF 26).  Plaintiffs offer no objective facts to counter defendant Zola's perception that there was nothing dividing or separating the living spaces within the building, such that it was one residence for purposes of the search.  (Commonwealth Defendants' SMF 28).  Plaintiffs cite to Zola's statement that, after recognizing that the entire building was one connected residential unit, he and the SOG officers continued with their duties in the protective sweep of the building.  (Plaintiffs' SMF 64-66).  It is undisputed that the

---

[1]    By the time defendant Feissner arrived in the bathroom of 11 West Monroe, the door was open and he never would have seen any seal on the "Number 9 side" of the door.

protective sweep of the building was lawful (*see* Plaintiffs' Brief in Opposition at 11-12) and that Zola and the SOG officers only remained at the building for 5 to 15 minutes before departing.

It is undisputed that defendant Feissner waited outside the building during the SOG officers' initial entry and protective sweep of the building, and Feissner only entered the building when he heard a call for help on the radio. (Commonwealth Defendants' SMF 31).  Like Zola, Feissner entered the door marked "11," ascended the stairs, went into the bathroom, and proceeded through the now-open second door into a hallway.  (Commonwealth Defendants' SMF 30-32).  Feissner's objective was to conduct a search for weapons and contraband, as allowed by the search warrant.  (Commonwealth Defendants' SMF 36).  Feissner recalls no evidence that he was inside a separate residence at the time of the search. (Commonwealth Defendants' SMF 37, 45).

Only after Feissner completed the search did he learn from an ICE agent that Wilian Taveras had said there were two separate residences in the building. (Commonwealth Defendants' SMF 46).  It is undisputed that Feissner then investigated Mr. Taveras's claim of separate residences by walking through the building and taking photographs.  (Commonwealth Defendants' SMF 47).  Until being specifically told of the issue and despite searching the entire inside of the building, Feissner was unaware from the appearance of the interior that he had

gone from Guerrero's apartment at 11 West Monroe Avenue into a separate dwelling unit that the occupants designated as 9 West Monroe Avenue.

## ARGUMENT

Speculation will not defeat a motion for summary judgment. *Lexington Ins. Co. v. Western Pa. Hosp.*, 423 F.3d 318, 332-33 (3d Cir. 2005) (citing *Hedberg v. Indiana Bell Tel. Co., Inc.*, 47 F.3d 928, 932 (7th Cir. 1995) ("[s]peculation does not create a *genuine* issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment") (emphasis in original)). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 127 S.Ct. 1769, 1776 (2007); *Matsushita*, 475 U.S. at 586 (party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts").

In order to defeat the Commonwealth Defendants' motion for summary judgment, plaintiffs must go beyond speculation and show actual facts in the record that are material to the legal claims and that the parties dispute. Plaintiffs must show intentional conduct by defendants Feissner and Zola, because it is well established that negligent conduct cannot give rise to liability under 42 U.S.C. § 1983. *See*, *e.g.*, *Daniels v. Williams*, 474 U.S. 327, 328 (1986). It is important to note that plaintiffs cite only to decisions arising from suppression motions in

criminal cases for the proposition that liability in this § 1983 action attaches if the Commonwealth Defendants "knew *or should have known*" that they had entered a separate dwelling unit and failed to depart.  Of course, the "should have known" language from those criminal cases suggests a negligence standard, and the undersigned counsel has located no civil rights actions in which the defendants were held to a standard other than intentional conduct.

In order to determine whether defendants Feissner and Zola are entitled to summary judgment on the illegal entry claim, therefore, the Court must consider the objective facts available to the officers at the time of the incident.  *Maryland v. Garrison*, 480 U.S. 79, 99 (1987).  In keeping with the well established standard of intentional conduct for § 1983 actions, the Commonwealth Defendants' motion should be denied only if those objective facts show that Feissner and Zola knowingly and deliberately disregarded a legitimate separation between dwelling units inside the building.

In the context of qualified immunity, Feissner and Zola are entitled to summary judgment unless they disregarded objective facts of which a reasonable officer would have been aware.  As stated by the Eastern District, "[t]he Courts have been clear: qualified immunity is appropriate for reasonable actions undertaken by police."  *Allen v. District Attorney's Office of Phila.*, 644 F.Supp.2d 600, 607 (E.D. Pa. 2009) (citing *Saucier v. Katz*, 533 U.S. 194, 205 (2001); *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) ("government officials performing

discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known").  The Supreme Court in *Garrison* held that the officers' mistaken entry into a separate dwelling inside a building was not unlawful, noting that "the officers' conduct was consistent with the reasonable effort to ascertain and identify the place intended to be searched within the meaning of the Fourth Amendment."  *Garrison*, 480 U.S. at 88.

Within this legal framework and the objective facts as they were known to the defendant officers, defendant Zola is clearly entitled to summary judgment in his favor.  First, it is undisputed that Zola was only present at the building as part of the Special Operations Group, the purpose of which was to conduct a protective sweep to ensure the safety of defendant Feissner during his subsequent search.  Zola and the SOG officers conducted the protective sweep of all areas accessible by human beings from the door marked "11" and then they left the scene.  Plaintiffs clearly and specifically have conceded that the protective sweep was lawful, even if defendant Zola and the SOG officers unknowingly entered a separate residential unit.

Although Zola recognized in the first-floor kitchen that they had proceeded to the part of the building marked on the exterior with the number "9," this objective fact makes no difference to his entitlement to summary judgment.  Even

9

if Zola recognized the connection between the number "9" on the exterior of the building and a room that he entered inside, Zola's perception remained unchanged that the entire interior consisted of one residential unit.  In other words, he did not reach a point in the search where he understood himself to be inside a separate unit, thereby triggering the legal duty to retreat.  A common shared bathroom door with no functioning lock is the only divider between these allegedly separate residential units.  Nothing else inside the building would indicate a divide between units.

To the extent that plaintiffs rely on telephone records listing Guerrero's address as "11 West Monroe Avenue, 2nd Floor," such records are part of a large volume of information from various sources, including photographs, hundreds of wiretap reports, and surveillance, that gave rise to the search warrant.  Such telephone records would not cancel out all other objective facts available to Zola, especially since plaintiffs admit that part of the space they claim as their residence is also on the second floor of the building.  Indeed, that is where the plaintiffs were sleeping at the time of the entry by the officers.

Even if Zola had observed objective indicia of a separate dwelling unit, it is undisputed that, after Zola's recognition that one room was marked "9" on the outside of the building, Zola only stayed inside the building long enough to complete his protective sweep and to ensure the safety of the building for Feissner's search.  As plaintiffs concede, it was lawful for Zola to secure areas

where an occupant of the building could go and hide, even if that meant entering a separate residential unit.  Thus, Zola only engaged in actions that plaintiffs concede to be lawful, and he departed the building within five to fifteen minutes of his arrival.

Zola and Feissner engaged in a good-faith effort to identify the exact location to be searched before they ever entered the building.  The undisputed facts show that they determined only to enter the door marked "11" and not the east-side doors marked "9," they considered the possibility of two residences inside the door marked "11," and they learned from Guerrero that there was only one residence inside the door marked "11."  The Commonwealth Defendants, therefore, deserve qualified immunity because they were acting under the reasonable belief that they were entering and searching the residence listed in the search warrant.

Given that the Commonwealth Defendants took steps to rule out other residences inside the door marked "11," defendant Feissner could only learn of separate residences from what he observed inside the building.  Plaintiffs concede the odd layout of the building.  The bathroom door in 11 West Monroe that opened to a hallway would not indicate to a reasonable officer that he had entered a separate residence.  It is undisputed that Feissner investigated after learning of Wilian Taveras's statement about separate residences.  Only then did Feissner take photographs and pay attention to the bathroom door.

Plaintiffs speculate about the importance of Feissner's comments that the bathroom door had a certain kind of lock. Had Taveras not said anything about the separate residence, however, Feissner never would have investigated such details, because there were otherwise no interior indicia of separate dwelling units. Feissner's investigation is itself a good-faith attempt to ensure compliance with the search warrant. In any event, Feissner departed the building immediately after completing his investigation, which is what the law requires of an officer who finds that he has exceeded the scope of a warrant.

Plaintiffs make several references in their brief and statement of material facts to "admissions" or conversations about the separate units inside the building. Plaintiffs take those conversations out of context in an attempt to defeat summary judgment. Neither Zola nor Feissner had discussions with other officers – other than the report from an ICE agent with regard to Taveras's statement – on the day of the search about the existence of separate residences. The record is clear that any such discussions occurred only after the lawsuit was filed, when the officers were then forced to examine how they may have exceeded the scope of the search warrant.

With regard to the other claims in the amended complaint, plaintiffs make no argument with regard to the allegation of force used against Barbara Gomez. That claim has presumably been abandoned. It is undisputed that the plaintiffs were gathered together in the second-floor kitchen during the protective sweep and

during the search of the residence.  It cannot be disputed that the law clearly allows

for limited detention during a search.  Although plaintiffs correctly note the

somewhat restricted time period lawfully permitted in protective sweeps, the time

allowed for lawful searches pursuant to search warrants is not so restricted.

Plaintiffs argue that defendant Feissner should be liable for an unreasonable

seizure with regard to Wilfredo Taveras's transport to the National Guard Armory.

As stated in the initial brief with regard to officer Gerry Gallagher, this was a very

limited detention in which Gallagher drove Wilfredo to the other side of town,

where he left Wilfredo in the custody of unidentified officers.  Plaintiffs speculate

that, because Feissner knew about Wilfredo's transport to the Armory, Feissner

must have directed the "arrest."  Even under plaintiffs' version of events, Feissner

allegedly caused Wilfredo to be taken to the Armory only for identification

purposes because federal immigration officers had asked Feissner to do so.

Nowhere in the record is it specified which immigration officers made this

request to Feissner.  Wilfredo Taveras made clear in his deposition testimony that

his stay at the Armory was extended only because the unnamed officers there

wanted him to have a ride home and Wilfredo could not remember his family's

phone number.  To suggest that Feissner had a duty to set Wilfredo free at the end

of the search assumes that Feissner had some control over the federal immigrations

officials and that Feissner knew that Wilfredo was still at the Armory.  The record

does not support such assumptions.  The immigrations procedures simply had no

Case 3:08-cv-00619-ARC   Document 65   Filed 09/14/10   Page 14 of 15


relation to the execution of a search warrant for illegal drugs and related

contraband.  Feissner is entitled to summary judgment on the Fourth Amendment

seizure claim or, in the alternative, qualified immunity for any unknowing

involvement in an unreasonable seizure that occurred while Feissner attempted in

good faith to assist immigration officers with a lawful objective.

## CONCLUSION

For each of the foregoing reasons, the motion of defendants Jason Zola and

William Feissner for summary judgment should be granted.

**Respectfully submitted,**

**THOMAS W. CORBETT, JR.**
**Attorney General**

**By:**  *s/ Patrick S. Cawley*

OFFICE OF ATTORNEY GENERAL       **PATRICK S. CAWLEY**
**Civil Litigation Section**          **Deputy Attorney General**
**15th Floor, Strawberry Square**     **PA 85575**
**Harrisburg, PA 17120**
**Direct: (717) 783-3146**
**Fax:  (717) 772-4526**            **SUSAN J. FORNEY**
                                **Chief Deputy Attorney General**
                                **Chief, Civil Litigation Section**

**Date: September 14, 2010**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

**WILIAN TAVERAS GOMEZ,** *et al.,*

      **Plaintiffs,**

      **v.**

**WILLIAM J. FEISSNER,** *et al.,*

      **Defendants.**

**No. 3:08-CV-619**

**(Judge Caputo)**

**Electronically Filed**

## CERTIFICATE OF SERVICE

I, Patrick S. Cawley, Deputy Attorney General for the Commonwealth of Pennsylvania, hereby certify that on September 14, 2010, I caused to be served a true and correct copy of the foregoing Reply Brief in Support of Motion of Defendants Zola and Feissner for Summary Judgment to the following:

**VIA ELECTRONIC FILING**

Laurence E. Norton, II, Esq.
Community Justice Project, Inc.
118 Locust Street
Harrisburg, PA 17101
*Counsel for Plaintiffs*

Timothy S. Judge, Esquire
Assistant U.S. Attorney
235 N. Washington Avenue
Scranton, PA 18507
*Counsel for Defendants Eppley and Christino*

      *s/ Patrick S. Cawley*
**PATRICK S. CAWLEY**
**Deputy Attorney General**