# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| WILLIAN TAVERAS GOMEZ, et. al., | CIVIL ACTION NO. 3:08-CV-619 |
| Plaintiffs, | |
| v. | (JUDGE CAPUTO) |
| WILLIAM J. FEISSNER, et. al., | |
| Defendants. | |

## MEMORANDUM

Presently before the Court are Defendants Christino's and Eppley's Motion to Dismiss and for Summary Judgment (Doc. 49) and Defendants Feissner's and Zola's Motion for Summary Judgment (Doc. 52.). For the reasons stated below, the Court will grant both Motions.

## BACKGROUND

The instant suit stems from an investigation into illegal drug trafficking in the greater Hazleton, PA area in 2007 involving the Pennsylvania Attorney General's Office, the Bureau of Narcotics Investigation and Drug Control, Hazleton Police, and members of the Luzerne County Drug Task Force. (Def. Ex. 1.) During the investigation, investigators became aware of the involvement of Bienviendo Guerrero in the unlawful sale of controlled substances as a "runner" for Lanuncio Dippiton, aka Jorge Rivera, who orchestrated the drug sales. (Def. Ex. 2 pp. 19-21.) Guerrero was observed by investigators leaving his residence at 11 West Monroe Ave in West Hazleton, PA, completing drug transactions, and returning to his residence. (Id.)

Plaintiffs Willian Taveras Gomez, his son Wilfredo Taveras, his daughter Williana Taveras, and his mother Barbara Gomez, live together in an apartment at 9 West Monroe Ave. in West Hazleton, PA, (Am. Compl. ¶ ¶ 5-7) which is located in the same building as 11 West Monroe but has its own entrance. Plaintiffs are of Hispanic descent and their primary language is Spanish. (Id. at ¶ 3.) While the entrance to 11 West Monroe Ave. is located on the south side of the building, the entrances to 9 West Monroe Ave. are on the east side of the building. Plaintiff Willian Taveras Gomez owns the entire building and rented 11 West Monroe to Edwin Cruz, with whom Bienviendo Guerrero was staying. (Def. Ex. 5 p. 25.) While doing preliminary surveillance, Defendant Feissner considered the possibility that the building might contain two residences, particularly given the fact that the premises had two electric meters and two satellite dishes. (Pl. Ex. B pp. 28-30.) However, Defendant Zola testified in his Deposition that he saw Bienviendo Guerrero go in and out of both 9 and 11 West Monroe Ave. (Def. Ex. C p. 6.)

After an investigation of several months, John Soprano, a Pennsylvania Office of Attorney General Bureau of Narcotics Investigation Agent, and Defendant William Feissner, a Corporal with the Butler Township Police Department and a Luzerne County Drug Task Force member, applied for and were granted a search warrant of Bienviendo Guerrero's residence at 11 West Monroe Ave. on September 4, 2007. (Def. Ex. 2 pp. 10-12.) Although they had not taken part in the investigation up to that point, U.S. Immigration and Customs Enforcement ("ICE") officials agreed to help with the state law enforcement activities. Two of these officials were Defendants Eppley and Christino, who agreed to provide assistance a few days before the state law enforcement operation was conducted. (Id. at 73.) On the morning of September 5, 2007, the Defendants reported to the National Guard Center in

Hazleton, Pennsylvania, where they were briefed on their assignments. (Def. Ex. 7 pp. 11-12.) The operation involved approximately thirty arrests and the execution of eight to eleven search warrants. Some officers were assigned to execute arrest warrants, while some were assigned to perform searches pursuant to the search warrants. (Def. Ex. 3 p. 47-50.) One group was assigned to conduct the search at 11 West Monroe Ave. This group was led by Corporal Feissner, West Hazleton Police Chief Gallagher, Special Agent Christino, Special Agent Eppley, and Hazleton Police Officer Leonard Ramirez. Defendants Eppley and Christino were assigned the tasks of helping with translation with Spanish-speaking persons at the premises and with conducting interviews. (Def. Ex. 2 pp. 61-67.) Additional members of the Hazelton City Police Department Special Operations Group ("SOG") were also charged with initially entering and securing the premises at 11 West Monroe Ave. The SOG team included Defendant Jason Zola, Robert Ferdinand, David Coffman, Mark Zola, James Dixon, Darryl Ledger, Kevin Wagner, and Christopher Orozco, and the team was led by Corporal David Coffman and Detective Jason Zola. (Def. Ex. 6 pp. 32-33.)

Upon arriving at 11 West Monroe Ave., Defendants Eppley and Christino were stationed outside while the SOG team entered the building through the 11 West Monroe Ave. entrance. (Def. Ex. 9 pp. 16-17.) When reaching a second floor staircase, Officer Wagner and Defendant Zola entered a bathroom which contained a door within it. (Def. Ex. 12 p. 12.) Seeing the door did not have any locks or other indications that it was part of a separate residence, Defendant Zola and Officer Wagner perceived it as a potential "threat area" that needed to be secured. (Def. Ex. 6 pp. 50-52.) Plaintiffs claim that the door was sealed with a plastic material nailed to both the door and frame on their side of the door. (Pl. Ex. F pp. 30-31.) Officer Wagner stated that Defendant Zola "kicked in" one door that

3

morning. (Pl. Ex. K pp. 34-35.) Plaintiffs claim it was the door in the bathroom leading into their residence at 9 West Monroe Ave., but Defendant Zola claimed it was the door to Plaintiff Barbara Gomez's bedroom.

The door opened onto a hallway, which was in fact a separate residence, 9 West Monroe Ave., occupied by the Plaintiffs. In the hallway, Defendant Zola and Officer Wagner first encountered Barbara Gomez, who had been asleep in a bedroom off the hallway with her granddaughter, Williana Taveras, when she heard the officers. Mrs. Gomez was put on the ground but not handcuffed. (Pl. Ex. G p. 20.) Wilfredo Taveras, Willian Taveras Gomez's son, who was sixteen years old at the time, was sleeping on the third floor of 9 West Monroe Ave. at the time and was awakened by the officers and handcuffed. After the room was secured, Willian Taveras was uncuffed and allowed to get dressed. Willian Taveras Gomez was also awakened and handcuffed. He then asked to be taken to see his mother and daughter. After about fifteen minutes, the SOG team members began discussing the "odd layout" of the building. (Pl. Ex. P p. 26.) Once the premises were secured, Defendants Eppley and Christino entered the building to help in the search and conduct interviews of the occupants with regard to their immigration status. (Pl. Ex. N pp. 36-37.)

At some point, Willian Taveras told the officers that he needed to go to school. (Pl. Ex I p. 5.) They told him he could get ready and they would take him. However, Chief Gallagher transported him instead to the Armory to have his immigration status verified. (Pl. Ex. B pp. 166-67.) There is some confusion as to why Willian Taveras was taken to the Armory, as Defendants Christino and Eppley stated in their Depositions that there was no immigration issue with the Plaintiff and that they believed he had been taken to school. (Pl.

4

Ex. N pp. 36-37.) However, Willian Taveras sat at the Armory for some time, since he could not remember the phone number of an adult who could pick him up. (Pl. Ex. F p. 6.) He was eventually allowed to walk back home, and when he got there, Defendants Eppley, Christino, Feissner, and Officer Gallagher were asking questions of the occupants in the kitchen of 11 West Monroe Ave. (Id. at 7.) Willian Taveras realized at that point that the officers were there to conduct a search of 11 West Monroe Ave. and not 9 West Monroe Ave, his family's residence. (Id.) Officers took pictures and seized evidence at 11 West Monroe Ave., including $605.00 (six-hundred and five dollars) in US currency, a passport, and miscellaneous documents. (Def. Ex. 19.) According to Wiliana Taveras, when Willian Taveras Gomez asked Defendant Christino in Spanish why the officers had come into their residence instead of 11 West Monroe Ave., Defendant Christino told him to shut up or he would be put in handcuffs because he was not a citizen. (Pl. Ex. H p. 10.) Defendants Eppley and Christino both deny making or hearing this statement. (Def. Ex. 9 pp. 609-70; Ex. 7, pp. 45-46.) Upon exiting, Defendants Eppley and Christino noticed for the first time a number "9" (nine) next to the door they had exited. (Def. Ex. 9 pp. 70-74; Ex. 7 pp. 36-38.)

Plaintiffs filed their Complaint on April 7, 2008, (Doc. 1) and their Amended Complaint on August 5, 2008 (Doc. 10). In their Amended Complaint, Plaintiffs brought causes of action for Illegal Entry (Count I); Illegal Seizure of Plaintiffs and Deprivation of Liberty (Count II); Unreasonable Searches (Count III); Unreasonable Seizure of Property (Count IV); Denial of Rights Enjoyed by White Citizens (Count V); Conspiracy to Deny Equal Protection to Hispanics (Count VI); and Failing to Prevent Actions taken under § 1985(3) (Count VII). Defendants Eppley and Christino filed a Motion to Dismiss and for Summary Judgment on July 29, 2010 (Doc. 49) and Defendants Winters, Gallagher, Zola, and

Feissner also filed a Motion for Summary Judgment on July 29, 2010 (Doc. 52). Defendants Gallagher and Winters were later dismissed by Stipulation. (Doc. 62.) The Court issued an Order on the Motions to Dismiss on November 15, 2010, but this Order was vacated to allow for previously requested oral argument. The oral argument has now taken place and the Motions have been fully briefed and are ripe for review.

## LEGAL STANDARD

### I. Motion to Dismiss

Federal Rule of Civil Procedure 12(b)(6) provides for the dismissal of a complaint, in whole or in part, for failure to state a claim upon which relief can be granted. Dismissal is appropriate only if, accepting as true all the facts alleged in the complaint, a plaintiff has not pleaded "enough facts to state a claim to relief that is plausible on its face," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007), meaning enough factual allegations "'to raise a reasonable expectation that discovery will reveal evidence of'" each necessary element, *Phillips v. County of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008) (quoting *Twombly*, 550 U.S. at 556); *see also Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993) (requiring a complaint to set forth information from which each element of a claim may be inferred). In light of Federal Rule of Civil Procedure 8(a)(2), the statement need only "'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.'" *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (per curiam) (quoting *Twombly*, 550 U.S. at 555). "[T]he factual detail in a complaint [must not be] so undeveloped that it does not provide a defendant [with] the type of notice of claim which is contemplated by Rule 8." *Phillips*, 515 F.3d at 232;

6

*see also Airborne Beepers & Video, Inc. v. AT&T Mobility LLC*, 499 F.3d 663, 667 (7th Cir. 2007).

In deciding a motion to dismiss, the Court should consider the allegations in the complaint, exhibits attached to the complaint, and matters of public record. *See Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993). The Court may also consider "undisputedly authentic" documents when the plaintiff's claims are based on the documents and the defendant has attached copies of the documents to the motion to dismiss. *Id.* The Court need not assume the plaintiff can prove facts that were not alleged in the complaint, *see City of Pittsburgh v. W. Penn Power Co.*, 147 F.3d 256, 263 & n.13 (3d Cir. 1998), or credit a complaint's "'bald assertions'" or "'legal conclusions,'" *Morse v. Lower Merion Sch. Dist.,* 132 F.3d 902, 906 (3d Cir. 1997) (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1429-30 (3d Cir. 1997)). "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950 (2009). When considering a Rule 12(b)(6) motion, the Court's role is limited to determining whether a plaintiff is entitled to offer evidence in support of her claims. *See Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974). The Court does not consider whether a plaintiff will ultimately prevail. *See id.* A defendant bears the burden of establishing that a plaintiff's complaint fails to state a claim. *See Gould Elecs. v. United States,* 220 F.3d 169, 178 (3d Cir. 2000).

**II.     Motion for Summary Judgment**

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). A fact is material if proof of its existence or nonexistence might affect the outcome of the suit under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Where there is no material fact in dispute, the moving party need only establish that it is entitled to judgment as a matter of law. Where, however, there is a disputed issue of material fact, summary judgment is appropriate only if the factual dispute is not a genuine one. *Id.* An issue of material fact is genuine if "a reasonable jury could return a verdict for the nonmoving party." *Id*.

Where there is a material fact in dispute, the moving party has the initial burden of proving that: (1) there is no genuine issue of material fact; and (2) the moving party is entitled to judgment as a matter of law. *See* CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE: CIVIL 2D § 2727 (2d ed. 1983). The moving party may present its own evidence or, where the nonmoving party has the burden of proof, simply point out to the Court that "the nonmoving party has failed to make a sufficient showing of an essential element of her case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

All doubts as to the existence of a genuine issue of material fact must be resolved against the moving party, and the entire record must be examined in the light most favorable to the nonmoving party. *White v. Westinghouse Elec. Co.*, 862 F.2d 56, 59 (3d

Cir. 1988). Once the moving party has satisfied its initial burden, the burden shifts to the nonmoving party to either present affirmative evidence supporting its version of the material facts or to refute the moving party's contention that the facts entitle it to judgment as a matter of law. *Anderson*, 477 U.S. at 256-57.

The Court need not accept mere conclusory allegations, whether they are made in the complaint or a sworn statement. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990). In deciding a motion for summary judgment, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

## **DISCUSSION**

**I.     Defendants Eppley's and Christino's Motion to Dismiss and for Summary Judgment (Doc. 49)**

   **A.     The § 1983 Claims (Counts I - IV)**

Plaintiffs' § 1983 claims will be dismissed against Defendant's Eppley and Christino because they were federal officials and were not acting under state law for purposes of § 1983 when the search warrant was executed.

42 U.S.C. § 1983 states:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . ..

Plaintiffs cannot bring a suit under § 1983 against federal agents operating under federal law. *Bethea v. Reid*, 445 F.2d 1163 (3d Cir. 1971). However, "federal employees

9

who conspire with state officials to violate someone's constitutional rights are treated as acting under color of state law." *Melo v. Hafer*, 912 F.2d 628, 638 (3d Cir. 1990) (internal citation omitted), *aff'd on other grounds*, 502 U.S. 21 (1991). Plaintiffs argue that engaging in a conspiracy with state officials is only one of a number of ways in which a federal agent can be brought under § 1983. In *Hindes v. F.D.I.C.*, the Third Circuit noted that a conspiracy is only one of a number of ways in which a federal official might be countenanced as operating under state law for purposes of § 1983. *Hindes v. F.D.I.C.*, 137 F. 3d 148, 158 (3d Cir. 1998) However, no case has held that a federal official can be held to be acting under color of state law other than by a conspiracy.

Here, Defendants Eppley and Christino were federal officials, working in their capacities as ICE agents, who were brought in to assist with state law enforcement activity. Since the Plaintiffs do not make any allegations of conspiracy between the Defendants Eppley and Christino and the other Defendants to violate the Plaintiff's Constitutional or other federal rights, and there is nothing in the record to suggest such a conspiracy, Counts I - IV, all of which are brought under § 1983, should be dismissed as to Defendants Eppley and Christino. However, it is palatable to conclude here that the act of agreeing to assist and actually assisting the state law enforcement officers in this law enforcement activity amounted to an agreement to work under the authority of the state, and therefore to further conclude that the Defendants were acting under color of state law. While I do not hold that Defendants Eppley and Christino were so acting, I will, based on the foregoing, assume they were. That assumption would place them in the same position as the state Defendants, but would also raise the issue of qualified immunity (see Section D infra.)

10

### B. The 42 U.S.C. § 1981 Claim (Count V)

Count V of Plaintiffs' Amended Complaint will be dismissed as to Defendants Eppley and Christino on similar grounds.

42 U.S.C. § 1981(a) provides:

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

A 1991 Amendment to § 1981 clarified: "[t]he rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under *color of State law*." 42 U.S.C. § 1981(c) (italics added).

The Third Circuit has held that a "cause of action for damages does not accrue under 42 U.S.C. § § 1981 et seq. for an alleged violation of the Act by federal officers acting under color of federal law." *U.S. ex rel. Moore v. Koelzer*, 457 F.2d 892, 893 (3d Cir. 1972) (internal citation omitted). More recently, the Middle District of Pennsylvania has held: "This court has long construed the phrase 'under color of state law' as used in related civil rights statues, notably 42 U.S.C. § 1983, to apply only to state actors not federal officials . . . Today, we hold that this construction also applies to the same language in § 1981." *Quiles v. United Stats Dep't of Def.*, Civ. No. 1:09-CV-580, 2009 WL 4810188 *5 (M.D. Pa. Dec. 10, 2009) (J. Conner adopting M.J. Carlson's Report and Recommendation).

In this case, Defendants were federal officials operating in their capacity as federal ICE agents: assisting as translators and interviewers on a state law enforcement

11

investigation. Plaintiffs made no allegations of conspiracy or any other allegation that would bring their activities within the ambit of "state law" for purposes of § 1981. Furthermore, although they were assisting in a state law enforcement investigation, their responsibilities were primarily tied to their roles as ICE agents. However, as mentioned with regard to the § 1983 claim against the Defendants, the Court for the sake of argument will assume that the Defendants were operating under color of state law – an assumption which then raises the issue of Defendants' entitlement to qualified immunity (see Section D infra).

### C. The 42 U.S.C. §§ 1985(3) and 1986 Claims (Counts VI and VII)

Finally, Counts VI and VII will be dismissed as to Defendants Eppley and Christino for failure to state a claim.

42 U.S.C. § 1985(3) states:

If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws . . . the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

42 U.S.C. § 1986 states:

Every person who, having knowledge of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful act be committed, shall be liable to the party injured, or his legal representatives, for all damages caused by such wrongful act.

Regarding claims under 42 U.S.C. § 1983(5), the Third Circuit has held:

In order to state a claim under 42 U.S.C. § 1985(3), a plaintiff must allege: (1) a conspiracy; (2) motivated by a racial or class based discriminatory animus designed to deprive, directly or indirectly, any person or class of persons to the

12

equal protection of the laws; (3) an act in furtherance of the conspiracy; and (4) an injury to person or property or the deprivation of any right or privilege of a citizen of the United States.

*Lake v. Arnold*, 112 F.3d 682, 685 (3d Cir. 1997) (internal citations omitted).

Regarding 42 U.S.C. § 1986, the Third Circuit has held:

Section 1986 is a companion to s 1985(3) and provides the claimant with a cause of action against any person who, knowing that a violation of s 1985 is about to be committed and possessing power to prevent its occurrence, fails to take action to frustrate its execution. Because transgressions of s 1986 by definition depend on a preexisting violation of s 1985, if the claimant does not set forth a cause of action under the latter, its claim under the former necessarily must fail also.

*Rogin v. Bensalem Twp.*, 616 F.2d 680, 696 (3d Cir. 1980).

Again, Plaintiffs have not alleged any facts pointing to a conspiracy between Defendants Eppley and Christino and the other Defendants to deprive the Plaintiffs of any of their rights or protections under any law. Therefore, both Counts VI and VII fail to state a claim, owing to the interrelation between § 1985(3) and § 1986, outlined immediately above.

### D. Qualified Immunity

Assuming, *in arguendo*, that Defendants Eppley and Christino had been operating under color of state law with regard to the § 1983 and § 1981 claims, they would still be entitled to qualified immunity.

The Third Circuit has long recognized that "qualified immunity . . . 'provides ample protection to all but the plainly incompetent or those who knowingly violate the law'." *Bumgarner v. Hart*, 316 Fed.Appx. 201, 207 (3d Cir. 2009) (quoting *Blackhawk v.*

13

*Pennsylvania*, 381 F.3d 202, 215 (3d Cir. 2004) (internal citation omitted)).

"Qualified immunity shields government officials from civil damages liability 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known'." *Manigault v. King*, 339 Fed.Appx. 229, 231 (3d Cir. 2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Courts apply a two-step test to the defense of qualified immunity: "whether the Officers' acts violated a constitutional or statutory right, and if they did, whether that right was clearly established at the time of the violation." *Mierzwa v. United States*, 282 Fed.Appx. 973, 978 (3d Cir. 2008). The Court has "discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 129 S.Ct. 808, 818. Regarding the second step of the test, the United States Supreme Court has held: "[f]or a constitutional right to be clearly established, its contours 'must be sufficiently clear that a reasonable official would understand that what he is doing violates that right'." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (internal citation omitted).

Turning to the second prong of the test first, a reasonable official in Defendants Eppley's and Christino's position would not have understood that what they were doing violated the Plaintiffs' Fourth, Fifth, and Fourteenth Amendment rights during the search in question. Defendants Eppley and Christino were last-minute additions to the search warrant teams, brought on to assist with translating and the processing of immigration issues. They took no part in any of the decisions regarding the application for the search warrant or how it was carried out – their roles in the search were passive and they relied on

14

the state officials in carrying out their assignments .  Under the particular circumstances, they acted reasonably, and there has been no allegations that they were incompetent or knowingly violated the law.

**II.     Defendants Feissner's and Zola's Motion for Summary Judgment**

   **A.     Qualified Immunity**

The state Defendants are entitled to qualified immunity.

As discussed immediately above, the Third Circuit has long recognized that "qualified immunity . . . 'provides ample protection to all but the plainly incompetent or those who knowingly violate the law'." *Bumgarner v. Hart*, 316 Fed.Appx. 201, 207 (3d Cir. 2009) (quoting *Blackhawk v. Pennsylvania*, 381 F.3d 202, 215 (3d Cir. 2004) (internal citation omitted)).

"Qualified immunity shields government officials from civil damages liability 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known'." *Manigault v. King*, 339 Fed.Appx. 229, 231 (3d Cir. 2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  Courts apply a two-step test to the defense of qualified immunity: "whether the Officers' acts violated a constitutional or statutory right, and if they did, whether that right was clearly established at the time of the violation." *Mierzwa v. United States*, 282 Fed.Appx. 973, 978 (3d Cir. 2008). The Court has "discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 129 S.Ct. 808, 818.   Regarding the second step of the test,

15

the United States Supreme Court has held: "[f]or a constitutional right to be clearly established, its contours 'must be sufficiently clear that a reasonable official would understand that what he is doing violates that right'." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (internal citation omitted).

The most helpful case law for determining the "reasonableness" of the Defendants conduct under the second prong of the qualified immunity test in the instant circumstances are cases dealing with evidence gathered from ambiguous search warrants.

In *Maryland v. Garrison*, 480 U.S. 79 (1987), one of the issues was the validity of a search of one of two apartments on the third floor of an apartment building pursuant to an overbroad warrant authorizing search of entire third floor based on the mistaken belief that the other apartment was the only one on that floor. There, the United States Supreme Court stated:

> [T]he validity of the search of respondent's apartment pursuant to a warrant authorizing the search of the entire third floor depends on whether the officer's failure to realize the overbreadth of the warrant was objectively understandable and reasonable. Here it unquestionably was. The objective facts available to the officers at the time suggested no distinction between McWebb's apartment and the third-floor premises.

*Garrison*, 480 U.S. at 88.

In ruling that the search was valid because officer's had acted objectively reasonable in the circumstances and had stopped the search of the apartment once they had realized their mistake, the Court found:

> If the officers had known, or should have known, that the third floor contained two apartments before they entered the living quarters on the third floor, and thus had

16

> been aware of the error in the warrant, they would have been obligated to limit their search to McWebb's apartment. Moreover, as the officers recognized, they were required to discontinue the search of respondent's apartment as soon as they discovered that there were two separate units on the third floor and therefore were put on notice of the risk that they might be in a unit erroneously included within the terms of the warrant.

*Id.* at 87.

Using *Garrison*'s "objectively reasonable" test to guide the application of the "reasonable official" prong of the qualified immunity test, the Court finds that the Defendants acted reasonably under the circumstances. Drawing all reasonable inferences in favor of Plaintiffs, a reasonable officer could have believed that, in going through the unmarked, unlocked door in the second floor bathroom of 11 West Monroe Ave. and conducting a protective sweep and then search of the rest of the building, they were operating within the scope of the search warrant they had for the premises.

Plaintffs' argue that, while the initial entry into their residence might have been justified, the Defendants failure to withdraw violated the test for reasonableness outlined in *Garrison*. However, the Court does not agree. While Defendants were told by the Plaintiffs that there were in fact two residences at the premises, and that Plaintiffs occupied 9 West Monroe Ave., it was not unreasonable, given the labyrinthine layout of the premises, for Defendants to investigate and verify what the Plaintiffs were telling them before the Defendants released the Plaintiffs and withdrew from the premises. This is especially true given the fact that the underlying target of the search warrant had been seen entering and exiting both the south and east entrances of the building. It was therefore reasonable for the officers to possibly be dubious of Plaintiffs claims that there were two residences and

17

to remain in the Plaintiffs' home until the claim that there were two residences was thoroughly checked-out and verified. The fact that the Defendants might have had some underlying suspicions that there were two residences in the building does not negate the reasonableness of their actions. While this was no doubt an extremely unfortunate incident, Defendants did not behave unreasonably and are therefore entitled to qualified immunity. Since the Court has determined that Defendants Feissner and Zola are entitled to qualified immunity, the other issues raised in the Briefs needn't be addressed.

## **CONCLUSION**

For the reasons stated above, Defendants Eppley's and Christino's Motion to Dismiss and for Summary Judgment (Doc. 49) will be granted and Defendants Feissner's and Zola's Motion for Summary Judgment (Doc. 52) will also be granted. An appropriate order follows.

| | |
|---|---|
| 12/20/2010 | /s/ A. Richard Caputo |
| Date | A. Richard Caputo |
| | United States District Judge |

# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| WILLIAN TAVERAS GOMEZ, et. al., | |
| Plaintiffs, | CIVIL ACTION NO. 3:08-CV-619 |
| v. | |
| WILLIAM J. FEISSNER, et. al., | (JUDGE CAPUTO) |
| Defendants. | |

## ORDER

**NOW**, this ___29th___ day of December, 2010, **IT IS HEREBY ORDERED:**

1) Defendants Eppley's and Christino's Motion to Dismiss and for Summary Judgment (Doc. 49) is **GRANTED**.

2) Defendants Feissner's and Zola's Motion for Summary Judgment (Doc. 52) is **GRANTED**.

3) The Clerk of Court is directed to close the case.

    /s/ A. Richard Caputo
    A. Richard Caputo
    United States District Judge